No. 25-4458

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

ROBERTO VERTHELYI,
*on behalf of himself and all others similarly situated,*

Plaintiff-Appellee,

v.

PENNYMAC MORTGAGE INVESTMENT TRUST;
PNMAC CAPITAL MANAGEMENT, LLC,

*Defendants-Appellants.*

*Interlocutory Appeal from the United States District Court
for the Central District of California,
No. 2:24-cv-05028-MWF-JC, Hon. Michael W. Fitzgerald*

_____

**OPENING BRIEF OF DEFENDANTS-APPELLANTS**

_____

STEVEN M. FARINA
MELISSA B. COLLINS
WILLIAMS & CONNOLLY LLP
 680 Maine Avenue, S.W.
 Washington, DC 20024
 (202) 434-5000
 sfarina@wc.com


*Counsel for Defendant-Appellant
PennyMac Mortgage Investment
Trust*

MATTHEW DONALD UMHOFER
JONAS P. MANN
UMHOFER, MITCHELL & KING
LLP
 767 South Alameda Street
 Suite 270
 Los Angeles, CA 90021
 (213) 394-7979
 matthew@umklaw.com

*Counsel for Defendants-
Appellants PennyMac Mortgage
Investment Trust and PNMAC
Capital Management, LLC*

## CORPORATE DISCLOSURE STATEMENT

PennyMac Mortgage Investment Trust, a Maryland real estate investment trust, is a publicly-traded entity listed on the New York Stock Exchange (NYSE: PMT). It has no parent company, and no publicly held corporation owns 10% or more of its common stock, other than any publicly-traded corporations who have independently reported their beneficial ownership on Schedule 13G with the United States Securities & Exchange Commission ("SEC"). On April 30, 2025, BlackRock, Inc. filed Amendment No. 5 to Schedule 13G with the SEC and disclosed that it had sole voting power over 14,071,043 PennyMac Mortgage Investment Trust common shares and sole dispositive power over 14,263,745 PennyMac Mortgage Investment Trust common shares as of March 31, 2025.

PNMAC Capital Management, LLC is indirectly owned by PennyMac Financial Services, Inc., a publicly-traded company (NYSE: PFSI). PNMAC Capital Management, LLC is not aware of any publicly-traded corporation that owns more than 10% of PennyMac Financial Services, Inc.'s stock.

Date: October 30, 2025

/s/ Matthew Donald Umhofer
MATTHEW DONALD UMHOFER

i

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ......................................................4

ISSUES PRESENTED ..........................................................................4

STATUTORY ADDENDUM ..................................................................5

STATEMENT OF THE CASE ..............................................................5

    A.    Statutory Background .................................................5

    B.    Factual Background ....................................................9

    C.    Procedural History ...................................................12

SUMMARY OF ARGUMENT .............................................................15

STANDARD OF REVEW ...................................................................20

ARGUMENT ........................................................................................20

I.    Plaintiff Fails To State a Claim Because PennyMac Complied with the LIBOR Act. ................................................................................20

    A.    PennyMac's Actions Complied with the LIBOR Act and Thus Were Not "Unlawful" Under the UCL. ...............................21

        1.    The LIBOR Act Directs Parties How To Interpret and Apply LIBOR Contracts. ..................................................22

        2.    After Applying the LIBOR Act, PennyMac's Articles Provide for Dividends at the Initial Rates..........................25

        3.    Under the Act's Plain Text, PennyMac's Initial Dividend Rates Are "Benchmark Replacements." ..................28

        4.    The District Court Erred in Relying Exclusively on Legislative History and Perceived Statutory Purpose. ..........37

    B.    Because Defendants Complied with the LIBOR Act, Plaintiff Cannot State a Claim Under the UCL's "Unfair" Prong. ..........44

II.    Maryland Law Governs, So Plaintiff Cannot State a Claim Under California's Unfair Competition Law..........................................48

ii

A.    The Choice-of-Law Provision Applies to this Dispute and Is Presumptively Enforceable. ...........................................................50

B.    The District Court Erred in Concluding that the Application of Maryland Law Would Conflict with a Fundamental California Policy. ...........................................................................................52

   1.    Maryland and California Law Do Not Conflict Regarding Remedies Available to Plaintiff. ...................................................53

   2.    Even Assuming a Conflict Exists, Proceeding Under Maryland Law Would Not Contravene a "Fundamental" California Policy. ...........................................................................56

C.    The District Court Erred in Concluding that California Has a Materially Greater Interest than Maryland. ................................63

CONCLUSION.....................................................................................................68

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*ABF Cap. Corp., v. Osley*, 414 F.3d 1061 (9th Cir. 2005) ................................. 52

*Aceves v. Allstate Ins. Co.*, 68 F.3d 1160 (9th Cir. 1995) ................................ 20

*Advoc. Health Care Network v. Stapleton*, 581 U.S. 468 (2017) ...................... 40

*Alvarez v. Chevron Corp.*, 656 F.3d 925 (9th Cir. 2011) ................................ 47

*Arizona Edison Co. v. S. Sierras Power Co.*, 17 F.2d 739 (9th Cir. 1927) ....... 55

*Asahi Metal Indus. Co. v. Solano County*, 480 U.S. 102 (1987) ...................... 64

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................... 20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................ 20

*Brown v. Gardner*, 513 U.S. 115 (1994) ......................................................... 33

*Century 21 Real Estate v. All Prof'l Realty, Inc.*,
    600 F. App'x 502 (9th Cir. 2015) .............................................................. 48

*Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010) ........................................... 46

*Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287 (9th Cir. 1997) ...................... 37

*Cir. City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) ..................................... 40

*Coneff v. AT & T Corp.*, 673 F.3d 1155 (9th Cir. 2012) ................................... 49

*Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204 (9th Cir. 2020) ............................ 45

*Duggan v. Commissioner*, 879 F.3d 1029 (9th Cir. 2018) ............................... 44

*Edgar v. MITE Corp.*, 457 U.S. 624 (1982) ..................................................... 66

*Encino Motorcars, LLC v. Navarro*, 584 U.S. 79 (2018) ................................. 33

*Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546 (2005) ............. 38

iv

Page

Federal Cases—continued:

*Fang v. CMB Exp. Infrastructure Inv. Grp. 48, LP*,
   773 F. Supp. 3d 963 (E.D. Cal. 2025) ..............................................63

*Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019).......................38

*Galilea, LLC v. AGCS Marine Ins. Co.*, 879 F.3d 1052 (9th Cir. 2018) ..........65

*Gen. Signal Corp. v. MCI Telecommunications Corp.*,
   66 F.3d 1500 (9th Cir. 1995)...............................................................58

*Great Lakes Ins. SE v. Raiders Retreat Realty Co., LLC*,
   601 U.S. 65 (2024)...............................................................................60

*Hatfield v. Halifax PLC*, 564 F.3d 1177 (9th Cir. 2009)...................................49

*Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076 (9th Cir. 1999) ..........41, 42

*Hodges v. Comcast Cable Comm'ns, LLC*,
   21 F.4th 535 (9th Cir. 2021) ..........................................................57, 58

*In re Cardelucci*, 285 F.3d 1231 (9th Cir. 2002) ............................................33

*Kim v. Cedar Realty Tr., Inc.*, 116 F.4th 252 (4th Cir. 2024) ...........................54

*Kisor v. Wilkie*, 588 U.S. 558 (2019) ...............................................................34

*Knight v. Commissioner*, 552 U.S. 181 (2008)..................................................32

*Krasner v. Cedar Realty Tr., Inc.*, 86 F.4th 522 (2d Cir. 2023).......................51

*Kucana v. Holder*, 558 U.S. 233 (2010)...........................................................43

*Levitt v. Yelp! Inc.*, 765 F.3d 1123 (9th Cir. 2014)...........................................21

*Loughrin v. United States*, 573 U.S. 351 (2014)...............................................31

*Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014) ...............................................32

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) .................64, 66

v

Page

Federal Cases—continued:

*Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012) ........................................38

*Mortensen v. Bresnan Commc'ns, LLC*, 722 F.3d 1151 (9th Cir. 2013) ..........20

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
   477 F.3d 668 (9th Cir. 2007) ..............................................................................39

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ..............................................................................64

*Pakootas v. Teck Cominco Metals, LTD.*, 830 F.3d 975 (9th Cir. 2016) .........20

*Pit River Tribe v. Bureau of Land Mgmt.*, 939 F.3d 962 (9th Cir. 2019) .......34

*Pro Water Sols., Inc. v. Angie's List, Inc.*,
   2021 WL 124496 (C.D. Cal. Jan. 13, 2021) .....................................................49

*Rajaram v. Meta Platforms, Inc.*, 105 F.4th 1179 (9th Cir. 2024) ..................38

*Regan v. Wald*, 468 U.S. 222 (1984) ..................................................................40

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ..................................................32

*Richards v. Lloyd's of London*, 135 F.3d 1289 (9th Cir. 1998) ........................59

*Roth v. Foris Ventures, LLC*, 86 F.4th 832 (9th Cir. 2023) .........................4, 20

*Rotkiske v. Klemm*, 589 U.S. 8 (2019) ...............................................................20

*Travelers Indem. Co. v. MTS Transp., LLC*,
   2012 WL 3929810 (W.D. Pa. Sept. 7, 2012) ...................................................65

*Trim v. Reward Zone USA LLC*, 76 F.4th 1157 (9th Cir. 2023) .....................38

*United States v. Lemus*, 93 F.4th 1255 (9th Cir. 2024) ...................................31

*United States v. Tan*, 16 F.4th 1346 (9th Cir. 2021) ........................................40

*United States v. Vance Crooked Arm*, 788 F.3d 1065 (9th Cir. 2015) ..............33

vi

Page

Federal Cases—continued:

*United States v. Woods*, 571 U.S. 31 (2013) .................................................32, 33

*Vasquez v. Rackauckas*, 734 F.3d 1025 (9th Cir. 2013) .....................................55

*Waggoner v. Snow, Becker, Kroll, Klaris & Krauss*,
    991 F.2d 1501 (9th Cir. 1993) ........................................................................58

*Walter v. Hughes Communications*,
    682 F. Supp. 2d 1031 (N.D. Cal. 2010) .....................................................62, 63

*Webb v. Smart Documents Solutions, LLC*,
    499 F.3d 1078 (9th Cir. 2007) ....................................................................44, 47

*Yei A. Sun v. Advanced China Healthcare, Inc.*,
    901 F.3d 1081 (9th Cir. 2018) ........................................................................59

*Yiren Huang v. FutureWei Techs., Inc.*,
    2018 WL 10593813 (N.D. Cal. Sept. 24, 2018) .............................................60

## STATE CASES

*26 Cap. Acquisition Corp. v. Tiger Resort Asia Ltd.*,
    309 A.3d 434 (Del. Ch. 2023) .........................................................................55

*Blue Chip Cap. Fund II Ltd. P'ship v. Tubergen*,
    906 A.2d 827 (Del. Ch. 2006) .........................................................................54

*Byars v. SCME Mortg. Bankers, Inc.*,
    135 Cal. Rptr. 2d 796 (Cal. Ct. App. 2003) ...................................................47

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel.*,
    973 P.2d 527 (Cal. 1999) .................................................................................47

*CQL Original Prods., Inc. v. Nat'l Hockey League Players' Assn.*,
    46 Cal. Rptr. 2d 412 (Cal. Ct. App. 1995) .....................................................60

*Cruz v. PacifiCare Health Sys., Inc.*, 66 P.3d 1157 (Cal. 2003) ........................56

Page

State Cases—continued:

*Discover Bank v. Superior Ct.*,
36 Cal. Rptr. 3d 456 (Cal. Ct. App. 2005) ...................................................64, 66

*Dynacorp Ltd. v. Aramtel Ltd.*, 56 A.3d 631 (Md. Ct. Spec. App. 2012).........65

*EpicentRx, Inc. v. Superior Ct.*, 572 P.3d 1 (Cal. 2025) ..........................*passim*

*Fed. Ins. Co. v. Allstate Ins. Co.*, 341 A.2d 399 (Md. 1975) ...............................37

*Green v. Ralee Eng'g Co.*, 960 P.2d 1046 (Cal. 1998) ........................................59

*Hambrecht & Quist Venture Partners v. Am. Med. Internat., Inc.*,
46 Cal. Rptr. 2d 33 (Cal. Ct. App. 1995) ...........................................................52

*Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89 (Md. 2021) ......................50

*McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017).......................................56, 57

*Namleb Corp. v. Garrett*, 814 A.2d 585 (Md. Ct. Spec. App. 2002) .................55

*Nat'l Ins. Underwriters v. Carter*, 551 P.2d 362 (Cal. 1976) ...........................37

*Nedlloyd Lines B.V. v. Superior Ct.*, 834 P.2d 1148 (Cal. 1992) ............*passim*

*Net2Phone, Inc. v. Superior Ct.*,
135 Cal. Rptr. 2d 149 (Cal. Ct. App. 2003) .....................................................60

*Olinick v. BMG Ent.*, 42 Cal. Rptr. 3d 268 (Cal. Ct. App. 2006).....................60

*Poling v. CapLease, Inc.*,
2016 WL 1749803 (Md. Ct. Spec. App. May 3, 2016) .............................54, 55

*Rothschild Int'l Corp. v. Liggett Grp. Inc.*, 474 A.2d 133 (Del. 1984).............54

*Washington Mut. Bank, FA v. Superior Ct.*,
15 P.3d 1071 (Cal. 2001) .........................................................................*passim*

Page

## STATUTES, REGULATIONS, AND RULES

12 U.S.C.
  § 5801 ................................................................................. *passim*
  § 5802 ................................................................................. *passim*
  § 5803 ................................................................................. *passim*
  § 5804 ........................................................................................25
  § 5806 ...................................................................................7, 46
  § 5807 ..........................................................................................6

28 U.S.C.
  § 1292 ...................................................................................4, 14
  § 1332 ..........................................................................................4

Fed. R. Civ. P. 12 ...........................................................................20

Cir. R. 28-2.7 ...................................................................................5

12 C.F.R. § 253.3 .........................................................................6, 8

Regulations Implementing the Adjustable Interest Rate (LIBOR) Act,
  88 Fed. Reg. 5204 (Jan. 26, 2023) (codified at 12 C.F.R. Part 253)
  5205 ............................................................................................6
  5209 ..........................................................................................25

California Consumer Legal Remedies Act ("CLRA") .....................62

California Unfair Competition Law ("UCL"),
  Cal. Bus. & Prof. Code § 17200, *et seq* ................................. *passim*

Maryland Consumer Protection Act ("MCPA"),
  Md. Code Ann., Com. Law §§ 13–101, *et seq* ...................52, 53, 62

Md. Code Ann., Corps. & Ass'ns
  § 8-101 ...............................................................................9, 50, 64
  § 8-102 ........................................................................................52
  § 8-201 ...................................................................................9, 52
  § 8-203 ...................................................................................9, 52

Page

## OTHER AUTHORITIES

Alt. Ref. Rates Comm., Proposed Legislative Solution to Minimize
   Legal Uncertainty and Adverse Economic Impact Associated with
   LIBOR Transition (2020), https://tinyurl.com/2bkupd38 ...........................36

H.R. Rep. No. 117-206 (2021) ................................................................42

Jason S. Oh, et al., *A Theory of the Reit*, 133 YALE L.J. 755 (2024) ...............65

Specific, Black's Law Dictionary (11th ed. 2019) ...............................................29

11 Williston on Contracts § 32:10 (4th ed. 2012) ...............................................37

# INTRODUCTION

Plaintiff represents a putative class of PennyMac preferred shareholders, all of whom agreed to the contractual terms governing their shares when they purchased those shares. The agreed-upon terms set out how PennyMac calculates the rate at which it issues dividends, including how to determine the dividend rate in the absence of the original rate to which the dividends were tied, the London Inter-Bank Offered Rate ("LIBOR"). After LIBOR was discontinued, PennyMac applied those terms consistent with the LIBOR Act, a federal statute enacted to address the scores of commercial contracts that relied on LIBOR. The LIBOR Act fills the gap in contracts that do not provide for a workable fallback by directing that such contracts transition to a different rate. But the Act also recognizes that other contracts—like PennyMac's—already contain specific fallbacks that do not rely on LIBOR. Those contracts, the Act directs, continue to operate according to their terms. That is just what PennyMac has done: applied the LIBOR Act to the shares' governing documents and issued dividends at the rate called for in the contract.

Plaintiff complains that PennyMac's rates are not consistent with his view of the purpose of the Act, and he contends that PennyMac therefore is

violating California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*. He argues that PennyMac's rates do not qualify as applicable fallback "benchmark replacements" under the Act, simply because they are fixed, not floating, rates. But the statute makes no such distinction, and Plaintiff's reading would stretch the LIBOR Act's reach far beyond its terms to override *any* agreement by contracting parties to fall back to a fixed rate in the absence of LIBOR.

The district court improperly relied on legislative history rather than a close reading of the statutory text to find Plaintiff's allegations sufficient to state a claim. Even so, it recognized the importance of this issue of first impression and certified its order for interlocutory appeal. For good reason: Plaintiff's position defies the statutory language and is inconsistent with Congress's intent—stated within the statute itself—to allow contracts that provide non-LIBOR fallbacks to operate according to their terms. This Court should reject Plaintiff's position, and enforce the plain text of the Act and the contractual terms the parties agreed to in the shares' governing documents.

Plaintiff's claim fails for another, independent reason: the Maryland choice-of-law provision in PennyMac's charter document, the Declaration of Trust, compels the application of Maryland law. This forecloses a claim under

2

California's UCL. The district court agreed that PennyMac's Maryland choice-of-law provision was applicable, but declined to enforce it on the ground that Maryland law conflicts with a fundamental policy embodied in the UCL regarding available remedies and that California has a materially greater interest in having its law applied to this dispute. Recognizing the question was a "difficult" one, 1-ER-12, the district court also found it appropriate for interlocutory review.

Again, this Court should reverse. The district court was incorrect that a potential difference in the remedies available here rises to a conflict on a matter of fundamental policy, and compounded that error by improperly focusing on a comparison between consumer protections statutes, without regard for other protection offered shareholders under Maryland law. Further, California does not have greater interest—let alone a materially greater one—in applying its law to a dispute about how a Maryland entity calculates dividends under its Maryland governing documents.

This Court should reverse and remand with instructions to grant Defendants' motions to dismiss the complaint.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332(d) because the putative class meets the Class Action Fairness Act's minimal-diversity requirement, and the complaint alleges claims that in aggregate exceed $5 million. 2-ER-304.

This Court has jurisdiction under 28 U.S.C. § 1292(b). The district court denied Defendants' motions to dismiss in an order entered on February 26, 2025. 1-ER-2. On May 5, 2025, the district court certified its order for interlocutory appeal. 2-ER-36. On May 15, 2025, Defendants timely petitioned this Court for permission to appeal. No. 25-3140 (9th Cir.), Dkt. 1. On July 17, 2025, the Court granted Defendants' petition. 3-ER-324. This Court's jurisdiction under § 1292(b) "permits [the Court] to address any issue fairly included within the certified order because it is the order that is appealable, and not the controlling question identified by the district court." *Roth v. Foris Ventures, LLC*, 86 F.4th 832, 836 (9th Cir. 2023) (cleaned up).

## ISSUES PRESENTED

1.    Whether Plaintiff's complaint fails to state a claim because PennyMac's fallback dividend rates each are a qualifying "benchmark

4

replacement" under the LIBOR Act, 12 U.S.C. § 5802(3), such that the use of those rates complies with the Act.

2.      Whether Plaintiff's complaint fails to state a claim because the choice-of-law provision in PennyMac's operative charter document (the "Declaration of Trust") compels the application of Maryland law.

## STATUTORY ADDENDUM

An addendum with the pertinent statutory provisions is included at the end of this brief.  *See* Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A.      Statutory Background

1.  For decades, LIBOR was a cornerstone of global financial markets, representing the average interest rate at which major banks could borrow funds from one another in the London interbank market.  Among other things, LIBOR served as a key benchmark for interest rates across various financial products, including mortgages, corporate loans, and financial contracts like derivatives.  *See* 2-ER-299.  In late 2017, however, the LIBOR panel banks announced that they would discontinue LIBOR's publication a few years later. 2-ER-300.  Ultimately, the US-Dollar LIBOR panel ceased publishing LIBOR in June 2023.  *Id.*

5

For some, LIBOR's cessation created a problem. Although new contracts could transition away from LIBOR by benchmarking to a different rate, many outstanding financial instruments relied on LIBOR and some, by their own terms, would not function after LIBOR was discontinued. *See* Regulations Implementing the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg. 5204, 5205 (Jan. 26, 2023) (codified at 12 C.F.R. Part 253).[1] These financial instruments were held by countless counterparties around the world, precluding as a practical matter any renegotiation of terms.

2. To address these otherwise non-functioning contracts, Congress passed and the President signed the Adjustable Interest Rate (LIBOR) Act ("LIBOR Act" or "Act") in March 2022. *See* 12 U.S.C. §§ 5801–5807. The Act sought to create a "clear and uniform" "nationwide" process to replace LIBOR in contracts that did not otherwise provide for "the use of a clearly defined or practicable replacement benchmark rate." *Id.* §§ 5801(b)(1), 5802(6), 5803. At the same time, the Act explicitly sought "to allow existing contracts that reference LIBOR but provide for the use of a clearly defined and practicable

---

[1] Congress delegated regulatory responsibilities to the Federal Reserve Board, 12 U.S.C. § 5807, which published its final rule in 2023, *see* 12 C.F.R. Part 253. Although the implementing regulations provide more detail on the Board-selected replacement rate when one is required, they largely mirror the Act in terms of determining whether a switch to that rate is mandatory. *Compare, e.g.*, 12 U.S.C. § 5803(a)–(b) *with* 12 C.F.R. § 253.3(a).

6

replacement rate, *to operate according to their terms*." *Id.* § 5801(b)(3) (emphasis added). In line with these goals, the LIBOR Act also expressly preempts state law "relating to the selection and use of a benchmark replacement" rate. *Id.* § 5806(1).

The Act thus serves as a gap-filler for certain contracts—namely, contracts that fail to specify a clear replacement rate that would work without LIBOR—by requiring those instruments to transition to a rate based on the Secured Overnight Financing Rate ("SOFR"). *Id.* §§ 5803(a)–(b), 5802(6). To that end, it calls for parties to evaluate contractual "fallback provisions," which are "terms in a LIBOR contract for determining a benchmark replacement . . . ." *Id.* § 5802(11). A "benchmark replacement," in turn, is defined broadly:

> The term "benchmark replacement" means a benchmark, or an interest rate or dividend rate (which may or may not be based in whole or in part on a prior setting of LIBOR), to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a temporary, permanent, or indefinite basis, under or with respect to a LIBOR contract.

*Id.* § 5802(3).

Specifically, on the first business day after June 30, 2023, parties were to "disregard[]" "reference[s]" in contracts' "fallback provisions" to (1) "benchmark replacement[s]" based on LIBOR, such as those that require use of the last-published LIBOR value, and to (2) requirements that parties "poll"

7

banks, *i.e.*, ask banks to quote their estimate of LIBOR to the parties directly. *Id.* §§ 5803(b), 5802(17). If, after disregarding any such references, an instrument fails to include another "specific benchmark replacement" or a "determining person,"[2] the LIBOR Act directs the instrument to switch to the Federal Reserve Board-selected, SOFR-based benchmark replacement rate. *Id.* § 5803(a).

But contracts that *do* contain a "specific benchmark replacement" after disregarding replacement rates based on LIBOR or polling—and therefore are workable by their own terms even after LIBOR's cessation—remain in effect and are not directed to switch to the SOFR-based rate:

> Nothing in this chapter may be construed to alter or impair . . . (2) except as provided in subsection (b) [described above], any LIBOR contract that contains fallback provisions that identify a benchmark replacement that is not based in any way on any LIBOR value….

*Id.* § 5803(f)(2); *see also* 12 C.F.R. § 253.3(b)(2).

---

[2] A "determining person" is a person who has the authority to determine an appropriate benchmark replacement. 12 U.S.C. § 5802(10). PennyMac's Articles do not reference a "determining person," so this provision is not at issue. *See* 2-ER-238 (Series A); 2-ER-258–59 (Series B*)*.

### B. Factual Background

1. PennyMac Mortgage Investment Trust ("PennyMac") is a real-estate investment trust ("REIT") organized under Maryland law. 2-ER-305. Its operations are managed by PNMAC Capital Management, LLC ("PCM"), a Delaware limited liability company. 2-ER-305. PennyMac has two classes of stock: common and preferred. 2-ER-306.

At issue here are the terms of two series of PennyMac's preferred stock: the Series A and Series B Fixed-to-Floating Preferred Shares ("Preferred Shares"), both of which were issued in 2017. *See* 2-ER-233–52 (Series A); 2-ER-253–271 (Series B). PennyMac issued each series of shares pursuant to Articles Supplementary, 2-ER-298–99, which are Maryland corporate documents that authorize a REIT to issue additional shares and are incorporated into the REIT's charter document, the Declaration of Trust, *see* Md. Code Ann., Corps. & Ass'ns §§ 8-101(b), 8-201, 8-203(b). PennyMac's Declaration of Trust expressly provides that the parties' rights and the effects of its provisions are "subject to and construed according to" Maryland law:

> The Declaration of Trust is executed by the undersigned Trustees and delivered in the State of Maryland with reference to the laws thereof, and *the rights of all parties and the validity, construction and effect of every provision hereof shall be subject to and construed according to the laws of the State of Maryland* without regard to conflicts of laws provisions thereof.

2-ER-293 (emphasis added).

The Articles provide that purchasers of the Preferred Shares ("Preferred Shareholders") receive quarterly dividends at a fixed rate for the first several years after the shares were issued. 2-ER-306–07; 2-ER-236 (Series A); 2-ER-256 (Series B). After a certain date—March 15, 2024 for the Series A and June 15, 2024 for the Series B—the dividend rate is then set according to further contractual terms, which provide that Preferred Shareholders are to be paid dividends at a rate based off the contractually-defined term "Three-Month LIBOR." 2-ER-306–07; 2-ER-236, 238 (Series A); 2-ER-256, 258–59 (Series B). "Three-Month LIBOR," in turn, provides contingencies for how the dividend should be calculated in a variety of circumstances. 2-ER-238 (Series A); 2-ER-258–59 (Series B).

Per the Articles' terms, Three-Month LIBOR is set first at a LIBOR rate appearing on a Reuters page (the "Screen Rate"). *Id.* If the Screen Rate is unavailable, a series of fallbacks kicks in:

- First, Three-Month LIBOR will equal the average interest rate quoted to PennyMac from individual banks on the London or New York City markets (the "Polling Rate"). *Id.*

10

- Second, if the Polling Rate is unavailable, then "the Three-Month LIBOR for the applicable Dividend Period will be the same as for the immediately preceding Dividend Period." *Id.*

- Finally, "if there was no such Dividend Period"—that is, there was no immediately preceding Dividend Period utilizing a Three-Month LIBOR rate—then the Articles set the dividend rate outright: "*the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period.*" *Id.* (emphasis added).

The Articles do not limit the use of these fallback provisions to any particular circumstances; by their terms, they are applicable whenever the Screen Rate is unavailable.

2. In June 2023—after PennyMac issued the Preferred Shares, but before the dates on which the dividend rates were set to float—the applicable LIBOR rate was discontinued. 2-ER-300; *see supra* p. 5. PennyMac therefore turned to the LIBOR Act's statutory requirements to determine the dividend rates owed on the Preferred Shares. After disregarding the LIBOR-and polling-based provisions as directed by the Act, the fallback provisions in each of the Articles provide that dividends be issued at the dividend rate in effect

11

during the prior period—here, the initial rates for each offering. *See infra* pp. 25-27. Accordingly, in August 2023, PennyMac informed its shareholders that it would continue issuing the dividends for its Preferred Shares at the initial rates, and it has done so. 2-ER-302, 312.

## C. Procedural History

In June 2024, Plaintiff Roberto Verthelyi (a New Jersey resident) brought this putative class action against Defendants, asserting a single claim under California's UCL. *See* 2-ER-297–321. Proceeding under the UCL's "unlawful" and "unfair" prongs, Plaintiff alleges that Defendants violated the LIBOR Act by continuing to issue dividends for the Preferred Shares at the initial rates, rather than implementing a floating-dividend rate based on SOFR. 2-ER-316–19. Plaintiff contends that PennyMac's dividend rates do not qualify as "benchmark replacement[s]" under the Act, because, in Plaintiff's view, a "benchmark replacement" may not be a fixed rate. 2-ER-217–220.

Defendants moved to dismiss the complaint for failure to state a claim. *See* C.D. Cal. Dkt. Nos. 34–35; 3-ER-330. Defendants argued that a fixed rate fallback like PennyMac's initial rate fits within the statutory definition of a "benchmark replacement," and therefore is left unaltered by the LIBOR Act

12

and was properly given effect. Because PennyMac's conduct complies with the LIBOR Act, Plaintiff cannot state a claim that the conduct violates the UCL. Defendants also argued that, in any event, Plaintiff cannot state a claim under California's UCL because the choice-of-law provision in the Declaration of Trust compels the application of Maryland law.

The district court denied the motions. On the LIBOR Act issue, the court determined that the statutory term "benchmark replacement," 12 U.S.C. § 5802(3), was ambiguous and therefore consulted the legislative history and perceived statutory purpose. 1-ER-15–18. Based on this legislative history, it observed that a central purpose of the Act "may have been to prevent floating-rate instruments from unfairly converting into fixed-rate instruments," and reasoned that "accepting PennyMac's interpretation" of the Act would be at odds with that purpose because it resulted in a fixed rate. 1-ER-17. Further, because Plaintiff had alleged that the parties never contemplated or agreed to a permanent fixed rate, "allowing PennyMac to issue dividends according to its interpretation [of the Articles] would not," in the district court's view, "support the Act's apparent goal of leaving intact the contractual terms the parties had agreed to." 1-ER-18 (internal quotation marks omitted). Accordingly, the court concluded that Plaintiff "sufficiently

alleged that PennyMac violated the LIBOR Act when it issued dividends at a fixed rate." *Id.*

On the choice-of-law issue, the district court agreed with Defendants that the Articles "are, by operation of law, part of PennyMac's Declaration of Trust, and therefore are subject to the Declaration of Trust's choice of law provision." 1-ER-9–10. It also concluded that Plaintiff's allegations fall within the scope of the choice-of-law provision, and that the chosen state (Maryland) has a substantial relationship to the parties and their transactions. 1-ER-11–12. While recognizing it to be a "difficult issue," 1-ER-12, the court nevertheless refused to enforce the provision. According to the district court, applying Maryland law "conflicts with a fundamental policy of California's consumer protection laws" in terms of the remedies available, and California has a "greater interest" than Maryland in having its law applied to this dispute because PennyMac is based in California. 1-ER-13–14.

Defendants thereafter sought certification of the court's order under Section 1292(b). Recognizing that reasonable jurists could disagree with its interpretation of the LIBOR Act, 2-ER-43, and again commenting on the "difficult[y]" of the choice-of-law question, 2-ER-40, the district court granted that motion and stayed proceedings pending a decision by this Court. 2-ER-

44. As the district court recognized, "[s]hould the Ninth Circuit agree with Defendants' interpretation of the Act, there would be no question that [Defendants] complied with the LIBOR Act." 2-ER-42. Further, if the Court held "that the [choice of law] provision was enforceable[,] Plaintiff's only claim would be dismissed." 2-ER-39. Defendants then petitioned this Court for permission to appeal the district court's dismissal order, and the Court granted review. *See* supra p. 4. This appeal followed.

## SUMMARY OF ARGUMENT

For two independent reasons, Plaintiff cannot state a claim under California's UCL, and the district court's decision to the contrary should be reversed.

I. First, the district court erred when it held that Plaintiff "sufficiently alleged that PennyMac violated the LIBOR Act when it issued dividends at a fixed rate." 1-ER-18. Under the LIBOR Act, contracts with "fallback provisions" containing a "benchmark replacement" not based on LIBOR continue operating according to their terms. 12 U.S.C. § 5803(f)(2). The Act defines "benchmark replacement" broadly to include any (1) "benchmark" or (2) "interest rate" or (3) "dividend rate." *Id.* § 5802(3). The definition draws no distinction between fixed and variable rates.

15

Here, after disregarding any LIBOR- and polling-based provisions as the LIBOR Act and its implementing regulations require, the "fallback provisions" in PennyMac's Articles Supplementary provide that dividends be issued to Preferred Shareholders at the initial, fixed rates. These initial rates are defined "dividend rate[s]" that do not rely on LIBOR in any way and thus are exactly the type of "benchmark replacement" rates that the LIBOR Act preserves. *See id.* § 5803(f)(2). The Articles therefore continue to operate according to their terms and PennyMac is not required to transition to a SOFR-based rate.

Plaintiff seeks to override this straightforward interpretation of the Act and the Articles by improperly narrowing the statutory definition of a "benchmark replacement" to exclude any and all fixed rates. Because PennyMac's fallback rates are fixed rates, Plaintiff contends, they are not qualifying "benchmark replacements." But Plaintiff's reading defies well-established principles of statutory interpretation—indeed, Plaintiff goes so far as to admit he is asking the court to "remov[e]" an entire clause from the statute. 2-ER-219.

The district court erred in finding Plaintiff's reading of the Act "plausible," and therefore that the statute has "some level [of] ambiguity." 1-

16

ER-17. This Court's analysis should begin and end with the text, interpreted according to black letter principles of statutory interpretation, which makes plain: contracts like PennyMac's with fallback provisions containing a benchmark replacement not based on LIBOR—including the fixed dividend rates here—are preserved and operate according to their terms.

The district court then compounded its error by relying upon Plaintiff's cherry-picked excerpts of legislative history to assess whether "PennyMac's actions comport[ed] with either the purpose or overall structure of the LIBOR Act," 1-ER-17, without making any effort to use that legislative history to actually resolve the purported ambiguity in the statute's text. While the legislative history should not be considered given the clarity of the statutory language, a full reading of the legislative history does not support Plaintiff's interpretation of the text, under which a "benchmark replacement" could *never* be a fixed rate—and instead supports Defendants', as Congress expressly elected to respect the diversity of fallback mechanisms parties agreed upon before LIBOR's discontinuation.

This statutory interpretation question is the heart of the matter: if this Court "agree[s] with Defendants' interpretation of the Act, there [is] no question that [Defendants] complied with the LIBOR Act." 2-ER-42. Because

17

PennyMac complied with the LIBOR Act, Plaintiff cannot state a claim under the UCL's "unlawful" prong. And because his theory under the "unfair" prong rests entirely on the same alleged LIBOR Act violation, that claim fails too. The UCL's safe harbor immunizes practices that are expressly approved by the government, and the LIBOR Act preempts any state law that would impose a different rate than that directed by the Act. Accordingly, Plaintiff's complaint fails to state a claim and must be dismissed.

II. Second, the district court erred when it refused to enforce the choice-of-law provision in PennyMac's Declaration of Trust. Choice-of-law provisions generally are enforced under California law unless the plaintiff can show both that the chosen law is contrary to a fundamental policy of California and that California has a materially greater interest in determination of the issue. Here, the district court agreed with Defendants that the choice of law provision is applicable. But it nonetheless did not enforce it because Maryland's consumer-protection statute, unlike the UCL, does not authorize consumer plaintiffs to seek injunctive relief.

The district court's reasoning fails at every turn. First, there is no true conflict in the remedies available to Plaintiff, who can effectively seek injunctive relief to enforce his contract with PennyMac under Maryland law.

18

Second, to the extent the UCL embodies a fundamental policy of California, it does so only insofar as a plaintiff seeks *public* injunctive relief—that is, relief for the benefit of the general public. No such relief is at issue here, where this Plaintiff pursues remedies that would benefit only himself and other similarly-situated shareholders who entered into a contractual relationship with PennyMac. Third, and relatedly, the UCL does not reflect a fundamental policy with respect to purely private injunctive relief, so enforcing PennyMac's choice-of-law provision as to Plaintiff does not contravene any fundamental California policy.

The district court also erred by holding that California has a "materially greater interest" than Maryland in having its law applied in this dispute. PennyMac is organized under the laws of Maryland and the Articles themselves are creatures of Maryland law. Meanwhile, Plaintiff is a resident of New Jersey who does not allege that he purchased PennyMac shares or was in any way harmed in California. Under these circumstances, California has no materially greater interest than Maryland in applying its law to resolve a dispute about how a Maryland entity should calculate dividends under its Maryland governing documents. The district court's refusal to enforce the choice-of-law provision was therefore error, and this Court should reverse.

19

## STANDARD OF REVEW

This Court reviews de novo a district court's denial of a motion to dismiss under Rule 12(b)(6). *See Roth*, 86 F.4th at 836. To survive a Rule 12(b)(6) motion, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although well-pleaded allegations are accepted as true, "legal conclusions" and "conclusory statements" must be disregarded. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009).

This Court also reviews de novo the district court's "interpretation of a statute." *Pakootas v. Teck Cominco Metals, LTD.*, 830 F.3d 975, 980 (9th Cir. 2016). Likewise, whether the district court erred in concluding that California law applies is a question of law subject to de novo review. *See Mortensen v. Bresnan Commc'ns, LLC*, 722 F.3d 1151, 1157 (9th Cir. 2013) (citing *Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1167 (9th Cir. 1995)).

## ARGUMENT

### I. Plaintiff Fails To State a Claim Because PennyMac Complied with the LIBOR Act.

The LIBOR Act's plain language resolves this case. Statutory interpretation begins with the text and, "[i]f the words of a statute are unambiguous, this first step of the interpretive inquiry is [the] last." *Rotkiske*

20

*v. Klemm*, 589 U.S. 8, 13 (2019). The relevant statutory provisions here are clear: PennyMac's initial dividend rates qualify as "benchmark replacements," and the LIBOR Act does not do away with them. The district court erred in concluding that Plaintiff sufficiently alleged a violation of the LIBOR Act, and without a violation of the LIBOR Act, Plaintiff fails to state a claim under the UCL.

### A. PennyMac's Actions Complied with the LIBOR Act and Thus Were Not "Unlawful" Under the UCL.

The UCL's "unlawful" prong essentially provides a cause of action for violations of other laws. *See Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1130 (9th Cir. 2014). Plaintiff invokes that provision here, arguing that the LIBOR Act requires PennyMac to implement a floating dividend rate based on SOFR, and that PennyMac violated the Act by continuing to issue dividends at its initial rates. This is incorrect.

The statute is clear, and Plaintiff does not appear to dispute, that "benchmark replacements" that are not based on LIBOR are to be given effect, and contracts containing such rates need not switch to SOFR-based rates. Further, PennyMac's Articles Supplementary are clear, and Plaintiff does not appear to dispute, that after disregarding certain provisions as directed by the LIBOR Act, the Articles call for dividends to be issued at the

21

initial dividend rates. *See* 2-ER-42 ("The parties do not disagree about the text of the Articles Supplementary, the fallback provisions contained therein, or the text of the LIBOR Act.").

Where the parties disagree, and the primary issue to be resolved by this Court, is whether PennyMac's initial dividend rates constitute "benchmark replacement" rates within the meaning of the statute. A plain reading of the statutory text, interpreted according to well-established principles and as applied to the Articles, confirms that the answer is yes: PennyMac's initial dividend rates *are* "benchmark replacements," not based on LIBOR, and issuing dividends at those rates complies with the LIBOR Act.

### 1. The LIBOR Act Directs Parties How To Interpret and Apply LIBOR Contracts.

The statutory provisions governing which contracts must transition to the Board-selected, SOFR-based rate are set out at 12 U.S.C. § 5803(a)–(b). Subsection (a) provides:

> On the LIBOR replacement date, the Board-selected benchmark replacement shall be the benchmark replacement for any LIBOR contract that, after giving effect to subsection (b)—
>
> (1)    contains no fallback provisions; or
>
> (2)    contains fallback provisions that identify neither—
>
>> (A) a specific benchmark replacement; nor

22

(B) a determining person.

12 U.S.C. § 5803(a). Subsection (b) further provides that:

> On the LIBOR replacement date, any reference in the fallback provisions of a LIBOR contract to—
>
> > (1) a benchmark replacement that is based in any way on any LIBOR value . . . ; or
> >
> > (2) a requirement that a person (other than a benchmark administrator) conduct a poll, survey, or inquiries for quotes or information concerning interbank lending or deposit rates;
>
> shall be disregarded as if not included in the fallback provisions of such LIBOR contract and shall be deemed null and void and without any force or effect.

*Id.* § 5803(b).

Reading these two provisions together directs a party as follows: First, evaluate the contract's "fallback provisions"—that is, the "terms in a LIBOR contract for determining a benchmark replacement" if LIBOR is unavailable. *Id.* § 5802(11). Disregard any language within the fallback provisions that relies on LIBOR or requires polling. *Id.* § 5803(b). Second, after disregarding those references, evaluate any remaining fallback provisions. Only if (1) there are no such fallback provisions, or (2) the remaining fallback provisions do not identify either a "specific benchmark replacement" or a "determining person,"

23

then the LIBOR Act directs that the contract apply the Board-selected, SOFR-based rate as a replacement for the LIBOR-based rate. *Id.* § 5803(a).

Other contracts—*i.e.*, contracts that, after striking any LIBOR- or polling-based references, still provide for either a "specific benchmark replacement" or a "determining person" fallback—are not required to transition to the SOFR-based rate, and instead continue to operate according to their terms (save for the stricken LIBOR- or polling-based provisions). *See id.* This is confirmed by the statute's savings clause: "Nothing in this chapter may be construed to alter or impair," after striking LIBOR-based and polling fallbacks, "any LIBOR contract that contains fallback provisions that identify a benchmark replacement that is not based in any way on any LIBOR value . . ." *Id.* § 5803(f)(2).

This commitment to preserving the non-LIBOR, non-polling provisions of contracts with workable LIBOR replacements is reflected across the statute, from the statutory purposes to its safe harbor section. Through the LIBOR Act, Congress sought to provide an avenue for unworkable contracts to navigate LIBOR cessation and preclude inevitable litigation that would arise when contracts could not operate according to their terms. *See id.* § 5801(b). Another key purpose was "to allow existing contracts that reference

24

LIBOR but provide for the use of a clearly defined and practicable replacement rate, to operate according to their terms." *Id.* § 5801(b)(3).

To that end, the Act explicitly states that "nothing in this chapter may be construed to create any negative inference or negative presumption regarding the validity or enforceability of—any benchmark replacement . . . that is not a Board-selected benchmark replacement." 12 U.S.C. § 5804(e)(1). The Federal Reserve Board's implementing regulations are more of the same, recognizing that they do not apply to "any LIBOR contract that contains fallback provisions that identify a benchmark replacement that is not based in any way on any LIBOR value . . . after disregarding any LIBOR- or poll-based fallback provisions." 88 Fed. Reg. at 5209.

The statute is plain: contracts without a qualifying "benchmark replacement" must switch to SOFR; but contracts that set out a "benchmark replacement" not based on LIBOR are given effect.

### 2. After Applying the LIBOR Act, PennyMac's Articles Provide for Dividends at the Initial Rates.

PennyMac applied these governing statutory provisions to its Articles to determine the dividend rates owed on the Preferred Shares after LIBOR's cessation.

When the original fixed terms expired—in March and June 2024, respectively, *see supra* p. 10—the fallback provisions kicked in, subject to the LIBOR Act's guidance on which provisions to disregard. Pursuant to the Act, PennyMac properly disregarded from the "Three-Month LIBOR" definition the provisions relying on LIBOR-as-published (the Screen Rate) and bank polling (the Polling Rate). *See* 12 U.S.C. 5803(b); *supra* pp. 7–8.

That left the fallback provisions' final sentence, which instructs: "the Three-Month LIBOR for the applicable Dividend Period will be the same as for the immediately preceding Dividend Period, or, if there was no such Dividend Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period." 2-ER-238; 2-ER-258–59. The first half of the sentence directs that the Three-Month LIBOR rate from the immediately preceding Dividend Period be employed. But if the immediately preceding Dividend Period did not use a Three-Month LIBOR rate—*i.e.*, "there was no such Dividend Period"—then the final clause applies: "the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period." *Id.*

Here, the relevant "immediately preceding Dividend Period[s]" were the periods before each series was set to float: (1) the period from December

26

15, 2023 to, but excluding, March 15, 2024 for the Series A shares; and (2) the period from March 15, 2024 to, but excluding, June 15, 2024 for the Series B shares. 2-ER-236, 239; 2-ER-256, 259. During that period, no Three-Month LIBOR rates were in effect; LIBOR was no longer being published, and the shares were still paying their fixed rates. *See* 2-ER-300; 2-ER-236; 2-ER-256. Because there was "no such Dividend Period" employing a Three-Month LIBOR rate, the Articles direct that "the dividend rate in effect for the immediately preceding Dividend Period" applies: the initial rate for each series.

The district court agreed, recognizing that the LIBOR Act "leaves operable only" the "final clause" in Section 4(g) of the Articles, which "directs the issuance of dividends" at the "dividend rate in effect" for the prior period. 1-ER-17. And Plaintiff agrees that "[t]he final clause at the end of the waterfall in Section 4(g) [of the Articles] points to a fixed rate." 2-ER-219–20. Thus, after applying the LIBOR Act, the Articles contain fallback provisions directing that, in these circumstances, PennyMac continues issuing dividends at the initial rates.

### 3. Under the Act's Plain Text, PennyMac's Initial Dividend Rates Are "Benchmark Replacements."

The only question, then, is whether those rates are given effect under the LIBOR Act, or whether the LIBOR Act somehow overrides them. As explained above, the statute directs that contracts without a "benchmark replacement" must switch to SOFR, but that contracts that do set out a "benchmark replacement" not based on LIBOR are given effect. Here, PennyMac's initial dividend rates are "benchmark replacement[s]" pursuant to 12 U.S.C. § 5802(3) and 12 U.S.C. § 5803(a), and are not based on LIBOR. As such PennyMac's use of those rates complies with the LIBOR Act.

The LIBOR Act defines the statutory term "benchmark replacement" as follows:

> a *benchmark, or an interest rate or dividend rate* (which may or may not be based in whole or in part on a prior setting of LIBOR), to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a temporary, permanent, or indefinite basis, under or with respect to a LIBOR contract.

12 U.S.C. § 5802(3) (emphasis added). Congress separately defined the term "benchmark" as "an index of interest rates or dividend rates that is used, in whole or in part, as the basis of or as a reference for calculating or determining any valuation, payment, or other measurement." *Id.* § 5802(1).

28

What qualifies as a "benchmark replacement" is straightforward. A "benchmark replacement" may be one of three things: a (1) "benchmark" as defined in § 5802(1), (2) "an interest rate," or (3) a "dividend rate." The statute draws no distinction between fixed and variable rates; any interest rate or dividend rate that replaces LIBOR or a LIBOR-based rate qualifies.[3] Nor does the statute draw a distinction between rates that contemplate a permanent cessation of LIBOR and those that contemplate a temporary one; to the contrary, a "benchmark replacement" encompasses rates "to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a *temporary*, permanent, or indefinite basis." *Id.* § 5802(3) (emphasis added).

As defined "dividend rates," PennyMac's initial dividend rates are "benchmark replacements" under the statute. Because the Articles *do* set out a fallback provision containing a "specific benchmark replacement" that is not "disregarded" under the Act, the LIBOR Act *does not* direct a switch to SOFR. *See id.* § 5803(a)-(b); Specific, Black's Law Dictionary (11th ed. 2019) ("specific" defined as "[o]f, relating to, or designating a particular or defined

---

[3] Even an interest or dividend rate that is based on a prior LIBOR rate is a "benchmark replacement" under the statute. A different statutory provision directs that such benchmark replacements based on LIBOR be disregarded, 12 U.S.C. § 5803(b)(1), but there is no dispute that PennyMac's initial rates are not based on LIBOR.

29

thing"). "Nothing in this chapter may be construed to alter or impair," after striking LIBOR-based and polling fallbacks, "any LIBOR contract that contains fallback provisions that identify *a benchmark replacement that is not based in any way on any LIBOR value . . . .*" 12 U.S.C. § 5803(f)(2) (emphasis added).

Plaintiff seeks to circumvent this straightforward result by arguing that PennyMac's initial dividend rates do not qualify as "benchmark replacement[s]" under 12 U.S.C. § 5802(3) because they are fixed rates. Specifically, Plaintiff contends that a "benchmark replacement" must itself be a "benchmark" as defined in 12 U.S.C. § 5802(1) (which must be an "index" tracking rates over time), and cannot be any other type of interest rate or dividend rate. 2-ER-211 ("Because the Articles do not identify a benchmark to replace LIBOR, PennyMac was required to adopt the SOFR index.").

Plaintiff gets to this result by reading the second clause in the definition of "benchmark replacement"—"or an interest rate or dividend rate"—right out of the statute. Plaintiff argues that, when the statute defines a "benchmark replacement" as "a benchmark, or an interest rate or dividend rate," the clause "or an interest rate or dividend rate" is merely "an appositive clause intended to explain (not contradict) the term 'benchmark'" as defined

30

in Section 5802(1).   2-ER-219.   Thus, Plaintiff urges, the court should "remov[e] the appositive clause" and instead read the statutory definition of a "benchmark replacement" as "a benchmark . . . to replace LIBOR or any interest or dividend rate based on LIBOR."  2-ER-219 (alteration in original).

Basic principles of statutory interpretation prohibit this tortured reading, and the district court should have rejected it.   Most obviously, Plaintiff's interpretation would negate an entire clause in the very subsection he is trying to interpret, thereby violating "the cardinal principle" that courts "must give effect, if possible, to every clause and word of a statute." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (internal quotation marks omitted); *see United States v. Lemus*, 93 F.4th 1255, 1259 (9th Cir. 2024) ("[W]e should avoid reading a provision that would make any part of it inoperative or superfluous, void or insignificant." (internal quotation marks omitted)). Defendants' interpretation, by contrast, gives effect to "every clause and word" of the statute: a "benchmark replacement" can be a "benchmark," *or* "an interest rate *or* dividend rate."

It would have been simple for Congress to define a "benchmark replacement" as a "benchmark" if that is what it intended—far simpler than adding an extraneous appositive clause.  The fact that it did not "strongly

31

supports rejecting [Plaintiff's] reading." *Knight v. Comm'r*, 552 U.S. 181, 188 (2008); *see Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014) (when "drafters did not adopt" the "obvious alternative" language, the "natural implication is that they did not intend" the alternative).

Moreover, Plaintiff's position that "or an interest rate or dividend rate" is an appositive clause that can be removed or disregarded collapses on itself. The Supreme Court recognizes that "an appositive" is "a word or phrase that is *synonymous* with what precedes it ('Vienna or Wien,' 'Batman or the Caped Crusader')." *United States v. Woods*, 571 U.S. 31, 45–46 (2013) (emphasis added). But "an interest rate or dividend rate" is not "synonymous" with a "benchmark's" index of rates. Indeed, it is precisely because the terms are different that Plaintiff seeks to read the phrase out of the statute. If the phrase "an interest rate or dividend rate" merely "explain[ed]" the term "benchmark," rather than expanding on its scope, Plaintiff would not need to "rob" the second clause in Section 5802(3) of "its independent and ordinary significance." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979). And including an appositive clause to "explain[]" makes no sense when the statute already expressly defines the term "benchmark." "This Court assumes that Congress carefully selects and intentionally adopts the language used in a

statute." *In re Cardelucci*, 285 F.3d 1231, 1234 (9th Cir. 2002) (cleaned up). There is no reason for Congress to use an appositive to clarify a term that is defined with precision in the very same section—let alone to do so using different (non-synonymous) words.

Plaintiff's reading also disregards the ordinary meaning of the word "or," which separates each operative noun in the definition: "benchmark, *or* an interest rate *or* dividend rate." 12 U.S.C. § 5802(3). Although "or" "can sometimes introduce an appositive . . . its ordinary use is almost always disjunctive, that is, the words it connects are to be given separate meanings." *Woods*, 571 U.S. at 45–46 (2013) (internal quotation marks omitted); *see United States v. Vance Crooked Arm*, 788 F.3d 1065, 1074 (9th Cir. 2015). The text offers no reason to depart from this ordinary meaning, and its disjunctive nature is reinforced by the presence of another "or" within the same sentence: a "benchmark replacement" is a "benchmark, *or* an interest rate *or* dividend rate." 12 U.S.C. § 5802(3) (emphases added). The second "or" is indisputably disjunctive. Reading the first "or" as non-disjunctive, as Plaintiff suggests, runs afoul of the "vigorous" presumption that, "when a term is repeated within a given sentence," it "is used to mean the same thing." *Brown v. Gardner*, 513 U.S. 115, 118 (1994); *see Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87

33

(2018) (rejecting interpretation that would render one "or" non-disjunctive while others were disjunctive, "all the while using the same word ('or') to signal both meanings").

Because the definition of "benchmark replacement" is properly interpreted according to these fundamental principles, which establish that a "benchmark replacement" may be any one of an index of rates (*i.e.*, a "benchmark"), an interest rate, or a dividend rate, the district court erred in finding Plaintiff's interpretation to be "plausible" and thus concluding there is "some level [of] ambiguity within the statute." 1-ER-17. Statutory ambiguity is not manufactured simply because a party can propose an alternative reading in a brief. The court itself must evaluate the text in light of the context of the statute. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Pit River Tribe v. Bureau of Land Mgmt.*, 939 F.3d 962, 970 (9th Cir. 2019) (internal quotation marks omitted); *cf. Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) ("[A] court cannot wave the ambiguity flag just because it found the [statute] impenetrable on first read.").

The district court did not engage with the Defendants' statutory construction arguments, and gave no reason why it would be "plausible" to "remov[e]" an entire phrase from a statutory definition as Plaintiff suggests. It is not. Ultimately, there is nothing in the text or structure of the statute to suggest that defining a "benchmark replacement" as a "benchmark, or an interest rate or dividend rate" means anything other than that a benchmark replacement can be any one of those three things. Nor is there anything in the text or structure of the statute to suggest that a fixed dividend rate does not qualify. That leads to only one conclusion: PennyMac's initial dividend rates—as particular dividend rates set out in the Articles—are specific "benchmark replacement" rates under the LIBOR Act.

None of Plaintiff's other arguments override the statutory text, either. For example, Plaintiff has argued that PennyMac cannot issue dividends at its current rates because the Articles "did not contemplate the permanent cessation of LIBOR." 2-ER-216. But Plaintiff fails to tie that position to any statutory language or requirement—because one does not exist. Indeed, Congress passed the LIBOR Act precisely because many contracts did not contemplate the permanent cessation of LIBOR. The statute does not impose any temporal or duration-based prerequisites on whether a specific rate in a

fallback provision survives. To the contrary, it expressly defines "benchmark replacement" to include rates that replace LIBOR "whether on a *temporary, permanent, or indefinite basis.*" 12 U.S.C. § 5802(3) (emphasis added).[4]

Thus, so long as a replacement rate otherwise satisfies the statutory requirements, it qualifies—regardless of whether the parties originally expected that rate to be temporary or permanent. The reason is straightforward: what matters is whether the contract can continue to operate, not why LIBOR became unavailable or for how long. The statute's purpose, definitions, operative provisions, and savings clauses all point in the same direction. Congress sought to repair broken contracts that could no longer function without LIBOR—not to rewrite contracts whose terms could still work. *See supra* pp. 6–8.

Similar reasoning also puts to rest Plaintiff's argument that the Preferred Shares cannot have a fixed rate fallback because they include the

---

[4] This is consistent with other provisions in the statute as well. *See, e.g.*, 12 U.S.C. § 5802(10) (a "determining person" may have authority to determine a benchmark replacement "on a temporary basis"). And the inclusion of "temporary" fallback rates as sufficient benchmark replacements differed from earlier proposed guidance, indicating that it was a conscious decision by Congress. *See* Alt. Ref. Rates Comm., Proposed Legislative Solution to Minimize Legal Uncertainty and Adverse Economic Impact Associated with LIBOR Transition 19 (2020), https://tinyurl.com/2bkupd38.

phrase "Fixed to Floating" in the title and contain provisions describing when the rate would float. *See* 2-ER-216–17. The dividends would be issued at a floating rate if the Three-Month LIBOR definition pointed to a floating rate— but in these circumstances, it does not. For all of the reasons described above, the LIBOR Act does not preclude fixed rates from being possible benchmark replacements—such rates work, and the contracts still function. The LIBOR Act leaves them be. They cannot and should not be rewritten to benefit particular Preferred Shareholders.[5]

### 4. The District Court Erred in Relying Exclusively on Legislative History and Perceived Statutory Purpose.

Rather than parse the statutory text or engage with the arguments described above, the district court recited the parties' competing positions, declared each of them "plausible" without explaining why, and quickly retreated to legislative history and statutory purpose. 1-ER-16–17.

---

[5] Further, to the extent there is any conflict between the fallback provisions and overarching statements anticipating a floating rate, the specific language within Section 4(g)'s definition of Three-Month LIBOR overrides the more general language elsewhere. *See* 11 Williston on Contracts § 32:10 (4th ed. 2012) ("When general and specific clauses conflict, the specific clause governs the meaning of the contract."); *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1296 (9th Cir. 1997); *Fed. Ins. Co. v. Allstate Ins. Co.*, 341 A.2d 399, 407 (Md. 1975); *Nat'l Ins. Underwriters v. Carter*, 551 P.2d 362, 366 (Cal. 1976).

Respectfully, the district court's flawed approach reflects "a relic from a bygone era of statutory construction." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019) (internal quotation marks omitted). Congress's "authoritative statement is the statutory text, not the legislative history." *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 568 (2005). For that reason, legislative-history arguments "are only on the menu" after deploying the "traditional tools of statutory construction" and "finding ambiguity." *Trim v. Reward Zone USA LLC*, 76 F.4th 1157, 1163 (9th Cir. 2023) (internal quotation marks omitted).

Here, as discussed above, the LIBOR Act's statutory directives are unambiguous: a "benchmark replacement" may include any interest rate or dividend rate—regardless of whether that rate is fixed or variable, and regardless of whether the parties expected the rate to be temporary or permanent. Thus, "reliance on legislative history is unnecessary" and the district court erred in considering it at all. *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012) (citation omitted); *see Rajaram v. Meta Platforms, Inc.*, 105 F.4th 1179, 1185 (9th Cir. 2024) (rejecting "non-textual arguments" because "the statutory text is clear, and legislative history, for those who take

it into account, is meant to clear up ambiguity, not create it" (internal quotation marks omitted)).

But even if legislative history could be considered here, the "evidence from the legislative history" that the district court relied upon does not support Plaintiff's reading of the statute and cannot create an exclusion that was not written into the text. 1-ER-17. Courts are supposed to use legislative history to discern the meaning of the text so they can apply that text, not to ascribe a general purpose, or "principal concern," 1-ER-17, to a statute and then determine whether a party's actions are consistent with that overarching purpose. *See Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 683 (9th Cir. 2007) ("The Supreme Court [has] made clear that principles in legislative history that have no statutory reference point and do not purport to explain any part of an enacted law do not carry the force of law."). In concluding broadly that PennyMac's rates do not "comport with either the purpose or overall structure of the LIBOR Act," 1-ER-17, the district court made no effort to actually resolve the supposed ambiguity in the definition of "benchmark replacement" and then apply the statute. To be clear, the full implication of Plaintiff's interpretation of the "benchmark replacement" definition would be that the LIBOR Act precludes *any* parties from agreeing,

in *any* circumstances, to fall back to *any* fixed rate. The legislative history cannot support such a conclusion, and indeed disproves it.

In support of its determination that PennyMac's rates were not consistent with an overall "purpose" of the Act, the district court cited two stray statements from the legislative record—one from Rep. Brad Sherman on the House floor, and another from Mark Van Der Weide, a congressional witness, during an April 2021 subcommittee hearing. 1-ER-17. The problems with relying on these sorts of statements are by now familiar. Because courts do not attribute to Congress as a whole the views expressed by one legislator, "scattered floor statements by individual lawmakers" are "among the least illuminating forms of legislative history." *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 481 (2017); *see United States v. Tan*, 16 F.4th 1346, 1352 (9th Cir. 2021) (same).

Even more "problematic" is witness "testimony" before a congressional "subcommittee," which is "still more steps removed from the full Congress." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 120 (2001); *see Regan v. Wald*, 468 U.S. 222, 237 (1984) (reliance on "[o]ral testimony of witnesses" would "open the door to the inadvertent, or perhaps even planned, undermining of the language actually voted on by Congress and signed into law by the

40

President"). Accordingly, even when this Court considers legislative history, it disregards "stray comments by individuals or other materials unrelated to the statutory language or the committee reports," such as the materials cited by Plaintiff below. *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1082 (9th Cir. 1999).

Even on their own terms, neither of the statements cited by the district court is persuasive evidence that Congress sought to "prevent floating-rate instruments" from converting into "fixed-rate instruments," full-stop, as Plaintiff's interpretation would require. *Contra* 1-ER-17. In the first, Rep. Sherman recites the unremarkable fact that LIBOR was the benchmark for certain "adjustable interest rate[]" loans, securities, and mortgages. 2-ER-197. In the second, Mr. Van Der Weide voices aspirations for what the statute "should" do, in testimony given nearly one year before the LIBOR Act became law, rather than offer any observations what the actual statutory language accomplished. 2-ER-150. Moreover, Mr. Van Der Weide's professed concern was that "problematic fallback language" in some contracts would convert them to "fixed-rate instruments *at the last published value of LIBOR*." 2-ER-150 (emphasis added). But that is a far cry from precluding parties from contracting to any fixed rate, as Plaintiff would have it. And the statute

41

addresses that concern head-on, directing that "a benchmark replacement that is based in any way on any LIBOR value . . . shall be disregarded," 12 U.S.C. § 5803(b)(1)—not through an oblique and unnatural reading of the definition of "benchmark replacement."

Meanwhile, the only legislative history that this Circuit (sometimes) considers, the House Committee Report, *see Hertzberg*, 191 F.3d at 1082, confirms that Congress sought to preserve the non-LIBOR, non-polling provisions of contracts with workable LIBOR replacements. The report says as much when addressing the bill's "scope": "This bill is designed to affect *only those instruments*, which according to their terms, *would require a calculation based on LIBOR after it is no longer published*." H.R. Rep. No. 117-206, at 8 (2021) (emphasis added); *see also id.* at 9 ("Nonetheless, this section does not alter or impair a LIBOR Contract that specifies a clearly defined and available replacement rate."). The House Report says nothing about fixed versus variable rates—because that was not a factor in the statutory language that was enacted.

The statutory definitions and operative provisions further this purpose of allowing workable contracts "to operate according to their terms," 12 U.S.C. § 5801(b)(3), providing that only certain, specific contractual language be

42

disregarded, *id.* § 5803(b); substituting SOFR for LIBOR only for contracts with no surviving fallbacks that include a specific benchmark replacement or a determining person, *id.* § 5803(a); and expressly not "alter[ing] or impair[ing]" surviving contractual provisions relying on non-LIBOR-based fallback rates, *id.* § 5803(f)(2). These "textual limitations upon" the Act "are no less a part of its purpose" than anything else. *Kucana v. Holder*, 558 U.S. 233, 252 (2010) (internal quotation marks omitted).

The district court acknowledged that an "apparent goal" of the Act was to "leav[e] intact 'the contractual terms the parties had agreed to,'" but erroneously concluded that "the parties did not agree to a fixed-rate instrument." 1-ER-18. That simply does not square with the text of the Articles Supplementary, which the parties indisputably agreed to when Plaintiff purchased the shares, and which result in a final fallback to the initial rates. *See supra*, pp. 25–27. If instead the district court meant that the Plaintiff did not contemplate the cessation of LIBOR or realize that the fallback he had agreed to could result in remaining at the initial rate, that is not a problem the LIBOR Act was designed to correct. Parties insert fallback provisions to cover a wide range of scenarios, many of which are not specifically envisioned by the parties at the time. Here, the parties agreed to

43

terms under which, if LIBOR became unavailable while dividends were being issued at the initial rate, that rate—the "dividend rate in effect for the immediately preceding Dividend Period"—would continue. Enforcing those terms is entirely consistent with the purpose of the Act.

*   *   *

At bottom, there is simply no good reason to deviate from the plain text of the statute—and, indeed, there is good reason to adhere to it. The "best evidence of Congress's intent is the statutory text." *Duggan v. Comm'r*, 879 F.3d 1029, 1034 (9th Cir. 2018) (alterations omitted). Here, applying that plain text to the Articles makes clear that PennyMac has complied with the LIBOR Act by continuing to issue dividends at the rates then in effect: the initial rates. Because Defendants complied with the LIBOR Act, Plaintiff cannot state a claim under the UCL's "unlawful" prong. *See Webb v. Smart Documents Solutions, LLC*, 499 F.3d 1078, 1082 (9th Cir. 2007). This Court should reverse.

### B. Because Defendants Complied with the LIBOR Act, Plaintiff Cannot State a Claim Under the UCL's "Unfair" Prong.

The district court allowed Plaintiff's claim that PennyMac's conduct was "unfair" under the UCL to continue because it concluded, incorrectly, that

44

Plaintiff properly alleged that PennyMac had violated the LIBOR Act.[6] 1-ER-19–20. Under the UCL's "unfair" prong, courts consider (1) whether the challenged conduct is "tethered" to a violation of a constitutional, statutory, or regulatory provision, or otherwise risks an antitrust violation; (2) whether the practice is immoral, unethical, oppressive, unscrupulous, or injurious to consumers; or (3) whether the utility of the challenged conduct is outweighed by its costs. *See, e.g.*, *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214–15 (9th Cir. 2020) (discussing various tests). Although each prong of the UCL can, in theory, be its own basis for liability, here, Plaintiff's "unfair" theory, like his "unlawful" one, "is premised on Defendants' purported violation of the LIBOR Act." 2-ER-43.

Plaintiff has argued that, even if PennyMac complied with the LIBOR Act, Defendants' conduct may still be found "unfair" under the UCL. That is wrong. Although the district court did not have an opportunity to reach the question because it found a violation had been alleged, it recognized that "there is a high likelihood that a resolution in Defendants' favor" on the

---

[6] Defendants do not dispute that, if Plaintiff has properly alleged a violation of the LIBOR Act, its claim may also proceed pursuant to the "unfair" prong of the UCL (though it would be duplicative). Accordingly, the only question for the Court on this issue is whether Plaintiff can pursue an "unfair" theory even when Defendants' conduct was lawful under the LIBOR Act. He cannot.

LIBOR Act violation "would result in Plaintiff's claim failing under both federal preemption and the UCL's safe-harbor doctrine." 2-ER-42. On this, the district court was correct.

First, the LIBOR Act itself bars any argument that the UCL may require PennyMac to issue dividends benchmarked to SOFR, even when the LIBOR Act as applied to the Articles directs that PennyMac continue issuing at its fallback dividend rates. The LIBOR Act expressly preempts "any provision of any State . . . law . . . relating to the selection or use of a benchmark replacement." 12 U.S.C. § 5806(1); *see Chae v. SLM Corp.*, 593 F.3d 936, 942 (9th Cir. 2010) (express preemption occurs when Congress "indicate[s] its intent to displace state law through express language"). This reflects Congress's intention that LIBOR contracts be treated uniformly nationwide after LIBOR's discontinuation. 12 U.S.C. § 5801(b)(1). Thus, the LIBOR Act and its implementing regulations determine what rate applies, not any individual state's law. Plaintiff therefore cannot invoke California law to impose a benchmark replacement rate different from that directed by the LIBOR Act.

PennyMac's rates are also independently protected by the UCL's safe-harbor doctrine. Under the safe-harbor doctrine, where the government "has

permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel.* Co., 973 P.2d 527, 541 (Cal. 1999); *see also Webb*, 499 F.3d at 1082 (UCL safe harbor for practices legislature and implementing agency "intended to permit"). Therefore, "[a] business practice . . . cannot be the basis of a [UCL] cause of action if the conduct has been deemed lawful" by another source of law. *Byars v. SCME Mortg. Bankers, Inc.*, 135 Cal. Rptr. 2d 796, 805 (Cal. Ct. App. 2003); *see also Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 (9th Cir. 2011).

Here, as shown above, PennyMac's Articles Supplementary and resulting dividend rates fall squarely within the LIBOR contracts that Congress expressly "permitted" to operate according to their own terms. *See supra* pp. 24–25. Congress's decision to "unequivocally permit[]" the conduct challenged here "afford[s] [a] safe harbor from UCL liability," providing yet another reason why Plaintiff's "unfair" theory cannot proceed. *Alvarez*, 656 F.3d at 933.

Fundamentally, even without preemption or a safe harbor, issuing dividends at a rate that complies with the law is not unfair.[7] Those rates do not inherently favor one party over another—whether PennyMac's initial rate is higher than a SOFR-based rate depends on SOFR—and were agreed to by the parties within the series of fallbacks presented in the Articles. But if PennyMac elected to issue dividends at a *different* rate at the request of one class of shareholders (the Preferred Shareholders), that would be unjust as to another class, the common shareholders. The "fair" action, therefore, is the one PennyMac took: enforcing the plain terms of the Preferred Shares as written, pursuant to the LIBOR Act.

## II. Maryland Law Governs, So Plaintiff Cannot State a Claim Under California's Unfair Competition Law.

Plaintiff's failure to allege a LIBOR Act violation is dispositive, but even if Plaintiff had alleged such a violation (he did not), the complaint cannot state a claim under California's UCL because the Declaration of Trust's choice-of-law provision compels the application of Maryland law. *See Century 21 Real*

---

[7] The district court's conclusion that an "unfair" claim could proceed because it "is sufficiently tethered to a policy goal for which Congress enacted the LIBOR Act," 1-ER-19, was based on the faulty premise that the LIBOR Act's purpose forecloses any fixed rates, and PennyMac's rates violate the LIBOR Act. *See supra*, pp. 37–44.

*Estate v. All Prof'l Realty, Inc.*, 600 F. App'x 502, 506 (9th Cir. 2015) (affirming dismissal of UCL claims when choice-of-law provision selected New Jersey); 2-ER-39 ("If the Court had held . . . that the [choice-of-law] provision was enforceable . . . Plaintiff's only claim would be dismissed.").[8]

Federal courts sitting in diversity apply the choice-of-law rules of the forum state. *See Coneff v. AT&T Corp.*, 673 F.3d 1155, 1161 (9th Cir. 2012). When "determining the enforceability" of "contractual choice-of-law provisions," California courts apply the framework "set forth in Restatement section 187, which reflect[s] a strong policy favoring enforcement of such provisions." *Nedlloyd Lines B.V. v. Superior Ct.*, 834 P.2d 1148, 1151 (Cal. 1992); *see Hatfield v. Halifax PLC*, 564 F.3d 1177, 1182 (9th Cir. 2009).

Under that framework, choice-of-law provisions are presumptively enforceable where the claims "fall within [the] scope" of the provision and the chosen state bears "a substantial relationship to the parties or their transaction, or . . . a reasonable basis otherwise exists for the choice of law." *Wash. Mut. Bank, FA v. Superior Ct.*, 15 P.3d 1071, 1079 (Cal. 2001). To

---

[8] District courts within this Circuit routinely dismiss UCL claims when choice-of-law provisions compel the application of another state's law. *See, e.g.*, *Pro Water Sols., Inc. v. Angie's List, Inc.*, 2021 WL 124496, at *4–7 (C.D. Cal. Jan. 13, 2021) (collecting cases).

overcome that presumption, the opponent of the clause must show that two narrow circumstances are each met: first, that "the chosen law is contrary to a fundamental policy of California," and second, "that California has a materially greater interest in the determination of the particular issue." *Id.*

## A. The Choice-of-Law Provision Applies to this Dispute and Is Presumptively Enforceable.

The Declaration of Trust's choice-of-law provision provides that "the rights of all parties and the validity, construction and effect of every provision hereof shall be subject to and construed according to the laws of the State of Maryland without regard to conflicts of laws provisions thereof." 2-ER-293; *supra* p. 9.

That provision applies to the dispute here. First, as a matter of law, the Articles Supplementary are part of PennyMac's Declaration of Trust. *See* Md. Code Ann., Corps. & Ass'ns § 8-101(b) ("declaration of trust" is "either as originally accepted for record or as amended, corrected, or supplemented by . . . articles supplementary"); *Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 94 (Md. 2021) (examining an analogous provision for corporations and explaining that articles supplementary are "simply an amendment of the corporate charter").[9] Plaintiff's UCL claim also "fall[s] within the scope" of

---

[9] Below, Plaintiff argued that the Declaration's choice-of-law provision is

50

the choice-of-law provision, *Wash. Mut. Bank*, 15 P.3d at 1078, because it is about Plaintiff's rights as a Preferred Shareholder under the Articles, specifically the application of the fallback terms within those Articles. In other words, the dispute relates to the "validity, construction, and effect" of the Articles (which are part of the Declaration of Trust) and the "rights of all parties" thereunder. 2-ER-293; *see Krasner v. Cedar Realty Tr., Inc.*, 86 F.4th 522, 525 (2d Cir. 2023) (articles supplementary are "a contract between [a Maryland legal entity] and its preferred stockholders under Maryland law that defines the rights of these stockholders in connection with their securities"). Thus, as the district court correctly held, "the choice-of law provision applies" to "Plaintiff's claim." 1-ER-11; *see also Nedlloyd*, 834 P.2d at 1155 (a "valid choice-of-law clause" in the parties' agreement "encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized").

Second, there is no question that Maryland has "a substantial relationship to the parties or their transaction" and there is a "reasonable

---

"irrelevant" because, he said, the Articles are not part of the Declaration. 1-ER-10. The district court correctly rejected that argument. *Id.* Under Maryland law, the court explained, the statutory definition of "declaration of trust" reflects the "common-sense proposition" that articles supplementary are a supplement to, and part of, the declaration of trust. *Id.*

51

basis for the parties' choice of law." *Wash. Mut. Bank*, 15 P.3d at 1078. PennyMac is a Maryland legal entity, and the Articles are creatures of Maryland law. Md. Code Ann., Corps. & Ass'ns §§ 8-102, 8-201, 8-203; *see supra* pp. 9–10. That constitutes a "contact sufficient to allow the parties to choose that state's law to govern their contract." *Nedlloyd*, 834 P.2d at 1153 (citation omitted); *see ABF Cap. Corp., v. Osley*, 414 F.3d 1061, 1065 (9th Cir. 2005); *Hambrecht & Quist Venture Partners v. Am. Med. Int'l, Inc.*, 46 Cal. Rptr. 2d 33, 41 (Cal. Ct. App. 1995). On this point, too, the district court agreed. 1-ER-12.

### B. The District Court Erred in Concluding that the Application of Maryland Law Would Conflict with a Fundamental California Policy.

Having concluded that the choice-of-law provision was presumptively enforceable, the district court nevertheless declined to enforce it because applying Maryland law would, in the court's estimation, "conflict[] with a fundamental policy of California's consumer protection laws" regarding available remedies. 1-ER-13.

The district court arrived at this conclusion by comparing California's UCL to Maryland's "equivalent" consumer-protection statute, the Maryland Consumer Protection Act ("MCPA"). 1-ER-12–13. The court observed that California's UCL permits consumer-plaintiffs to "pursue injunctive relief, at

least in part, as a deterrent and check on public harm." 1-ER-13 (internal quotation marks omitted). The MCPA, on the other hand, authorizes a consumer-plaintiff to seek damages but reserves the authority to pursue injunctive relief to the Attorney General. *Id.* In view of this difference, the court concluded that enforcing the choice-of-law provision and applying Maryland law would contravene a "fundamental" California policy reflected in the UCL—namely, the ability "to seek injunctive relief on behalf of the public." 1-ER-12. That reasoning cannot be sustained.

### 1. Maryland and California Law Do Not Conflict Regarding Remedies Available to Plaintiff.

The district court's narrow focus on the MCPA and the relief available under that particular statute manufactures a conflict where, in fact, there is none. In the district court's view, apparently, Plaintiff and the putative class would have no opportunity to seek equitable relief at all in Maryland. That is simply not the case, and overlooks the vast body of Maryland law, which offers Plaintiff other avenues to seek effectively the same relief: PennyMac issuing dividends in compliance with Plaintiff's interpretation of the Articles Supplementary and the LIBOR Act.

PennyMac's Preferred Shareholders are not consumers in the typical sense, purchasing a product from a company in a one-time transaction, or

encountering a misleading company advertisement. Rather, as Preferred Shareholders, their rights vis-à-vis PennyMac and other shareholders are governed by contract through the Declaration of Trust and its Articles Supplementary. *See, e.g.*, *Kim v. Cedar Realty Tr., Inc.*, 116 F.4th 252, 260 (4th Cir. 2024) ("Claims that arise from the duties listed in the Articles . . . treated as breach-of-contract claims.") (applying Maryland law); *Poling v. CapLease, Inc.*, 2016 WL 1749803, at *3 (Md. Ct. Spec. App. May 3, 2016) (rights of preferred shareholders "are defined by contract").

Consumer protection laws are not the only—or even the most natural—way to enforce those shareholder rights. Rather, because directors and officers are "contractually bound to honor preferred stockholders' preferential rights," aggrieved shareholders routinely turn to black letter corporate and contractual law for relief. *See Kim*, 116 F.4th at 256 (internal quotation marks omitted) (lawsuit alleging that Maryland REIT "breached the contractual and fiduciary duties owed to preferred stockholders by structuring the transactions to rob them of their preferential rights"); *Rothschild Int'l Corp. v. Liggett Grp. Inc.*, 474 A.2d 133, 135–36 (Del. 1984) (alleging breach of corporate charter for failing to pay preferred shareholders the "full liquidation price" owed them); *Blue Chip Cap. Fund II Ltd. P'ship v. Tubergen*, 906 A.2d

827, 828, 834 (Del. Ch. 2006) (alleging breach of contract and fiduciary duty for distributing "an inflated amount" of money to a different class of shareholders).[10]

No matter the state, Plaintiff (and other shareholders) can still seek to enforce the terms of the parties' contract using basic principles of corporate law. That includes the ability to seek specific performance of the contract, an equitable remedy "which is, essentially, an injunction." *Vasquez v. Rackauckas*, 734 F.3d 1025, 1040 (9th Cir. 2013) (citing *Ariz. Edison Co. v. S. Sierras Power Co.*, 17 F.2d 739, 740 (9th Cir. 1927)); *see, e.g.*, *Namleb Corp. v. Garrett*, 814 A.2d 585, 591 (Md. Ct. Spec. App. 2002) (recognizing remedy of specific performance); *accord 26 Cap. Acquisition Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 464 (Del. Ch. 2023) (same)).

In short, the "conflict" identified by the district court is illusory. Because avenues for equitable relief are available under Maryland law, applying the choice-of-law provision here would not conflict with any California policy regarding available remedies, and the provision should be

---

[10] On matters of corporate law, Maryland courts often "look to Delaware courts for guidance." *Kim*, 116 F.4th at 266 n.17; *see Poling*, 2016 WL 1749803, at *3 n.8.

enforced. *See Nedlloyd*, 834 P.2d at 1152 ("If there is no such conflict, the court shall enforce the parties' choice of law.").

### 2. Even Assuming a Conflict Exists, Proceeding Under Maryland Law Would Not Contravene a "Fundamental" California Policy.

Even if the remedies under Maryland law materially differed from those under the UCL, the district court erred in concluding that Plaintiff met his burden of showing a conflict on "fundamental" California policy. The district court based its ruling on a supposed "fundamental California policy of allowing private parties . . . to seek equitable relief for the public." 1-ER-12. This reasoning fails: Plaintiff is not seeking "equitable relief *for the public*" or to address any "*public* harm," 1-ER-12–13 (emphasis added), and the UCL does not embody "fundamental" California policy regarding the relief sought by Plaintiff, which is purely private in nature.

First, Plaintiff is not seeking "public" injunctive relief under California law. Plaintiffs often seek UCL injunctions to resolve a conflict between the parties and to "rectify individual wrongs," rather than for the "benefit" of the "general public." *Cruz v. PacifiCare Health Sys., Inc.*, 66 P.3d 1157, 1164 (Cal. 2003). Such private injunctive relief is designed to redress or prevent "injury to an individual plaintiff—or to a group of individuals similarly situated to the plaintiff." *McGill v. Citibank, N.A.*, 393 P.3d 85, 89–90 (Cal. 2017). "[P]ublic

56

injunctive relief," on the other hand, is designed "to remedy a public wrong, not to resolve a private dispute, and any benefit to the plaintiff requesting such relief likely . . . would be incidental to the general public benefit of enjoining such a practice." *Id.* at 94 (internal quotation marks omitted). Only those contracts that "purport[] to waive . . . the statutory right to seek *public injunctive relief* under the UCL" are "invalid and unenforceable under California law." *Id.* (emphasis added).

This Court's decision in *Hodges v. Comcast Cable Communications, LLC,* provides an instructive contrast between public and private injunctive relief. 21 F.4th 535 (9th Cir. 2021). The "paradigmatic example" of "public" injunctive relief "would be the sort of injunctive relief sought in *McGill* . . . where the plaintiff sought an injunction against the use of false advertising to promote a credit protection plan." *Id.* at 542 (citing *McGill*, 393 P.3d at 90–91). "Such an injunction attempts to stop future violations of law that are aimed at the general public . . . ." *Id.* The relief sought in *Hodges*, on the other hand—to halt certain privacy and data-collection practices—was considered private-injunctive relief because it would benefit only Comcast's cable subscribers, who were a "group of individuals similarly situated to the plaintiff." *Id.* at 549.

57

In seeking an injunction requiring PennyMac to pay the Preferred Shareholders a different dividend rate, Plaintiff, like the plaintiff in *Hodges*, is seeking private, not public, injunctive relief. He does not seek to remedy a public wrong or benefit the general public; he seeks to resolve a dispute between PennyMac and a putative class of particular shareholders over the meaning of a contract to which they had agreed. As both this Court and other courts have "recognized," this sort of "injunctive relief," which is "aimed at regulating the substantive terms of contractual arrangements," is "private injunctive relief that primarily benefits those who enter into such contracts." *Hodges*, 21 F.4th at 546 (collecting cases). Accordingly, Plaintiff's claim for relief, which benefits a group of contracting parties, does not implicate any public policy regarding the pursuit of injunctive relief for the public.

Second, Plaintiff's ability to seek *private* injunctive relief under the UCL is not a matter of "fundamental" California policy as properly understood under California law. The relevant question is not whether the remedies available in Maryland are somehow inferior to those available under California's UCL. *See Gen. Signal Corp. v. MCI Telecomms. Corp.*, 66 F.3d 1500, 1506 (9th Cir. 1995); *Waggoner v. Snow, Becker, Kroll, Klaris & Krauss*, 991 F.2d 1501, 1507–08 (9th Cir. 1993). Instead, the question is whether the

58

UCL's authorization of *private* injunctive relief is so "fundamental" that parties cannot implicitly waive the right to seek it by agreeing to a choice-of-law provision selecting another state's law. *See Nedlloyd*, 834 P.2d at 1153.

The California Supreme Court has long recognized that "the Legislature, and not the courts, is vested with the responsibility to declare the public policy of the state." *Green v. Ralee Eng'g Co.*, 960 P.2d 1046, 1049 (Cal. 1998). For that reason, California courts "are reluctant to decline enforcement of contractual provisions on public policy grounds, especially where no statute or constitutional provision directly speaks to the issue." *EpicentRx, Inc. v. Superior Ct.*, 572 P.3d 1, 12 (Cal. 2025). The authority to override private agreements on this ground is both "delicate and undefined," and "should be exercised only in cases free from doubt." *Id.* To establish that a statutory right is fundamental, therefore, "the plaintiff must point to a statute or judicial decision that clearly states such a strong public policy." *Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1090 (9th Cir. 2018).[11]

---

[11] Although *Sun* involved a forum-selection clause rather than a choice-of-law provision, courts apply similar standards for the "fundamental policy" prong in both contexts. *See, e.g.*, *EpicentRx*, 572 P.3d at 11 (citing *Nedlloyd*, 834 P.2d at 1152, as providing for a similar test "in the analogous context of choice of law clauses"); *Richards v. Lloyd's of London*, 135 F.3d 1289, 1292–93 & n.1 (9th Cir. 1998) (en banc); *see also Great Lakes Ins. SE v. Raiders Retreat Realty Co., LLC*, 601 U.S. 65, 72 (2024) ("[T]his Court's decisions . . . on the

The UCL itself does not evidence such a policy, because it "does not contain an anti-waiver provision indicating a fundamental California public policy favoring application of California's consumer protections above the law of foreign jurisdictions." *Yiren Huang v. FutureWei Techs., Inc.*, 2018 WL 10593813, at *7 (N.D. Cal. Sept. 24, 2018); *see Net2Phone, Inc. v. Superior Ct.*, 135 Cal. Rptr. 2d 149, 153 (Cal. Ct. App. 2003) (explaining that the UCL does not contain any provision "that voids any purported waiver of rights as being contrary to California public policy").

This is in contrast to numerous other statutes, where the California Legislature has expressly made certain rights non-waivable. *See EpicentRx*, 572 P.3d at 13, 17 (collecting examples). Courts recognize that this lack of an anti-waiver provision is a "factor *favoring enforcement*" of a "choice of law" provision. *See Olinick v. BMG Ent.*, 42 Cal. Rptr. 3d 268, 282 (Cal. Ct. App. 2006) (emphasis added); *see also CQL Original Prods., Inc. v. Nat'l Hockey League Players' Assn.*, 46 Cal. Rptr. 2d 412, 418 (Cal. Ct. App. 1995) (employing similar reasoning in declining to invalidate forum-selection clause).

---

enforceability of forum-selection clauses dictate the same conclusion for choice-of-law provisions.").

The California Supreme Court's recent decision in *EpicentRx v. Superior Court*, 572 P.3d 1 (2025), confirms that the absence of an anti-waiver provision is powerful evidence the Legislature has not made the statute's underlying policy sufficiently fundamental to override contractual terms. There, the Court held that a forum selection clause requiring litigation in Delaware's Court of Chancery—which provides no jury trial right in civil cases—does not violate California public policy, notwithstanding California's "strong public policy, based on the California Constitution, in favor of the right to trial by jury." *Id.* at 6.

In reaching that conclusion, the Court emphasized that neither the California constitution nor any other statute "purport[s] to void jury trial waivers that do not conform to the statute or to prohibit parties from agreeing to them." *Id.* at 17 (further explaining that "neither the Constitution nor the relevant statutes declare all such waivers void" and contrasting with cases involving express anti-waiver provisions). The same reasoning applies here: if California's constitutional guarantee of jury trial is not fundamental enough to override contractual provisions absent express anti-waiver language, then the UCL—likewise lacking any such language—cannot be either.

61

In concluding the policy was fundamental, the district court relied on a federal district court case, *Walter v. Hughes Communications*, 682 F. Supp. 2d 1031 (N.D. Cal. 2010). The *Walter* court invalidated a Maryland choice-of-law provision after comparing the remedies available under California's UCL and Consumer Legal Remedies Act ("CLRA") with those available under Maryland's MCPA. *Id.* at 1041. But that federal court decision does not transform private injunctive relief under the UCL into a "fundamental policy of California" where the California Legislature has not deemed it to be one.

The bulk of the court's opinion in *Walter* was devoted to explaining why the CLRA—not the UCL—embodied a "fundamental" California policy. The court reasoned that the CLRA qualified as fundamental in part because it contains an anti-waiver provision. *Id.* at 1041.[12] The *Walter* court's UCL analysis, by contrast, was almost an afterthought. After explaining in some detail why the CLRA's punitive damages provision was a "fundamental part of the statutory scheme," the court cursorily added—without any further analysis—that the "injunctive relief authorized by the UCL . . . raise[s] similar

---

[12] Because the CLRA includes an anti-waiver provision, the *Walter* court also flipped the usual burden of proof and placed "the burden of proving that the choice-of-law provision is enforceable" on the party seeking enforcement. *Walter*, 682 F. Supp. 2d at 1038.

policy concerns." *Id.* To the extent *Walter* can be read to imply that the UCL's authorization of injunctive relief is fundamental California policy, it is an outlier among the district courts, most of which have held that the "UCL itself does not represent a fundamental policy of California." *Fang v. CMB Exp. Infrastructure Inv. Grp. 48, LP*, 773 F. Supp. 3d 963, 986 (E.D. Cal. 2025).

This Court should follow the recent guidance of the California Supreme Court in *EpicentRx*, not the thin reasoning of a federal district court, when evaluating what constitutes "fundamental" California policy. The ability of a plaintiff to seek private injunctive relief on behalf of a class of similarly situated private parties, all of whom have a contractual relationship with the defendant, is not a matter of fundamental policy, and PennyMac's choice-of-law provision should be enforced.

### C. The District Court Erred in Concluding that California Has a Materially Greater Interest than Maryland.

Finally, even assuming that the application of Maryland law is contrary to a fundamental policy of California, the district court further erred in concluding that California has "a materially greater interest" than Maryland in "imposing its laws to resolve the current dispute." 1-ER-13–14. That error alone requires reversal because the opponent of a choice-of-law provision must prove "*both that* the chosen law is contrary to a fundamental policy of

63

California *and that* California has a materially greater interest in the determination of the particular issue." *Wash. Mut. Bank*, 15 P.3d at 1079 (emphases added); *see Discover Bank v. Superior Ct.*, 36 Cal. Rptr. 3d 456, 461 (Cal. Ct. App. 2005).

Here, although the complaint pleads that defendants have headquarters in California, PennyMac is organized under the laws of Maryland, and the Articles Supplementary are themselves creatures of Maryland law, *see, e.g.*, Md. Code Ann., Corps. & Ass'ns § 8-101(b); *see supra* p. 9. Meanwhile, Plaintiff is a resident of New Jersey, and he does not allege that he purchased PennyMac shares or was harmed in California. California's interest here is therefore minimal. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) ("California's interest in applying its law to residents of foreign states is attenuated"), *overruled on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022); *cf. Asahi Metal Indus. Co. v. Solano County*, 480 U.S. 102, 114 (1987) (observing in personal jurisdiction case that "California's legitimate interests in the dispute have considerably diminished" "[b]ecause the plaintiff is not a California resident").

64

Maryland, by contrast, has "significant interest" in ensuring the consistency of rules applicable to entities organized under Maryland law, and in "resolving disputes" arising from contracts expressly "governed by" that law. *Dynacorp Ltd. v. Aramtel Ltd.*, 56 A.3d 631, 681 (Md. Ct. Spec. App. 2012). Where contracting parties specifically select Maryland law, they create a legitimate expectation that Maryland's carefully developed legal principles and policy determinations will apply to disputes arising from their agreement. *See Travelers Indem. Co. v. MTS Transp., LLC*, 2012 WL 3929810, at *11 (W.D. Pa. Sept. 7, 2012) (noting Maryland's "significant interest in seeing its law govern contracts issued in its state to ensure consistency and predictability for its citizens."). This is particularly true for Maryland real-estate investment trusts, like PennyMac, who specifically choose Maryland law because it provides a well-developed statutory scheme and "area-expert judiciary." Jason S. Oh, et al., *A Theory of the Reit*, 133 YALE L.J. 755, 768 & n.64, 801 (2024) (comparing Maryland-REIT law to Delaware-corporate law and noting that Maryland charters about "80%" of all REITs); *see Galilea, LLC v. AGCS Marine Ins. Co.*, 879 F.3d 1052, 1059 (9th Cir. 2018) (weighing state's interest in light of how "developed" the substantive law of that state is).

For its part, the district court focused almost entirely on California's "interest in protecting its consumers." 1-ER-13–14. But here Plaintiff is *not* a California consumer—he is a New Jersey shareholder. 2-ER-305; *supra* p. 12. And a "State has no legitimate interest in protecting nonresident shareholders." *Edgar v. MITE Corp.*, 457 U.S. 624, 644 (1982). Moreover, Plaintiff seeks class-wide relief and thus "attempt[s] to assert claims on behalf of *every* state's consumers, not just California's." *Discover Bank*, 36 Cal. Rptr. 3d at 462.; *see* 2-ER-314. And no one thinks that California has "a greater interest in protecting other states' consumers than other states have in protecting California's." *Id.* If anything, the fact that Plaintiff seeks to represent a nationwide class only heightens Maryland's interest in promoting uniformity of the laws applicable to its companies.

The district court also reasoned that California has "an interest in regulating and holding accountable California-based companies that take actions within the state to harm ordinary retail investors." 1-ER-14. Putting aside that PennyMac did not "harm ordinary retail investors," PennyMac's California location alone is insufficient to establish that California's interest here is materially stronger. *See Mazza*, 666 F.3d at 594 (finding that California's interest in applying its law to the "claims of foreign residents" is

attenuated). Regardless, that consideration is insufficient to establish that California's interest is "materially greater" than Maryland's, given that PennyMac is a Maryland legal entity whose Articles Supplementary and Declaration of Trust are creatures of Maryland law.

*     *     *

This Court should enforce the choice-of-law provision the Plaintiff agreed to. There is no actual conflict between California and Maryland law, as both jurisdictions provide materially identical remedies for the alleged harm at issue. Nor does enforcement offend any fundamental policy of California, because Plaintiff does not seek public injunctive relief, and the Legislature's failure to include an anti-waiver provision confirms that no overriding California policy attaches when purely private injunctive relief is sought.

## CONCLUSION

This Court should reverse the district court's denial of Defendants' motions to dismiss.

Respectfully submitted,

/s/ Matthew Donald Umhofer

STEVEN M. FARINA
MELISSA B. COLLINS
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC 20024
(202) 434-5000
sfarina@wc.com

Counsel for Defendant-Appellant PennyMac Mortgage Investment Trust

MATTHEW DONALD UMHOFER
JONAS P. MANN
UMHOFER, MITCHELL & KING LLP
767 South Alameda Street
Suite 270
Los Angeles, CA 90021
(213) 394-7979
matthew@umklaw.com

Counsel for Defendants-Appellants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC

OCTOBER 30, 2025

68

## STATEMENT OF RELATED CASES

PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC are unaware of any cases related to the presently pending action.

/s/ Matthew Donald Umhofer
MATTHEW DONALD UMHOFER

*Counsel for Defendants-Appellants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC*

DATED: OCTOBER 30, 2025

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32, I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Cir. R. 32-1(a) because this brief contains 13,988 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word and Century Expanded 14-point font.

*/s/ Matthew Donald Umhofer*
MATTHEW DONALD UMHOFER

*Counsel for Defendants-Appellants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC*

DATED: OCTOBER 30, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ Matthew Donald Umhofer

MATTHEW DONALD UMHOFER

*Counsel for Defendants-Appellants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC*

DATED: OCTOBER 30, 2025

# STATUTORY ADDENDUM

## STATUTORY ADDENDUM - TABLE OF CONTENTS

12 U.S.C. § 5801.  Findings and purpose. ............................................................A2

12 U.S.C. § 5802.  Definitions. ..........................................................................A3

12 U.S.C. § 5803.  LIBOR contracts. ..................................................................A7

12 U.S.C. § 5804.  Continuity of contract and safe harbor............................A10

12 U.S.C. § 5805.  Benchmark for loans. ..........................................................A13

12 U.S.C. § 5806.  Preemption...........................................................................A15

12 U.S.C. § 5807.  Rulemaking. .........................................................................A16

**12 U.S.C. § 5801. Findings and purpose.**

**(a) Findings**
Congress finds that—

(1) LIBOR is used as a benchmark rate in more than $200,000,000,000,000 worth of contracts worldwide;

(2) a significant number of existing contracts that reference LIBOR do not provide for the use of a clearly defined or practicable replacement benchmark rate when LIBOR is discontinued; and

(3) the cessation or nonrepresentativeness of LIBOR could result in disruptive litigation related to existing contracts that do not provide for the use of a clearly defined or practicable replacement benchmark rate.

**(b) Purpose**
It is the purpose of this chapter—

(1) to establish a clear and uniform process, on a nationwide basis, for replacing LIBOR in existing contracts the terms of which do not provide for the use of a clearly defined or practicable replacement benchmark rate, without affecting the ability of parties to use any appropriate benchmark rate in new contracts;

(2) to preclude litigation related to existing contracts the terms of which do not provide for the use of a clearly defined or practicable replacement benchmark rate;

(3) to allow existing contracts that reference LIBOR but provide for the use of a clearly defined and practicable replacement rate, to operate according to their terms; and

(4) to address LIBOR references in Federal law.

**12 U.S.C. § 5802. Definitions.**

In this chapter:

**(1) Benchmark**
The term "benchmark" means an index of interest rates or dividend rates that is used, in whole or in part, as the basis of or as a reference for calculating or determining any valuation, payment, or other measurement.

**(2) Benchmark administrator**
The term "benchmark administrator" means a person that publishes a benchmark for use by third parties.

**(3) Benchmark replacement**
The term "benchmark replacement" means a benchmark, or an interest rate or dividend rate (which may or may not be based in whole or in part on a prior setting of LIBOR), to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a temporary, permanent, or indefinite basis, under or with respect to a LIBOR contract.

**(4) Benchmark replacement conforming changes**
The term "benchmark replacement conforming changes" means any technical, administrative, or operational changes, alterations, or modifications that—
    **(A)**  the Board determines, in its discretion, would address 1 or more issues affecting the implementation, administration, and calculation of the Board-selected benchmark replacement in LIBOR contracts; or
    **(B)**  solely with respect to a LIBOR contract that is not a consumer loan, in the reasonable judgment of a calculating person, are otherwise necessary or appropriate to permit the implementation, administration, and calculation of the Board-selected benchmark replacement under or with respect to a LIBOR contract after giving due consideration to any benchmark replacement conforming changes under subparagraph (A).

**(5) Board**
The term "Board" means the Board of Governors of the Federal Reserve System.

A3

**(6) Board-selected benchmark replacement**

The term "Board-selected benchmark replacement" means a benchmark replacement identified by the Board that is based on SOFR, including any tenor spread adjustment pursuant to section 5803(e) of this title.

**(7) Calculating person**

The term "calculating person" means, with respect to any LIBOR contract, any person, including the determining person, responsible for calculating or determining any valuation, payment, or other measurement based on a benchmark.

**(8) Consumer; credit**

The terms "consumer" and "credit" have the meanings given the terms in section 1602 of Title 15.

**(9) Consumer loan**

The term "consumer loan" means a consumer credit transaction.

**(10) Determining person**

The term "determining person" means, with respect to any LIBOR contract, any person with the authority, right, or obligation, including on a temporary basis (as identified by the LIBOR contract or by the governing law of the LIBOR contract, as appropriate) to determine a benchmark replacement.

**(11) Fallback provisions**

The term "fallback provisions" means terms in a LIBOR contract for determining a benchmark replacement, including any terms relating to the date on which the benchmark replacement becomes effective.

**(12) IBOR**

The term "IBOR" means LIBOR, any tenor of non-U.S. dollar currency rates formerly known as the London interbank offered rate as administered by ICE Benchmark Administration Limited (or any predecessor or successor administrator thereof), and any other interbank offered rates that are expected to cease.

A4

**(13) IBOR benchmark replacement**

The term "IBOR benchmark replacement" means a benchmark, or an interest rate or dividend rate (which may or may not be based in whole or in part on a prior setting of an IBOR), to replace an IBOR or any interest rate or dividend rate based on an IBOR, whether on a temporary, permanent, or indefinite basis, under or with respect to an IBOR contract.

**(14) IBOR contract**

The term "IBOR contract" means any contract, agreement, indenture, organizational document, guarantee, mortgage, deed of trust, lease, security (whether representing debt or equity, including any interest in a corporation, a partnership, or a limited liability company), instrument, or other obligation or asset that, by its terms, continues in any way to use an IBOR as a benchmark.

**(15) LIBOR**

The term "LIBOR"—

    **(A)**    means the overnight and 1-, 3-, 6-, and 12-month tenors of U.S. dollar LIBOR (formerly known as the London interbank offered rate) as administered by ICE Benchmark Administration Limited (or any predecessor or successor administrator thereof); and

    **(B)**    does not include the 1-week or 2-month tenors of U.S. dollar LIBOR.

**(16) LIBOR contract**

The term "LIBOR contract" means any contract, agreement, indenture, organizational document, guarantee, mortgage, deed of trust, lease, security (whether representing debt or equity, including any interest in a corporation, a partnership, or a limited liability company), instrument, or other obligation or asset that, by its terms, uses LIBOR as a benchmark.

**(17) LIBOR replacement date**

The term "LIBOR replacement date" means the first London banking day after June 30, 2023, unless the Board determines that any LIBOR tenor will cease to be published or cease to be representative on a different date.

A5

**(18) Security**

The term "security" has the meaning given the term in section 77b(a) of Title 15.

**(19) SOFR**

The term "SOFR" means the Secured Overnight Financing Rate published by the Federal Reserve Bank of New York (or a successor administrator).

**(20) Tenor spread adjustment**

The term "tenor spread adjustment" means--

    **(A)** 0.00644 percent for overnight LIBOR;

    **(B)** 0.11448 percent for 1-month LIBOR;

    **(C)** 0.26161 percent for 3-month LIBOR;

    **(D)** 0.42826 percent for 6-month LIBOR; and

    **(E)** 0.71513 percent for 12-month LIBOR.

## 12 U.S.C. § 5803.  LIBOR contracts.

### (a) In general

On the LIBOR replacement date, the Board-selected benchmark replacement shall be the benchmark replacement for any LIBOR contract that, after giving any effect to subsection (b)—

> **(1)** contains no fallback provisions; or
> **(2)** contains fallback provisions that identify neither—
>> **(A)** a specific benchmark replacement; nor
>> **(B)** a determining person.

### (b) Fallback provisions

On the LIBOR replacement date, any reference in the fallback provisions of a LIBOR contract to—

> **(1)** a benchmark replacement that is based in any way on any LIBOR value, except to account for the difference between LIBOR and the benchmark replacement; or
> **(2)** a requirement that a person (other than a benchmark administrator) conduct a poll, survey, or inquiries for quotes or information concerning interbank lending or deposit rates;

shall be disregarded as if not included in the fallback provisions of such LIBOR contract and shall be deemed null and void and without any force or effect.

### (c) Authority of determining person

> **(1) In general**
> Subject to subsection (f)(2), a determining person may select the Board-selected benchmark replacement as the benchmark replacement.
> **(2) Selection**
> Any selection by a determining person of the Board-selected benchmark replacement pursuant to paragraph (1) shall be--
>> **(A)** irrevocable;
>> **(B)** made by the earlier of the LIBOR replacement date and the latest date for selecting a benchmark replacement according to the terms of the LIBOR contract; and

**(C)** used in any determinations of the benchmark under or with respect to the LIBOR contract occurring on and after the LIBOR replacement date.

**(3) No selection**

If a determining person does not select a benchmark replacement by the date specified in paragraph (2)(B), the Board-selected benchmark replacement, on and after the LIBOR replacement date, shall be the benchmark replacement for the LIBOR contract.

**(d) Conforming changes**

**(1) In general**

If the Board-selected benchmark replacement becomes the benchmark replacement for a LIBOR contract pursuant to subsection (a) or (c), all benchmark replacement conforming changes shall become an integral part of the LIBOR contract.

**(2) No consent required**

A calculating person shall not be required to obtain consent from any other person prior to the adoption of benchmark replacement conforming changes.

**(e) Adjustment by Board**

**(1) In general**

Except as provided in paragraph (2), on the LIBOR replacement date, the Board shall adjust the Board-selected benchmark replacement for each category of LIBOR contract that the Board may identify to include the relevant tenor spread adjustment.

**(2) Consumer loans**

For LIBOR contracts that are consumer loans, the Board shall adjust the Board-selected benchmark replacement as follows:

**(A)** During the 1-year period beginning on the LIBOR replacement date, incorporate an amount, to be determined for any business day during that period, that transitions linearly from the difference between the Board-selected benchmark replacement and the corresponding LIBOR tenor determined as of the day immediately before the LIBOR replacement date to the relevant tenor spread adjustment.

A8

**(B)** On and after the date that is 1 year after the LIBOR replacement date, incorporate the relevant tenor spread adjustment.

**(f) Rule of construction**

Nothing in this chapter may be construed to alter or impair—

**(1)** any written agreement specifying that a LIBOR contract shall not be subject to this chapter;

**(2)** except as provided in subsection (b), any LIBOR contract that contains fallback provisions that identify a benchmark replacement that is not based in any way on any LIBOR value (including the prime rate or the effective Federal funds rate);

**(3)** except as provided in subsection (b) or (c)(3), any LIBOR contract subject to subsection (c)(1) as to which a determining person does not elect to use a Board-selected benchmark replacement pursuant to that subsection;

**(4)** the application to a Board-selected benchmark replacement of any cap, floor, modifier, or spread adjustment to which LIBOR had been subject pursuant to the terms of a LIBOR contract;

**(5)** any provision of Federal consumer financial law that--

**(A)** requires creditors to notify borrowers regarding a change-in-terms; or

**(B)** governs the reevaluation of rate increases on credit card accounts under open-ended (not home-secured) consumer credit plans; or

**(6)** except as provided in section 5804(c) of this title, the rights or obligations of any person, or the authorities of any agency, under Federal consumer financial law, as defined in section 5481 of this title.

**12 U.S.C. § 5804.  Continuity of contract and safe harbor.**

**(a) In general**

A Board-selected benchmark replacement and the selection or use of a Board-selected benchmark replacement as a benchmark replacement under or with respect to a LIBOR contract, and any benchmark replacement conforming changes, shall constitute—

> **(1)** a commercially reasonable replacement for and a commercially substantial equivalent to LIBOR;
>
> **(2)** a reasonable, comparable, or analogous rate, index, or term for LIBOR;
>
> **(3)** a replacement that is based on a methodology or information that is similar or comparable to LIBOR;
>
> **(4)** substantial performance by any person of any right or obligation relating to or based on LIBOR; and
>
> **(5)** a replacement that has historical fluctuations that are substantially similar to those of LIBOR for purposes of the Truth in Lending Act (15 U.S.C. 1601 note) and regulations promulgated under that division.

**(b) No impairment**

Neither the selection or use of a Board-selected benchmark replacement as a benchmark replacement nor the determination, implementation, or performance of benchmark replacement conforming changes under section 5803 of this title may—

> **(1)** be deemed to impair or affect the right of any person to receive a payment, or to affect the amount or timing of such payment, under any LIBOR contract; or
>
> **(2)** have the effect of--
>
> > **(A)** discharging or excusing performance under any LIBOR contract for any reason, claim, or defense (including any force majeure or other provision in any LIBOR contract);
> >
> > **(B)** giving any person the right to unilaterally terminate or suspend performance under any LIBOR contract;
> >
> > **(C)** constituting a breach of any LIBOR contract; or
> >
> > **(D)** voiding or nullifying any LIBOR contract.

**(c) Safe harbor**

No person shall be subject to any claim or cause of action in law or equity or request for equitable relief, or have liability for damages, arising out of—

> **(1)** the selection or use of a Board-selected benchmark replacement;
>
> **(2)** the implementation of benchmark replacement conforming changes; or
>
> **(3)** with respect to a LIBOR contract that is not a consumer loan, the determination of benchmark replacement conforming changes,

in each case after giving effect to the provisions of section 5803 of this title; provided, however, that in each case any person (including a calculating person) shall remain subject to the terms of a LIBOR contract that are not affected by this chapter and any existing legal, regulatory, or contractual obligations to correct servicing or other ministerial errors under or with respect to a LIBOR contract.

**(d) Selection**

The selection or use of a Board-selected benchmark replacement or the determination, implementation, or performance of benchmark replacement conforming changes under section 5803 of this title shall not be deemed to—

> **(1)** be an amendment or modification of any LIBOR contract; or
>
> **(2)** prejudice, impair, or affect the rights, interests, or obligations of any person under or with respect to any LIBOR contract.

**(e) No negative inference**

Except as provided in subsections (a), (b), or (c)(1) of section 5803 of this title, nothing in this chapter may be construed to create any negative inference or negative presumption regarding the validity or enforceability of—

> **(1)** any benchmark replacement (including any method for calculating, determining, or implementing an adjustment to the benchmark replacement to account for any historical differences between LIBOR

A11

and the benchmark replacement) that is not a Board-selected benchmark replacement; or

**(2)** any changes, alterations, or modifications to or with respect to a LIBOR contract that are not benchmark replacement conforming changes.

**12 U.S.C. § 5805. Benchmark for loans.**

**(a) Definitions**
In this section:

> **(1) Bank**
> The term "bank" means an institution subject to examination by a Federal financial institutions regulatory agency.

> **(2) Covered action**
> The term "covered action" means—
>> **(A)** the initiation by a Federal supervisory agency of an enforcement action, including the issuance of a cease-and-desist order; or
>> **(B)** the issuance by a Federal supervisory agency of a matter requiring attention, a matter requiring immediate attention; or a matter requiring board attention resulting from a supervisory activity conducted by the Federal supervisory agency.

> **(3) Federal financial institutions regulatory agency**
> The term "Federal financial institutions regulatory agencies" has the meaning given the term in section 3302 of this title.

> **(4) Federal supervisory agency**
> The term "Federal supervisory agency" means an agency listed in subparagraphs (A) through (H) of section 3401(7) of this title.

> **(5) Non-IBOR loan**
> The term "non-IBOR loan" means any loan that, by its terms, does not use in any way LIBOR, any tenor of non-U.S. dollar currency rates formerly known as the London interbank offered rate as administered by ICE Benchmark Administration Limited (or any predecessor or successor administrator thereof), and any other interbank offered rates that are expected to cease, as a benchmark.

A13

**(b) Benchmarks used by banks**

With respect to a benchmark used by a bank—

**(1)** the bank, in any non-IBOR loan made before, on, or after March 15, 2022, may use any benchmark, including a benchmark that is not SOFR, that the bank determines to be appropriate for the funding model of the bank; the needs of the customers of the bank; and the products, risk profile, risk management capabilities, and operational capabilities of the bank; provided, however, that the use of any benchmark shall remain subject to the terms of the non-IBOR loan, and applicable law; and

**(2)** no Federal supervisory agency may take any covered action against the bank solely because that benchmark is not SOFR.

A14

**12 U.S.C. § 5806. Preemption.**

This chapter, and regulations promulgated under this chapter, shall supersede any provision of any State or local law, statute, rule, regulation, or standard—

> **(1)** relating to the selection or use of a benchmark replacement or related conforming changes; or

> **(2)** expressly limiting the manner of calculating interest, including the compounding of interest, as that provision applies to the selection or use of a Board-selected benchmark replacement or benchmark replacement conforming changes.

**12 U.S.C. § 5807.  Rulemaking.**

Not later than 180 days after March 15, 2022, the Board shall promulgate regulations to carry out this chapter.