**No. 25-4458**

# In the United States Court of Appeals for the Ninth Circuit

ROBERTO VERTHELYI
*on behalf of himself and all others similarly situated*

*Plaintiff-Appellee,*

*v.*

PENNYMAC MORTGAGE INVESTMENT TRUST;
PNMAC CAPITAL MANAGEMENT, LLC,

*Defendants-Appellants.*

*On Petition for Permission to Appeal from the United States District Court for the Central District of California, No. 2:24-cv-05028-MWF-JC, Hon. Michael W. Fitzgerald*

**PLAINTIFF-APPELLEE'S BRIEF IN OPPOSITION TO DEFENDANTS-APPELLANTS' OPENING BRIEF**

Nicole Lavallee (SBN 165755)
Daniel E. Barenbaum (SBN 209261)
BERMAN TABACCO
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
nlavallee@bermantabacco.com
dbarenbaum@bermantabacco.com

Catherine Pratsinakis
DILWORTH PAXSON, LLP
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Telephone: (215) 575-7000
cpratsinakis@dilworthlaw.com

*Counsel for Plaintiff-Respondent Roberto Verthelyi*

# **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................1

II.     JURISDICTIONAL STATEMENT................................................8

III.    QUESTIONS PRESENTED ..............................................................9

IV.     STATEMENT OF THE CASE .........................................................9

        A.      Factual Background..............................................................9

                1.      LIBOR's Cessation and Efforts to Prevent Disruption to the Financial Industry ....................................................10

                2.      Congress Passes the LIBOR Act to Establish a Clear and Uniform Process for Replacing LIBOR...................................12

                3.      PennyMac's Articles Require Payment of a Floating Rate.......13

        B.      Procedural Background ......................................................17

V.      SUMMARY OF ARGUMENT .......................................................19

VI.     ARGUMENT....................................................................................23

        A.      Defendants-Appellants Have Not Met Their Burden of Establishing Appellate Jurisdiction ....................................24

                1.      Defendants-Appellants Have Not Met the Requirements of Section 1292(b) With Respect to the LIBOR Act Issue ...........24

                2.      Defendants-Appellants Have Not Met the Requirements of Section 1292(b) With Respect to the Choice of Law Issue ......25

        B.      By Violating the LIBOR Act, PennyMac Engaged in an Unlawful Practice Under the UCL ......................................29

                1.      The Articles Do Not Contain a Clearly Defined and Practicable Fallback Provision...................................................30

                2.      PennyMac's Conduct Violates the LIBOR Act.........................31

                3.      The Language of the Statute Reflects an Appositive Phrase ....34

i

4. The LIBOR Act Indicates an Intent to Require Replacing LIBOR with a Benchmark ..........................................................39

5. Congress Intended to Prevent the Conversion of Floating-Rate Instruments into Fixed-Rate Instruments .........................44

C. PennyMac Engaged in Unfair Business Practices Under the UCL ....48

D. PennyMac is Not Shielded by the UCL's Safe Harbor or Federal Preemption...............................................................................51

E. California Law Applies to this Action................................................52

1. Maryland Law is Contrary to California's Fundamental Policy Granting a Private Action for Injunctive Relief ............53

2. California's Interests in the Litigation Trump Maryland's Interests ................................................................................58

VII. CONCLUSION...................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbott Labs. v. Super. Ct. of Orange Cnty.*,
467 P.3d 184, 190 (Cal. 2020) ................................................................28

*Advoc. Health Care Network v. Stapleton*, 581 U.S. 468 (2017) ...........................45

*Am. Online, Inc. v. Superior Court*,
108 Cal. Rptr. 2d 699 (Cal. Ct. App. 2001) ..........................................27

*Anderberg v. Hain Celestial Group, Inc.*,
652 F. Supp. 3d 1232 (S.D. Cal. 2023) ..................................................60

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. W. Dist. Texas*,
571 U.S. 49 (2013) ...................................................................... 26, 52

*BBBB Bonding Corp. v. Caldwell*,
288 Cal. Rptr. 3d 439 (Cal. Ct. App. 2021) ..........................................51

*Blair v. Rent-A-Center, Inc.*,
928 F.3d 819 (9th Cir. 2019) ..................................................................55

*Bourdon v. United States Dep't of Homeland Sec.*,
940 F.3d 537 (11th Cir. 2019) ................................................................34

*Brack v. Omni Loan Co., Ltd.*, 80 Cal. Rptr. 3d 275 (Cal. Ct. App. 2008) .............27

*Briskin v. Shopify, Inc.*, 135 F.4th 739 (9th Cir. 2025) (*en banc*) ...........................60

*Brown v. Gardner*, 513 U.S. 115 (1994) ...................................................... 37, 38

*Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525 (1958) ..........................58

*California Sea Urchin Comm'n v. Bean*, 883 F.3d 1173 (9th Cir. 2018) .................39

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
973 P.2d 527 (Cal. 1999) ............................................................ 29, 51

*Cir. City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) ....................................... 45, 46

*Cnty. of Amador v. United States Dep't of Interior*,
872 F.3d 1012 (9th Cir. 2017)..................................................................40

*Couch v. Telescope Inc.*, 611 F.3d 629, 632 (9th Cir. 2010) ................ 23, 24, 25, 29

*Deutsche Bank Nat. Tr. Co. v. FDIC*, 744 F.3d 1124 (9th Cir. 2014) .......................23

*Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204 (9th Cir. 2020) ...................................48

*E.H. v. Meta Platforms, Inc.*,
No. 23-CV-04784, 2024 WL 557728 (N.D. Cal. Feb. 12, 2024) ........................48

*Encino Motorcars, LLC v. Navarro*, 584 U.S. 79 (2018) ........................... 37, 38, 39

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ...............................51

*EpicentRx, Inc. v. Superior Ct.*, 572 P.3d 1 (Cal. 2025)........................................57

*Gallarde v. I.N.S.*, 486 F.3d 1136 (9th Cir. 2007) ..................................................40

*Geo-Energy Partners-1983 Ltd. v. Salazar*, 613 F.3d 946 (9th Cir. 2010).............34

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) ....................................40

*Hall v. Superior Court*, 197 Cal.Rptr. 757 (Cal. Ct. App. 1983) ............................28

*Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076 (9th Cir. 1999) .......................47

*Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535 (9th Cir. 2021) ..............55

*Hoffman v. Citibank (South Dakota), N.A.*, 546 F.3d 1078 (9th Cir. 2008)............27

*In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009) ...................................................28

*Jialu Wu v. Italk Global Commc'ns, Inc.*, No. 20-CV-7150 PSG (PJWx),
2020 WL 8461696 (C.D. Cal. Oct. 21, 2020) ...................................................28

*Kisor v. Wilkie*, 588 U.S. 558 (2019) .....................................................................39

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) ...................................26

*Kuehner v. Dickinson & Co.*, 84 F.3d 316 (9th Cir. 1996) .....................................23

*Maldonado v. Fast Auto Loans, Inc.*,
275 Cal.Rptr.3d 82 (Cal. Ct. App. 2021)..........................................................55

iv

*Mandviwala v. Five Star Quality Care, Inc.*,
  723 Fed. Appx. 415 (9th Cir. 2018)................................................ 27, 52

*Maney v. Brown*, 91 F.4th 1296 (9th Cir. 2024)....................................23

*McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017)...................... 28, 53, 55

*McKell v. Wash. Mut., Inc.*,49 Cal. Rptr. 3d 227 (Cal. Ct. App. 2006)............. 30, 52

*Mejia v. DACM Inc.*, 268 Cal.Rptr.3d 642 (Cal. Ct. App. 2020)............................55

*Nedlloyd Lines B.V. v. Superior Ct.*, 834 P.2d 1148 (Cal. 1992)....................... 53, 57

*Nielsen v. Preap*, 586 U.S. 392 (2019)............................................ 33, 37

*NLRB v. SW General, Inc.*, 580 U.S. 288 (2017)....................................46

*NLRB v. United Food & Com. Workers Union, Loc. 23, AFL-CIO*,
  484 U.S. 112 (1987)..................................................................44

*Olinick v. BMG Ent.,* 42 Cal. Rptr. 3d 268 (Cal. Ct. App. 2006)............................59

*Pit River Tribe v. Bureau of Land Mgmt.*,
  939 F.3d 962 (9th Cir. 2019)................................................ 34, 39, 40

*Ramsey v. Comcast Cable Commc'ns, LLC*,
  317 Cal. Rptr. 3d 561 (Cal. Ct. App. 2023), *cert. denied*
  *Comcast Commc'ns, LLC v. Ramsey*, 145 S.Ct. 1050 (2025)................ 55, 56, 60

*Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681 (9th Cir. 2011) ......................... 23, 25

*Regan v. Wald*, 468 U.S. 222 (1984)...............................................46

*Republican Nat'l Comm. v. Google LLC*,
  742 F. Supp. 3d 1099 (E.D. Cal. 2024) ............................................28

*Ribbens Int'l., S.A. de C.V. v. Transp. Int'l Pool, Inc.*,
  47 F. Supp. 2d 1117 (C.D. Cal. 1999) ............................................58

*Rodriguez v. Sony Comput. Ent. Am., LLC*, 801 F.3d 1045 (9th Cir. 2015) ...........24

*Rose v. Bank of Am., N.A.*, 304 P.3d 181 (Cal. 2013) .............................30

*Roth v. Foris Ventures, LLC*, 86 F.4th 832 (9th Cir. 2023) ......................23

*Rotkiske v. Klemm*, 589 U.S. 8 (2019) ..................................................................33

*Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22 (2025)................................56

*Rubio v. Cap. One Bank,* 613 F.3d 1195 (9th Cir. 2010) ........................................29

*Schoenberg v. Exportadora de Sal, S.A.*, 930 F.2d 777 (9th Cir. 1991)...................27

*Scotts Co. LLC v. Seeds, Inc.*, 688 F.3d 1154 (9th Cir. 2012)..................................57

*Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207 (9th Cir. 2001) ...........................26

*Starr Indem. & Liab. Co. v. Rolls-Royce Corp.*,
  725 Fed. Appx. 592 (9th Cir. 2018)....................................................................27

*State v. Tunney*, 895 P.2d 13 (Wash. Ct. App. 1995)..............................................36

*Trim v. Reward Zone USA LLC*, 76 F.4th 1157 (9th Cir. 2023) ..............................44

*U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439 (1993) ...............33

*Union Cnty., Iowa v. Piper Jaffray & Co.*, 525 F.3d 643 (8th Cir. 2008)......... 24, 25

*United States v. Gumbs*, 964 F.3d 1340 (11th Cir. 2020).........................................37

*United States v. Lopez*, 4 F.4th 706 (9th Cir. 2021) ................................................33

*United States v. Neal*, 776 F.3d 645 (9th Cir. 2015) ...............................................24

*United States v. Woods*, 571 U.S. 31 (2013) ...........................................................37

*Vasquez v. Rackauckas*, 734 F.3d 1025 (9th Cir. 2013) .................................... 56, 57

*Vaughn v. Tesla, Inc.*, 303 Cal. Rptr. 3d 457 (Cal. Ct. App. 2023) .........................55

*Vrugtman v. It's Just Lunch Int'l LLC*,
  No. 20-cv-2352, 2021 WL 4979443 (C.D. Cal. Sept. 24, 2021).........................28

*Walter v. Hughes Commc'ns, Inc.*,
  682 F. Supp. 2d 1031 (N.D. Cal. 2010)........................................... 28, 54, 58, 59

**STATUTES**

12 U.S.C. § 5801 ................................................................................... passim

12 U.S.C. § 5802 .............................................................................. passim

12 U.S.C. § 5803 .............................................................................. passim

12 U.S.C. § 5806 .......................................................................................52

28 U.S.C. § 1292(b) .......................................................................... passim

California Unfair Competition Law ("UCL"),
    Cal. Bus. & Prof. Code § 17200 et seq....................................... 1, 9, 30

Md. Code Ann., Com. Law §§ 13-406 & 13-408 ....................................54

## FEDERAL REGULATIONS

12 C.F.R. § 253 ................................................................................ 3, 5, 9

12 C.F.R. § 253.1(b).................................................................................3

12 C.F.R. § 253.3(a) .................................................................................5

12 C.F.R. § 253.4(b)........................................................................... 5, 13

Regulations Implementing the Adjustable Interest Rate (LIBOR) Act,
    88 Fed. Reg. 5204-01, 5205 (Jan. 26, 2023) ....................................3, 9

## OTHER AUTHORITIES

Antonin. Scalia & Bryan A. Garner,
    *Reading Law: The Interpretation of Legal Texts* (2012) ............................... 33, 34

Bryan A. Garner, *Garner's Modern English Usage* (4th ed. 2016).........................33

House Legislative Counsel's Manual on Drafting § 351 ............................ 34, 35, 37

Jason S. Oh, *et al.*, *A Theory of the REIT*, 133 Yale L.J. 755 (2024) ......................59

Restatement (Second) of Conflict of Laws § 187....................................53

Roll Call 407, Bill H.R. 4616 (Dec. 8, 2021) ........................................46

## I.  <u>INTRODUCTION</u>

This case concerns whether a business headquartered in and operating out of California may be held accountable for unlawful and unfair business practices under the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"), for violating a federal statute and reneging on its promises to provide a floating-rate dividend to its investors. The suggestion that a California business can avoid liability under the UCL for misconduct affecting California residents, among others, that originated and was orchestrated from within California merely because the responsible legal entities are organized under the laws of other states contradicts decades of state and federal precedent. It would be especially unprecedented to grant such broad immunity from California's consumer protection laws when the businesses do not even maintain a physical presence within the states of their incorporation.

In June 2023, Plaintiff-Appellee Robert Verthelyi ("Plaintiff-Appellee" or "Plaintiff") purchased financial products marketed by Defendants-Appellants PennyMac Mortgage Investment Trust (the "Trust") and PNMAC Capital Management ("PMC" and, together with the Trust, "PennyMac" or "Defendants-Appellants") as providing purchasers with fixed-to-floating rate dividends. Those investments were PennyMac preferred shares—namely, Series A Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares (the "Series A Shares") and Series B

1

Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares (the "Series B Shares", and together with the Series A Shares, the "Preferred Shares").

The dividend terms for the Preferred Shares are contained within the governing documents—the 2017 Articles Supplementary ("Articles")—at Section 4(a)-(l). 2-ER-236–239; 256–259. Section 4(a) of the Articles requires PennyMac to transition from a fixed-rate to floating-rate dividend pegged to the London Interbank Offering Rate ("LIBOR")—a benchmark then widely used by investors around the globe to calculate floating interest rates. For the Preferred Shares, PennyMac promised purchasers that they would receive a fixed-rate dividend of 8.125% per annum for Series A Shares and 8.00% per annum for Series B Shares from the purchase date until the Preferred Shares' respective "Fixed Rate Period" ended: March 15, 2024, for Series A, and June 15, 2024, for Series B. After the maturation date, purchasers would be entitled to receive floating-rate dividends based on market conditions—calculated as the Three-Month LIBOR plus 5.831% for Series A Shares and Three-Month LIBOR plus 5.99% for Series B Shares. By purchasing the Preferred Shares, Plaintiff-Appellee and other investors anticipated that the market rate at the time of redemption would be higher than the initial fixed rates and that dividends would be paid in accordance with market rates.

By late 2017, amid allegations of price manipulation, the LIBOR panel banks that published the LIBOR rates announced that they would cease publishing

LIBOR at the end of 2021 (later extended to June 2023 for USD LIBOR only)—allowing time for the market to move away from LIBOR. On March 5, 2021, the U.K. Financial Conduct Authority announced that LIBOR would permanently cease publication on June 30, 2023.

Concerned about ensuing turmoil, Congress and the Federal Reserve sought to pass legislation to address the U.S. market's heavy reliance on the LIBOR benchmark. The Federal Reserve explained: "Of particular concern are so-called 'tough legacy contracts,' which are contracts that reference USD LIBOR and will not mature by June 30, 2023, but which lack adequate fallback provisions providing for a *clearly defined or practicable replacement benchmark* following the cessation of USD LIBOR." *See* Regulations Implementing the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg. 5204-01, 5205 (Jan. 26, 2023) (codified at 12 C.F.R. § 253.1(b)) (emphasis added). According to the Federal Reserve, "many floating-rate notes and securitizations have problematic fallback language—generally, [upon LIBOR's cessation,] these contracts convert to fixed-rate instruments at the last published value of LIBOR." 2-ER-150. As Senator Patrick Toomey stated during Senate hearings, "any legislation that addresses tough legacy contracts must be

3

narrowly tailored, not change the equities of these contracts….." Case No. 24-05028, Dkt. 40-2 at 8.[1]

In 2022, Congress passed the Adjustable Interest Rate (LIBOR) Act, 12 U.S.C. § 5801 *et seq.* (the "LIBOR Act"). At the time of the LIBOR Act's passage, contracts that used LIBOR as the benchmark for interest rates and dividend rates were valued at more than $200 trillion worldwide. 12 U.S.C. § 5801(a)(1). Congress's express purpose for enacting the LIBOR Act was to require that, on or before June 30, 2023, any floating-rate instrument that used LIBOR as a benchmark for calculating interest or dividend rates, would replace LIBOR with a "clearly defined or practicable replacement benchmark." 12 U.S.C. § 5801(b).

To effect that purpose, the LIBOR Act mandates that securities contracts that reference LIBOR after June 30, 2023—including the Articles at issue here—must be read to replace LIBOR with the benchmark created in 2017 by the Federal Reserve as an alternative to LIBOR: the Secured Overnight Financing Rate ("SOFR"). The LIBOR Act states that the "Board-selected benchmark replacement *shall* be the benchmark replacement for any LIBOR contract that… contains no fallback provisions; or contains fallback provisions that identify neither—(A) a specific benchmark replacement; nor (B) a determining person" (emphasis added). 12 C.F.R.

---

[1] The District Court granted Plaintiffs' Request for Judicial Notice of documents cited in Plaintiffs' Opposition to Defendants' Motion to Dismiss. 1-ER-5.

§ 253.3(a). And indeed, in December 2022, pursuant to authority granted to it under the LIBOR Act, the Federal Board of Governors issued a final rule (the "LIBOR Rule") adopting SOFR as LIBOR's replacement. *See* Regulations Implementing the Adjustable Interest Rate (LIBOR) Act (Regulation ZZ), 12 C.F.R. § 253.4(b) (2023).

In enacting the LIBOR Act, Congress sought to "establish clear and uniform process, on a nationwide basis, for replacing LIBOR in existing contracts ...." 12 U.S.C. § 5801(b). The LIBOR Act is "targeted narrowly to address legacy contracts that have no fallback language, that have fallback language referring to LIBOR or to a poll of banks, *or that convert to fixed-rate instruments*." 2-ER-107, 151 (emphasis added). Congress did not seek to interfere with "legacy contracts with fallbacks to another floating rate." 2-ER-107, 151.

The financial industry understood that the LIBOR Act was intended to prevent the unfair conversion of floating-rate to fixed-rate financial instruments. In accordance with the LIBOR Act and Rule, the overwhelming majority of financial firms with floating rate instruments—dating both before and after passage of the LIBOR Act—replaced LIBOR with SOFR.

However, in August 2023, though the Articles had no adequate fallback provision contemplating the permanent cessation of LIBOR nor reference a benchmark to replace LIBOR, PennyMac shocked investors and the market by announcing that its fixed-to-floating rate Preferred Shares would convert to fixed-

5

rate instruments permanently—using the initial fixed-rate dividends of 8.125% for Series A and 8.00% Series B in perpetuity as a replacement for LIBOR. In so deciding, PennyMac relied upon a legacy LIBOR-based fallback provision in the Articles (Section 4(g)) and used in similar form throughout the industry to create a rate in the event of the temporary unavailability of LIBOR rates. Pursuant to that provision, in the event a temporary delay in the reporting of LIBOR, PennyMac would go through a series of steps to obtain LIBOR quotes; if none were obtainable, it would revert to the dividend rate paid in the previous period—here, PennyMac claims, the initial fixed rate. In so deciding, PennyMac deviated from both the law's requirements and the industry practice of adopting SOFR as the replacement benchmark. PennyMac's announcement caused the market value of its Preferred Shares to plummet by nearly 20%.

The fundamental disagreement here is whether the Articles contain a permissible, workable fallback provision or benchmark to replace LIBOR or whether instead PennyMac was required to adopt SOFR. PennyMac's Articles are the exact type of contracts Congress sought to reform—tough legacy contracts that never contemplated the permanent cessation of LIBOR, and which require adoption of SOFR by law. Section 4(g) of the Articles is not a clearly defined, practicable, or "workable" fallback provision, but a temporary fix for when LIBOR is unavailable on a particular day and time. PennyMac was only able to arrive at its decision to

6

convert its fixed-to-floating rate Preferred Shares into fixed-rate instruments by skewing the LIBOR Act in a way that assumes that Congress is incapable of adhering to not only common rules of grammar and punctuation, but also its own style guide. A proper examination of the statutory text—diction and punctuation—renders Defendants-Appellants' reading impossible.

Had PennyMac acted in accordance with industry practice by adopting SOFR as the replacement benchmark, as it was legally required to do, Series A Shareholders would have received 11.18884% on March 15, 2024, and Series B Shareholders would have received 11.34784% on June 15, 2024—not the 8.125% and 8.00% fixed rates that PennyMac paid. Series A Shareholders initially lost 27.3% of their bargained-for dividend, and Series B Shareholders lost 29.5%.

As alleged, PennyMac's actions harmed "retail" investors—not institutional investors. One market professional described PennyMac's behavior as "particularly nasty, even exploitative, to investors. … [¶] I don't think they would have had the sheer *chutzpah* to treat institutional investors that badly." 2-ER-303.

In addition to ignoring the LIBOR Act, Defendants-Appellants argue that they do not have to comply with California law because, while headquartered and operating out of California and having no physical presence in Maryland, the Trust (but not PMC) is organized under Maryland law. Defendants-Appellants' Opening Brief, Case No. 25-4458, Dkt. No. 9.1 ("D-A Br.") at 48. To arrive at that conclusion,

7

Defendants-Appellants mischaracterize and stretch legal precedent regarding the UCL. The purpose of the UCL is to empower consumers to hold businesses operating in California accountable for conduct that is unlawful, unfair, or misleading—particularly for conduct that affects California consumers. Each of these three prongs represent a ***separate and unique*** claim such that businesses are regularly found liable for conduct that is unfair even if not unlawful. PennyMac's decision to convert its Preferred Shares to fixed-rate instruments was unlawful because it violated the LIBOR Act. PennyMac's decision was ***also unfair*** because it substantially reduced consumers' dividends while ignoring the purpose and promise of the instruments without a reasonable justification for doing so.

Courts routinely enforce the UCL against entities residing and doing business in California, even when the claims arise from a contract containing a choice-of-law provision specifying a different source of law. This is especially true where, as here, Defendants-Appellants are headquartered in California, and the conduct at issue occurred in California and affects California consumers.

The District Court uniformly agreed with Plaintiff's arguments, issuing an Order denying the motions to dismiss in their entirety. This Court should affirm.

## II.    <u>JURISDICTIONAL STATEMENT</u>

Plaintiff-Appellee objects to the Appellate Court's jurisdiction under 28 U.S.C. § 1292(b). *See infra* at V.A; Case No. 25-3140, Dkt. 4 at 12–22.

## III.    QUESTIONS PRESENTED

1. Whether Defendants-Appellants' use of a fixed-interest rate as a "benchmark replacement" for LIBOR is expressly authorized by the Adjustable Interest Rate (LIBOR) Act, 12 U.S.C. § 5801 *et seq.*, and the LIBOR Rule (Regulations Implementing the Adjustable Interest Rate (LIBOR) Act), 88 Fed. Reg. 5204-01, 5205 (Jan. 26, 2023) (codified at 12 C.F.R. § 253 *et seq.*).

2. Whether the State of California has a substantially greater interest in the litigation than the State of Maryland, such that enforcement of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, warrants non-enforcement of Defendants-Appellants' contractual choice of law provision designating Maryland state law as the governing law for all disputes related to the Articles.

## IV.    STATEMENT OF THE CASE

### A.    Factual Background

Defendant-Appellant PennyMac Mortgage Investment Trust ("Trust") is a real estate investment trust, or REIT, that invests primarily in residential mortgage loans and mortgage-related assets. It maintains its principal place of business in Westlake Village, California and is organized under Maryland law. 2-ER-305. Defendant-Appellant PNMAC Capital Management, LLC manages and oversees all aspects of the Trust. It is also headquartered in Westlake Village, California and is organized under Delaware law. 2-ER-305. Neither entity operates out of either Maryland or

9

Delaware. 2-ER-224. The Trust is governed in accordance with its Declaration. 2-ER-274.

Plaintiff is an individual investor from New Jersey who holds 20 shares of PennyMac's Series A, which he has held since June 27, 2023. 2-ER-305. Plaintiff also holds 60 shares of PennyMac's Series B, which he has held since at least June 30, 2023. *Id.* Plaintiff purchased the Preferred Shares with the understanding that they were fixed-to-floating instruments.

### 1. LIBOR's Cessation and Efforts to Prevent Disruption to the Financial Industry

For decades, the London Inter-Bank Offered Rate, or LIBOR, was the most common benchmark rate for fixed-to-floating instruments. 2-ER-299, 308. Each day, the Intercontinental Exchange calculated LIBOR by averaging the interest rates that several London-based banks anticipated being charged by their peer banks for an inter-bank loan. In 2020, financial instruments totaling nearly $223 trillion used LIBOR as their benchmark rate. 2-ER-299, 308.

In 2012, the U.S. Department of Justice began conducting criminal investigations into the manipulation and abuse of LIBOR. In response to the billions of dollars in injury sustained by state and local governments by the misconduct, the U.S. Treasury's Financial Stability Oversight Council advocated for using alternative benchmarks. In 2014, the Federal Reserve and the Federal Reserve Bank of New York created the *Alternative Reference Rates Committee*, or "ARRC", to

help ensure a successful transition from USD LIBOR to a more robust benchmark rate. In October 2017, the LIBOR panel banks announced that they would cease publishing LIBOR by the end of 2021—later extended through June 2023 for USD LIBOR. 2-ER-300, 310.

In 2017, the Federal Reserve developed SOFR as an alternative to LIBOR. Unlike LIBOR, which was based on self-reported, forward-looking estimates, SOFR is calculated based on the actual costs of overnight repurchasing contracts utilizing U.S. government bonds as collateral. The New York Federal Reserve began publishing SOFR in April 2018, and issuers began tying their financial instruments to SOFR. 2-ER-299–300, 308.

In 2018, ARRC chose SOFR as its recommended replacement for LIBOR and began developing guiding principles for transitioning floating-rate notes that referenced LIBOR to ones that referenced SOFR. 2-ER-300–01. By 2019, ARRC published guidance on fallback provisions addressing LIBOR's impending cessation to reduce market disruption when that cessation occurred, and by 2021, the guidance encouraged replacing LIBOR with SOFR (or a SOFR-like index) to reduce litigation and regulatory risk. 2-ER-308. ARRC recommended that fallback language be feasible, practicable, and fair (*i.e.*, that it not advantage one market participant to the disadvantage of another). 2-ER-308.

## 2. Congress Passes the LIBOR Act to Establish a Clear and Uniform Process for Replacing LIBOR

Nevertheless, as LIBOR's permanent decommissioning loomed, there were still "a significant number of existing contracts that reference[d] LIBOR." 12 U.S.C. § 5801(a)(2). On March 15, 2022, Congress passed the LIBOR Act to create default rules for "fallback provisions" in contracts that otherwise lacked a "clearly defined or practicable benchmark rate when LIBOR was discontinued." *Id.*

The LIBOR Act defines "fallback provision" as one containing "the terms in a LIBOR contract for determining a benchmark replacement." *Id.* § 5802(11). A "benchmark" is "an index of interest rates or dividend rates that is used… as the basis of or as a reference for calculating or determining any valuation, payment, or other measurement." *Id.* § 5802(1). And a "benchmark replacement" is a "benchmark, or an interest rate or dividend rate (which may or may not be based in whole or in part on a prior setting of LIBOR), to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a temporary, permanent, or indefinite basis, under or in respect of a LIBOR Contract." *Id.* § 5802(3).

Section 5803(a) of the LIBOR Act provides that "[o]n the LIBOR replacement date [June 30, 2023], the Board-selected benchmark replacement [SOFR] ***shall be*** the benchmark replacement for any LIBOR contract that, after giving any effect to subsection (b)– (1) contains no fallback provisions; or (2) contains fallback provisions that identify neither—(A) a specific benchmark replacement nor (B) a

12

determining person." 12 U.S.C. § 5803(a). Subsection (b) further states that any reference in the fallback provision to either (1) a benchmark replacement that references LIBOR or (2) a requirement that a poll be conducted to obtain quotes "concerning interbank lending or deposit rates… shall be disregarded as if not included in the fallback provisions…." 12 U.S.C. § 5803(b) . In December 2022, the Federal Reserve issued the LIBOR Rule, 12 C.F.R. § 253.4(b) , adopting SOFR as the LIBOR benchmark replacement. 2-ER-301, 310.

### 3. PennyMac's Articles Require Payment of a Floating Rate

PennyMac's governing documents require the payment of a floating rate. Section 13.1 of the Declaration of Trust ("Governing Law") states:

> The Declaration of Trust is executed by the undersigned Trustees and delivered in the State of Maryland with reference to the laws thereof, and the rights of all parties and the validity, construction, and effect of every provision hereof shall be subject to and construed according to the laws of the State of Maryland without regard to conflicts of laws provisions thereof.

2-ER-239.

PennyMac issued two series of preferred shares: Series A and Series B Fixed-to-Floating Preferred Shares, in March and July 2017, respectively. 2-ER-306–07. These floating-rate shares are governed by the Articles. 2-ER-298–99; 1-ER-4. The Articles do not contain a choice of law provision.

PennyMac raised over $310 million selling the Preferred Shares by promising investors floating-rate dividends. 2-ER-306. In Section 4(a) of the Series A Articles,

13

PennyMac promised dividends equal to an initial fixed rate of 8.125% from the date of issuance in 2017 through March 14, 2024 and "*a floating rate* equal to Three-Month LIBOR… plus a spread of 5.831%" from "March 15, 2024 and thereafter." 2-ER-306–07; 2-ER-236 (emphasis added). Section 4(a) of the Series B Articles promises an initial fixed rate of 8.00% from issuance in 2017 through June 14, 2024 and "*a floating rate* equal to Three-Month LIBOR… plus a spread of 5.99%" from "June 15, 2024 and thereafter." 2-ER-256 (emphasis added). Preferred Shares were not redeemable until the floating rate period commenced—on March 14, 2024, for Series A, and June 14, 2024, for Series B.

When PennyMac issued the Preferred Shares, neither the LIBOR panel nor the U.K. Financial Conduct Authority had announced the cessation of LIBOR; initial SOFR data was not published until the following year. However, PennyMac had nearly six years between the announcement of LIBOR's cessation and its final publication to determine how it would keep its contractual obligations to provide the promised floating-rate dividend to its Preferred Shareholders. After Congress passed the LIBOR Act in March 2022 and the Federal Reserve issued the LIBOR Rule in December 2022, financial institutions were ordered to convert their LIBOR-based floating rate securities to another reference rate by no later June 30, 2023. 2-ER-311. Any LIBOR contract that had not been converted to a new reference rate by its terms

14

or otherwise by June 30, 2023, shall use the Federal Reserve's chosen replacement: SOFR.

Instead, PennyMac waited until August 25, 2023—nearly three months after the final publication of LIBOR—to announce that, at odds with the statutory requirements and regulatory guidance, and in a sharp departure from industry practice, PennyMac would ignore its contractual obligation to provide a floating dividend rate on its Preferred Shares and revert instead to the Series' initial, lower fixed rates. 2-ER-300; 2-ER-311. Despite the Preferred Shares' designation as "Fixed-to-Floating" securities and the lack of a fallback provision addressing LIBOR's permanent cessation, PennyMac claimed that it could convert its fixed-to-floating Preferred Shares to permanent fixed-rate instruments—that its Articles contained a fallback provision that permitted the Preferred Shares to remain fixed-rate instruments in perpetuity, beyond the fixed-rate periods defined in Section 4(a) of the Articles. 2-ER-302, 312.

PennyMac's "fixed rate" argument was tethered to a provision in its Articles that was grounded in an obsolete legacy definition of "Three-Month LIBOR" in Section 4(g) of the Articles in the event of LIBOR's temporary unavailability. Section 4(g) includes the final sentence: "or, if there was no such Dividend Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period." 2-ER-238 (Series A); 2-ER-258–59 (Series B).

15

PennyMac's deviation from the LIBOR Act and industry norm caused the market value of the Preferred Shares to plummet. Plaintiff and other investors who purchased shares prior to PennyMac's announcement were left holding rapidly devaluing assets. After PennyMac's announcement, the liquidation preference price of the Series A Shares dropped from $25.00 to $22.77, and the Series B shares dropped to $22.40. The market understood exactly what PennyMac had done: on March 14, 2024, when the Series A Shares were contractually required to transition from the fixed-rate period to the floating-rate period, there was no "Three-Month LIBOR" to use as a reference rate. Under PennyMac's stated interpretation of the LIBOR Act and its improper application of the Articles' "temporary unavailability" fallback provision to the permanent cessation of LIBOR, the Series A Shares converted from the "initial fixed rate of 8.125%" to the "floating rate" that was "in effect for the preceding Dividend Period"—the "initial fixed rate of 8.125%." Thus, PennyMac created a fixed-rate doom loop. For the subsequent Dividend Period, the Dividend Rate would again be calculated using the rate "in effect for the preceding Dividend Period" (then March 14, 2024), which had been the carried forward "initial fixed rate of 8.125%." The same result would apply on the next Dividend Period *ad infinitum*. 2-ER-302–3.

Conversely, had PennyMac adhered to the LIBOR Act, regulatory guidance, and industry practice, by adopting SOFR as its benchmark replacement, the Series

16

A Shareholders would have received a dividend rate of 11.18884% on March 24, 2024, instead of the 8.125% PennyMac announced. The Series B Shareholders would have received a dividend rate of 11.34784% as of June 15, 2024, instead of 8.00% PennyMac announced. 2-ER-303.

## B. Procedural Background

On June 14, 2024, Plaintiff initiated this class action alleging that Defendants-Appellants' adoption of a fixed-rate dividend in perpetuity on its fixed-to-floating Preferred Shares in violation of the LIBOR Act, 12 U.S.C. § 5801 *et seq.*, was both unlawful and unfair under the UCL. 2-ER-298–304.

On August 20, 2024, Defendants moved to dismiss the Complaint on two grounds. First, Defendants argued that a Maryland choice-of-law provision governed, thus prohibiting claims under California's UCL. 2-ER-300–01. Second, Defendants argued that their use of a fixed rate did not violate the LIBOR Act. 2-ER-300–04. Thereafter, Plaintiff opposed the motions, and after the motions were fully briefed, the District Court held a hearing.

Subsequently, on February 26, 2025, the District Court issued its opinion and order denying Defendants' motions on both grounds (the "Order"). In a thorough, detailed opinion, the District Court conducted a conflict-of-laws analysis under California's choice-of-law rules to determine that the Maryland choice-of-law provision was unenforceable. 1-ER-11–14. The District Court first determined that

17

the choice-of-law provision did apply to the claims because "Plaintiff's claim boils down to a dispute regarding the rights of the Preferred Shareholders." 1-ER-11. The District Court's analysis then determined that California has a materially greater interest in protecting consumers through its statutory scheme, which permits injured consumers not only to bring class actions to recover their losses but also to seek injunctive relief to deter and prevent future harm to other consumers located in the state, such that its law applies in this litigation. 1-ER-13–14. The District Court also concluded that California has a greater interest in offering protections to both in-state and out-of-state investors who contract with California-based companies and expect such California companies to act in a manner consistent with Congressional policy goals. 1-ER-14.

After determining that California law applied, the District Court turned to the question of whether Defendants' conduct violated the LIBOR Act. 1-ER-15–18. The District Court first determined that the LIBOR Act's definition of "benchmark replacement" was ambiguous. 1-ER-16–17. Finding ambiguity in the statutory language, the District Court determined that Defendants' proffered interpretation conflicted with the legislative purpose of the LIBOR Act. 1-ER-17–18. The District Court found that Plaintiff sufficiently alleged that the parties did not agree to a fixed-rate instrument and that "allowing PennyMac to issue dividends according to its interpretation would not support the Act's apparent goal of leaving intact 'the

18

contractual terms the parties had agreed to.'" 1-ER-18. The District Court also held that Plaintiff sufficiently alleged that Defendants "violated the LIBOR Act when it issued dividends at a fixed rate." 1-ER-18. The District Court held that Plaintiff has sufficiently stated claims against Defendants under both the *unlawful* and *unfair* prongs of the UCL. 1-ER-18, 20.

On March 25, 2025, Defendants filed a motion seeking to certify the Order for interlocutory appeal under 28 U.S.C. § 1292(b). Plaintiff opposed certification. After the parties fully briefed the motion, the District Court certified its Order to the Ninth Circuit for interlocutory review on May 5, 2025.

On May 15, 2025, Defendants-Appellants filed their Petition for Permission to Appeal. Case No. 25-3140, Dkt. 1. Plaintiff-Appellee answered on May 27, 2025. *Id.*, Dkt. 4. Defendants-Appellants replied on June 2, 2025. *Id.*, Dkt. 7. On July 17, 2025, the Defendants-Appellants' Petition for Permission was granted. *Id.*, Dkt. 10. This appeal was opened the following day. 3-ER-324.

## V.    <u>SUMMARY OF ARGUMENT</u>

Defendants-Appellants' decision to permanently convert the Preferred Shares to a fixed-rate dividend violated the language of the LIBOR Act and Rule, disregarded the public policy underpinning the enactment of the LIBOR Act and Rule, and caused substantial harm to Plaintiff in violation of the UCL. Additionally, as a business headquartered and operating out of California, PennyMac cannot

escape liability under the UCL for unlawfully and unfairly harming investors. For these reasons, the Court should affirm the District Court's Order denying Defendants' motion to dismiss.

In preparation for the permanent cessation of LIBOR, Congress passed the LIBOR Act with the express purpose of establishing "a clear and uniform process, on a nationwide basis, for replacing LIBOR in existing contracts, the terms of which do not provide for the use of a clearly defined or practicable replacement benchmark." 12 U.S.C. § 5801(b)(1). The LIBOR Act requires that, on June 30, 2023, any contract that either lacks a fallback provision or has a fallback provision that does not identify a specific "benchmark replacement" or "determining person," shall replace LIBOR with SOFR. *Id.* § 5803(a).

On August 25, 2023, Defendants-Appellants defied the law and industry practice, and broke their promises to investors by announcing that their "fixed to floating" Preferred Shares would not pay a floating rate after LIBOR's discontinuation despite the requirement that they adopt SOFR, and would instead continue to pay as dividends the initial fixed rates in perpetuity. Defendants-Appellants attempted to justify their decision by claiming that the Articles for the Preferred Shares identify "the Prior Dividend Period's rate" as their "benchmark replacement." In so arguing, Defendants-Appellants refer to language unrelated to the permanent cessation of LIBOR, but instead detailing a process for determining

a rate where LIBOR is temporarily unavailable. Defendants-Appellants assert that use of the fixed rate is appropriate even though a fixed rate is not a benchmark because the LIBOR Act's definition of "benchmark replacement" provides for three options: a "benchmark", an "interest rate", or a "dividend rate." D-A Br. at 29 (citing 12 U.S.C. § 5802(3)). Defendants-Appellants assertion fails for multiple reasons.

First, it assumes Congress ignored rules of English grammar and its own guidance on drafting legislation. To agree with Defendants-Appellants, the Court would need to (1) ignore the use of a comma at the end of the phrase ", or interest rate or dividend rate (which may or may not be based in part on LIBOR),"; (2) ignore the otherwise improper "or" preceding "interest rate"; and (3) ignore that Congress requires use of the serial (Oxford) comma. 12 U.S.C. § 5802(3). Second, the overall structure of the LIBOR Act, including the title itself ("Adjustable Rate") and its express statement of purpose within the text, rejects that a fixed value could be a "benchmark replacement." Such a conversion of a floating-rate instrument into a fixed-rate instrument is anathema to the LIBOR Act's unambiguous language, structure, and purpose (and even the title itself). Third, any remaining ambiguity after fully engaging with the text, context, and purpose of the statute is resolved by reviewing the legislative history. The record is unanimous: the LIBOR Act was enacted to prevent LIBOR-contracts from becoming fixed-rate instruments. Thus, Plaintiff-Appellee has stated a claim for unlawful conduct in violation of the UCL,

21

and this Court should affirm the District Court's Order denying Defendants-Appellants' motions to dismiss.

Additionally, the conduct was also unfair under the UCL because it violates the public policy underpinning the LIBOR Act and causes significant harm to consumers without any rational justification. The legislative history is unanimously against permitting the conversion of a floating-rate instrument into a fixed-rate instrument. Defendants-Appellants' conduct resulted in a 20% drop in the market value of the Preferred Shares and a 27-29% drop in the dividend earnings rates. Defendants-Appellants cannot point to any justification for such an injury. Their decision was an outlier that defied the Federal Reserve's guidance and industry practice. And, contrary to Defendants-Appellants' assertion, there is no safe harbor or preemption foreclosing enforcement of the UCL. Therefore, the Court should affirm the Order denying Defendants-Appellants' motions to dismiss.

Finally, Defendants-Appellants attempt to skirt UCL liability by pointing to a choice-of-law provision in the Declaration of Trust. The Declaration provides that all actions arising under its terms, as amended by the Articles (including the Preferred Shares), are to be governed by Maryland law. Defendants, thus, argue that the choice-of-law provision forecloses Plaintiff from bringing California claims. But California conflict of laws rules are clear: choice-of-law provisions are not enforceable if they deprive a plaintiff the right provided by a statute expressing a

22

fundamental policy of California. California courts routinely decline enforcing choice-of-law provisions when doing so would prevent a plaintiff from seeking the injunctive relief provided by the UCL–here, a public injunction. This is true even for defendants organized under the laws of other states. Accordingly, the UCL is enforceable in this Action, and the Court should affirm the Order.

## VI.    <u>ARGUMENT</u>

As a threshold matter, this Court has "a special obligation" to ensure that it has jurisdiction over this interlocutory appeal. *Couch v. Telescope Inc.*, 611 F.3d 629, 632 (9th Cir. 2010). Although the two-judge motion panel granted Defendants-Appellants' application, the Circuit Court has an "independent duty to confirm that [its] jurisdiction is proper." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011) (quoting *Kuehner v. Dickinson & Co.*, 84 F.3d 316, 318–19 (9th Cir. 1996)).

A review of a district court's denial of a motion to dismiss for failure to state a claim is *de novo. Maney v. Brown*, 91 F.4th 1296, 1299 (9th Cir. 2024). If jurisdiction exists, the Court may address "any issue fairly included within the certified order, because it is the *order* that is appealable, and not the controlling question identified by the district court." *Roth v. Foris Ventures, LLC*, 86 F.4th 832, 836 (9th Cir. 2023) (quoting *Deutsche Bank Nat. Tr. Co. v. FDIC*, 744 F.3d 1124, 1134 (9th Cir. 2014)).

23

### A. Defendants-Appellants Have Not Met Their Burden of Establishing Appellate Jurisdiction

The requirements for an interlocutory appeal under 28 U.S.C. § 1292(b) are jurisdictional; they must be met if appeal is taken. *Couch*, 611 F.3d at 633 (quoting *Union Cnty., Iowa v. Piper Jaffray & Co.*, 525 F.3d 643, 645–46 (8th Cir. 2008)). Defendants-Appellants fail to meet their burden. *See Couch*, 611 F.3d at 633 ("the party pursuing the interlocutory appeal bears the burden").

### 1. Defendants-Appellants Have Not Met the Requirements of Section 1292(b) With Respect to the LIBOR Act Issue

Defendants-Appellants fail to meet their burden under Section 1292(b) because there is no "substantial ground" for a difference of opinion as to the LIBOR Act claims. 28 U.S.C. § 1292(b). In analyzing the LIBOR Act, the District Court applied standard rules of statutory interpretation. Upon determining that the "benchmark replacement" definition was unclear and ambiguous, the District Court found that Defendants' reading does "not comport with either the purpose or overall structure of the LIBOR Act" and "would result in enforcement of the exact type of conduct Congress sought to reform." 1-ER-17; *see Rodriguez v. Sony Comput. Ent. Am., LLC*, 801 F.3d 1045, 1051 (9th Cir. 2015) ("'[P]articular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme.'") (quoting *United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015)).

24

This is the first and only litigation arising out of the LIBOR Act, demonstrating that the industry agrees that the LIBOR Act does not allow the conversion of a variable-rate security into a fixed-rate security. PennyMac is an outlier; the majority of PennyMac's competitors adopted SOFR as the LIBOR Act requires. 2-ER-311. "[A] question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *Couch,* 611 F.3d at 634; *Union Cnty., Iowa*, 525 F.3d at 647 ("[A] dearth of cases does not constitute substantial ground for difference of opinion.").

In the absence of caselaw, Defendants-Appellants must identify persuasive, authoritative sources that support their interpretation of the Act. *Couch*, 611 F.3d at 633. Defendants, however, fail to point to *any* legal concept, treatise, or academic article to support their interpretation. *Contra Reese*, 643 F.3d at 691–92 (citing legal concepts articulated by the Second, Ninth, and Eleventh Circuits, the District Court for the District of Columbia, and *Williston on Contracts*). Accordingly, Defendants-Appellants have failed to meet their burden to establish the requirements for jurisdiction under Section 1292(b) on the LIBOR issue.

### 2. Defendants-Appellants Have Not Met the Requirements of Section 1292(b) With Respect to the Choice of Law Issue

Similarly, Defendants-Appellants fail to meet their burden under Section 1292(b) with respect to whether California or Maryland law applies. Defendants-Appellants sought certification on the grounds that the District Court misapplied

25

California's choice-of-law rules. That issue does not meet the requirements of 28 U.S.C. § 1292(b) because it is neither a question of pure law nor is there a substantial ground for a difference of opinion.

*First*, the application of a choice of law provision is not a pure legal question. A conflict-of-laws analysis is a two-step process requiring the court to "select the correct choice-of-law rule, a pure legal question, and then apply that rule to the facts of this case, a mixed question of law and fact." *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001).

Thus, the only pure question of law here is whether the District Court correctly identified California's choice-of-law rule as controlling for its conflict-of-laws analysis. But Defendants-Appellants do not challenge the District Court's appropriate use of California's choice of law rules. *See Atl. Marine Constr. Co. v. U.S. Dist. Ct. W. Dist. Texas*, 571 U.S. 49, 65 (2013) ("A federal district court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits.") (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494–496 (1941)). Instead, Defendants-Appellants challenge the District Court's ***application of the facts presented in this case to California's choice of law rule, which is a mixed question of law and fact inappropriate for interlocutory review***. *Shannon-Vail,* 270 F.3d at 1210. In the rare case where this Court has heard an interlocutory review of a choice of law decision, the question was *whether the correct test was used*. *See,*

26

*e.g.*, *Starr Indem. & Liab. Co. v. Rolls-Royce Corp.*, 725 Fed. Appx. 592, 593 (9th Cir. 2018) (unpublished) ("Appellees now argue that Hertz is not a binding case under Arizona law, so the court should apply a more 'flexible' standard than the nerve center test."); *Hoffman v. Citibank (South Dakota), N.A.*, 546 F.3d 1078, 1085 (9th Cir. 2008) ("[T]he district court erred because it did not apply California's choice of law analysis as articulated in Restatement § 187(2) and *Nedlloyd*…."); *Schoenberg v. Exportadora de Sal, S.A.*, 930 F.2d 777, 782 (9th Cir. 1991) (first addressing whether the choice of law rules of California or federal common law applied).

*Second*, there is no substantial difference of judicial opinion as to the application of California's choice of law rule. The District Court properly determined that California has a strong public policy in favor of private citizens having the right to seek public injunctions. This Court and California appellate courts have repeatedly held that statutes empowering individuals to act as private attorneys general represent *fundamental policies* that outweigh a choice-of-law clause. *See, e.g., Mandviwala v. Five Star Quality Care, Inc.*, 723 Fed. Appx. 415, 416–17 (9th Cir. 2018) (unpublished) (Private Attorney Generals Act); *Brack v. Omni Loan Co., Ltd.*, 80 Cal.Rptr.3d 275, 283–84 (Cal. Ct. App. 2008) (Finance Lenders Law); *Am. Online, Inc. v. Superior Court*, 108 Cal.Rptr.2d 699, 712 (Cal. Ct. App. 2001) (Consumer Legal Remedies Act); *Hall v. Superior Court*, 197

27

Cal.Rptr. 757, 761-62 (Cal. Ct. App. 1983) (Corporate Securities Law of 1968). Federal district courts in California have reached the same determination when addressing UCL claims. *See, e.g., Vrugtman v. It's Just Lunch Int'l LLC*, No. 20-cv-2352, 2021 WL 4979443 at *9 (C.D. Cal. Sept. 24, 2021) (UCL outweighed Nevada choice-of-law provision); *Jialu Wu v. Italk Global Commc'ns, Inc.*, No. 20-CV-7150 PSG (PJWx), 2020 WL 8461696 at *2 (C.D. Cal. Oct. 21, 2020) (same for Texas); *Walter v. Hughes Commc'ns, Inc.*, 682 F. Supp. 2d 1031, 1038–42 (N.D. Cal. 2010) (same for Maryland).

Indeed, "[t]he purpose of [injunctive] relief, in the context of a UCL action, is to protect California's consumers against unfair business practices by stopping such practices in their tracks." *Abbott Labs. v. Super. Ct. of Orange Cnty.*, 467 P.3d 184, 190 (Cal. 2020) (quoting *In re Tobacco II Cases*, 207 P.3d 20, 35 (Cal. 2009)); *see also Republican Nat'l Comm. v. Google LLC*, 742 F.Supp.3d 1099, 1112 (E.D. Cal. 2024) ("The purpose of the UCL is to prevent unfair competitive conduct which harms both business competitors and the public."). The right to public injunctive relief is so fundamental that contractual provisions that effectively waive that right are void as contrary to public policy. *McGill v. Citibank, N.A.*, 393 P.3d 85, 94 (Cal. 2017) ("Thus, insofar as the arbitration here purports to waive McGill's right to request in any forum such public injunctive relief, it is invalid and enforceable under California law.").

28

Just because "other courts have disagreed" with the District Court's decision to not enforce the choice-of-law clause "does not mean there is such a substantial difference of opinion as will support an interlocutory appeal." *Couch*, 611 F.3d at 633. Nor are "'interests of comity' one of [the] statutory bases for jurisdiction over less than final judgments." *Id.* at 634. Thus, the District Court erred in granting Defendant's motion because "the [choice-of-law] question raises novel issues concerning comity and competing interests of state law." 2-ER-40.

## B. By Violating the LIBOR Act, PennyMac Engaged in an Unlawful Practice Under the UCL

By converting the fixed-to-floating Preferred Shares to fixed-rate instruments and refusing to adopt SOFR as the benchmark replacement, PennyMac violated the LIBOR Act and, thus, violated the UCL.

California's UCL defines unfair competition as any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500)…." Cal. Bus. & Prof. Code § 17200. A claim under the UCL may be premised on three types of improper conduct (or a combination thereof): (a) unlawful conduct; (b) unfair conduct; or (c) fraudulent conduct. *Rubio v. Cap. One Bank,* 613 F.3d 1195, 1203 (9th Cir. 2010) ("Each of th[e] three adjectives captures a separate and distinct theory of liability."); *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999). Each presents distinct grounds for liability.

The UCL "borrows violations of other laws and treats them as unlawful practices [that are] *independently* actionable." *Rose v. Bank of Am., N.A.*, 304 P.3d 181, 185 (Cal. 2013); *McKell v. Wash. Mut., Inc.*, 49 Cal.Rptr.3d 227, 242 (Cal. Ct. App. 2006). "Violations of federal statutes, including those governing the financial industry, may serve as the predicate for a UCL cause of action." *Rose*, 304 P.3d at 183. Accordingly, violations of the LIBOR Act and Rule constitute UCL violations.

### 1. The Articles Do Not Contain a Clearly Defined and Practicable Fallback Provision

PennyMac's Articles do not contain a clearly defined, practicable benchmark replacement for LIBOR upon its permanent cessation.

LIBOR had been the industry standard benchmark for decades. Neither the Articles nor Section 4(g) specifically were drafted in contemplation of LIBOR's permanent cessation. PennyMac issued the Preferred Shares before LIBOR panel banks and the U.K. Financial Conduct Authority announced LIBOR would cease publication. 2-ER-300, 310. Rather, Section 4(g) provides a waterfall of steps (in preferential order) to secure a usable rate in the event of LIBOR's temporary unavailability on a particular date by a specified time (11:00 a.m.).

These steps are systematic, going from the polling of certain banks, to using the LIBOR quote from the "immediately preceding Dividend Period," to, "if there was no such Dividend Period,… the dividend rate in effect for the immediately preceding Dividend Period." 2-ER-238 (Series A); 2-ER-258–59 (Series B). This

30

final clause does not state that PennyMac can revert to issuing fixed-to-floating dividends at the initial fixed rate in perpetuity.

PennyMac's permanent payment of the initial fixed rate during the floating period directly contradicts Section 4(a) which explicitly states that "from and including" the day the "Fixed Rate Period" ends, dividends will be paid at a "*a floating rate* equal to Three-Month LIBOR… plus a spread of 5.831%" (5.99% for Series B) during the floating-rate period. 2-ER-236 (Series A); 2-ER-256 (Series B). Section 4(g) was never meant to (and does not) amend the floating-rate payment obligation of Section 4(a). That obligation is a clear, separate indication that neither party contemplated using a fixed rate in perpetuity. Section 4(a) does not simply vanish. As such, Section 4(g) does not provide a clearly defined, practicable fallback provision to address LIBOR's permanent cessation.

### 2.     PennyMac's Conduct Violates the LIBOR Act

The LIBOR Act was passed to protect purchasers of variable-rate securities that lacked an adequate fallback provision in the event of the permanent cessation of LIBOR. The LIBOR Act mandates that "[o]n the LIBOR replacement date [June 30, 2023], the Board-selected benchmark replacement [Secured Overnight Financing Rate, or SOFR] shall be the ***benchmark replacement*** for any LIBOR contract that, after giving any effect to subsection (b)– (1) contains no fallback provisions; or (2)

31

contains fallback provisions that identify neither—(A) a specific **benchmark replacement**; nor (B) a determining person." 12 U.S.C. § 5803(a) (emphasis added).

A "benchmark replacement" is defined as:

> **a benchmark, or an interest rate or dividend rate (which may or may not be based in whole or in part on a prior setting of LIBOR),** to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a temporary, permanent, or indefinite basis, under or with respect to a LIBOR contract.

*Id.* § 5802(3) (emphasis added).[2] The definition for "benchmark," also defined by the statute, tracks the same language as "benchmark replacement", explaining that a benchmark is an *index of interest rates or dividend rates*:

> The term "benchmark" means **an index of interest rates or dividend rates that is used**, in whole or in part, as the basis of or as a reference for calculating or determining any valuation, payment, or other measurement.

*Id.* § 5802(1) (emphasis added).

The key dispute surrounding the definition of "benchmark replacement"—specifically, twenty-seven words and two punctuation marks contained within the bolded and italicized language in the definition above: "a benchmark, or an interest rate or dividend rate (which may or may not be based in whole or in part on a prior

---

[2] The definition for "benchmark replacement" is repeated using the exact same diction and punctuation in the definition of an "IBOR benchmark replacement" for the specific usage of non-US currency LIBOR rates. 12 U.S.C. § 5802(13) *accord* § 5802(12) ("The term "IBOR" means LIBOR, any tenor or non-U.S. dollar currency rates formerly known as the London interbank offered rate….").

32

setting of LIBOR),…." Put simply, the question is whether the first "or" introduces a series of three distinct elements or opens an appositive phrase—"an explanatory phrase that narrows an earlier, more general phrase." Bryan A. Garner, *Garner's Modern English Usage* 62 (4th ed. 2016). Everything between the two commas is an appositive phrase that provides additional context to the word "benchmark." And, as noted above, the definition of "benchmark" uses those same terms as those between the two commas in the definition of "benchmark replacement" to define what a benchmark is—demonstrating clear support for Plaintiff-Appellee's position. Yet, Defendants-Appellants contend that a benchmark replacement can be any of three things: (1) a benchmark; (2) an interest rate; or (3) a dividend rate.

Statutory interpretation begins "by analyzing the statutory language." *Rotkiske v. Klemm*, 589 U.S. 8, 13 (2019). But analyzing statutory language is not limited to applying dictionary definitions to individual words: "the 'rules of grammar govern' statutory interpretation 'unless they contradict legislative intent or purpose.'" *Nielsen v. Preap*, 586 U.S. 392, 408 (2019) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 140 (2012)); *United States v. Lopez*, 4 F.4th 706, 721 (9th Cir. 2021) (citation omitted)). The Court must analyze "the statute's full text, language as well as punctuation, structure, and subject matter." *U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993). Courts "presume that Congress, in drafting the statute, applied ordinary grammar

rules." *Bourdon v. United States Dep't of Homeland Sec.*, 940 F.3d 537, 543 (11th Cir. 2019); *see also* A. Scalia & B. Garner, at 140 ("Words are to be given the meaning that proper grammar and usage would assign them."); *id.* at 161 ("Punctuation is a permissible indicator of meaning."). Additionally, statutory language must be analyzed with respect to the "specific context in which the language is used, and the broader context of the statute as a whole." *Pit River Tribe v. Bureau of Land Mgmt.*, 939 F.3d 962, 970 (9th Cir. 2019) (quoting *Geo-Energy Partners-1983 Ltd. v. Salazar*, 613 F.3d 946, 956 (9th Cir. 2010)). Defendants' proffered interpretation is at odds with the context contained within the statute and rules of grammar.

### 3. The Language of the Statute Reflects an Appositive Phrase

When applied to rules of grammar and the House of Representatives' Legislative Counsel's Manual on Drafting, the language contained between the two commas in the definition of "benchmark replacement" can only be an appositive.

The language between the two commas in "benchmark replacement" does not employ grammar associated with a series of elements. The statute includes a comma after the last element, uses the conjunction "or" twice, and lacks a serial (or *Oxford)* comma after "interest rate." All three infractions are expressly discussed in the House Legislative Counsel's Manual on Drafting. §§ 351(d)(1)(A)(iii) ("each item *(other than the last item)* ends with a comma or semicolon...") (emphasis added);

34

351(d)(1)(A)(iv) ("the conjunction 'and' or 'or' appears at the end of the next-to-last item only."); 351(d)(3)(A) ("The last two elements of a series should be separated by a comma before the conjunction."). If Congress had intended to make a series of three elements, proper grammar would require excising the first "or" and final comma (placed after the parenthetical) at issue here, and adding a comma to the series, as follows (with corrections in red): "… means a benchmark, ~~or~~ interest rate, or dividend rate (which may or may not be based on LIBOR)~~,~~ to replace LIBOR."

Congress would have certainly used proper grammar to create a list of three elements in the "benchmark replacement" definition, because it did so repeatedly throughout the rest of the Act. The punctuation within the contested language of the Act is *inconsistent with every other instance* in which the Act provides a series of elements. *See, e.g.,* 12 U.S.C. § 5802(16) ("The term 'LIBOR contract' means any contract, agreement, indenture, organizational documents, guarantee, mortgage, deed of trust, lease, security (whether representing debt or equity, including any interest in a corporation, a partnership, or a limited liability company), instrument, or other obligation or asset..."); § 5802(10) ("The term 'determining person' means… any person with the authority, right, or obligation…."); § 5803(b)(2) ("a requirement that a person (other than a benchmark administrator) conduct a poll, survey, or inquiries for quotes…."). Congress even used proper punctuation for a

35

series within the same sentence: "… whether on a temporary, permanent, or indefinite basis …."

Nor is Congress's use of punctuation in the phrase at issue an error. Congress used identical punctuation for identical phrases in the definitions of "benchmark replacement" and "IBOR benchmark replacement." *Compare* § 5802(3) *with* § 5802(13). Given the consistent comma usage throughout the Act—and the inconsistency of Defendants' position that the words at issue are not applied to explain/define "benchmark" in the definition of that word, but as alternatives for a "benchmark" in the definition of "benchmark replacement"—the contested phrase cannot be a series of elements.

Since the phrase is not a series, the commas must be interpreted as separating the non-restrictive phrase "or interest rate or dividend rate (which may or may not be based in part on LIBOR)" from the rest of the sentence. Commas are punctuation that separate non-restrictive phrases and clauses from the simplified sentence. Because non-restrictive phrases are explanatory, they are sometimes called parentheticals. *State v. Tunney*, 895 P.2d 13, 16 (Wash. Ct. App. 1995) ("appositives which serve a nonrestrictive (parenthetic) function are set off by commas"). Since the non-restrictive phrase "interest rate or dividend rate" immediately follows the noun "benchmark," it could either be one of two things: an adjective phrase modifying "benchmark," or an appositive noun phrase. It is clearly not an adjective

36

phrase as it does not modify "benchmark," so the only way to provide it a meaning that adheres to the common rules of grammar is as an appositive.

Defendants-Appellants' counterargument to basic grammar is full-throated, but thin—that the Court's analysis should start and end with the definition of "or", which is "almost always disjunctive." D-A Br. at 33 (citing *United States v. Woods*, 571 U.S. 31, 45–46 (2013)). In support of this argument, they suggest that the "presence of another 'or' within the same sentence" that is "indisputably disjunctive" would run afoul of the "presumption that 'when a term is repeated within a given sentence,' it 'is used to mean the same thing.'" D-A Br. at 33 (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)); *id.* (citing *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018)). These arguments are both overstated and unpersuasive.

First, the presumption that "or" is "almost always disjunctive" is just that: a presumption. "Unsurprisingly, statutory context can overcome the ordinary, disjunctive meaning of 'or.'" *Encino*, 584 U.S. at 87. Reading the first "or" in the definition of "benchmark replacement" as a disjunctive is contrary to both accepted rules of grammar and the House Legislative Counsel's Manual on Drafting. *Nielsen*, 586 U.S. at 408 ("the rules of grammar govern statutory interpretation") (cleaned up); *see also United States v. Gumbs*, 964 F.3d 1340, 1347 (11th Cir. 2020) (interpreting statute in accordance with "grade-school grammar"). Defendants-

Appellants would also have the Court ignore Congress's repeatedly accurate comma usage throughout the rest of statute.[3]

Second, Defendants-Appellants grossly misrepresent the Court's analysis in both *Brown* and *Encino*. Defendants-Appellants argue that, in accordance with *Brown*, "or" must mean the same thing each time it is used. However, the Court in *Brown* was not considering a word as ubiquitous and variable as "or." The issue there concerned whether finding that a Veterans Affairs hospital was at fault for an "injury" was required in advance of granting compensation under a federal statute. 513 U.S. at 118. The context of the statute clearly illustrated that the Veteran Administration's fault was not a required element; the statute provided compensation for injuries suffered in "the pursuit [by the veteran] of vocational rehabilitation" rather than "the provision [by the Veterans Administration] of vocational rehabilitation." *Id.* at 119. The fact that the statute separated "injury" and "fault" in other instances in which the word "injury" was used was merely one additional, non-controlling factor that supported the Supreme Court's interpretation.

*Encino*, which analyzed how a series of modifiers is to be applied to a series of nouns, is wholly inapposite. 584 U.S. at 82–83. *Encino* concerned whether the

---

[3] Ironically, Defendants-Appellants frequently use commas to separate non-essential words and phrases in their briefing. *See, e.g.,* D-A Br. at 31 ("Thus, Plaintiff urges, the court should…"). They also use ", or" to introduce an appositive phrase. *E.g., id.* at 50 ("… not to ascribe a general purpose, or 'principal concern,' to a statute…") (internal citation omitted).

language "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles" should be interpreted to mean (1) any salesman *who sells*, partsman *who services*, or mechanic *who service*s; or (2) any salesman *who sells or services*, partsman *who sells or services*, or mechanic *who sells or services*. *Id*. There is no similar issue in the LIBOR Act.

### 4. The LIBOR Act Indicates an Intent to Require Replacing LIBOR with a Benchmark

Courts do not consider individual words and phrases in a vacuum; statutory language must be interpreted in a manner that carefully considers the "specific context in which the language is used, and the broader context of the statute as a whole." *Pit River*, 939 F.3d at 970; *see also Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) ("a court must carefully consider the text, structure, history, and purpose of a regulation") (cleaned up). The definition of "benchmark replacement" is just one subsection of the LIBOR Act and must be interpreted within the context of the LIBOR Act as a whole—both its language and its purpose.

When a statute includes an explicit statement of legislative purpose, a court must reject an interpretation of a statute that "cannot be squared with the statute's stated purpose." *California Sea Urchin Comm'n v. Bean*, 883 F.3d 1173, 1184 (9th Cir. 2018) (rejecting a reading of a statute that would turn a statute "with an express purpose of protecting otters into one that harmed the otter populations"). Additionally, Courts should consider the historical environment in which the

legislation was drafted. *Pit River*, 939 F.3d at 971 ("'[U]nderstanding the historical context in which a statute was passed can help to elucidate the statute's purpose and the meaning of statutory terms and phrases,'") (quoting *Cnty. of Amador v. United States Dep't of Interior*, 872 F.3d 1012, 1022 (9th Cir. 2017)). Finally, "'interpretations of a statute which would lead to absurd results are to be avoided if alternative interpretations **consistent with the legislative purpose** are available.'" *Gallarde v. I.N.S.*, 486 F.3d 1136, 1143 n.7 (9th Cir. 2007) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) (emphasis added)).

In the LIBOR Act, Congress includes its "Findings and purpose." 12 U.S.C. § 5801. Section 5801 demonstrates that Congress did not intend for a fixed rate to be used as a benchmark replacement for LIBOR. When the LIBOR Act was passed, more than $200 trillion worth of contracts worldwide used LIBOR as their benchmark. 12 U.S.C. § 5801(a)(1). Many of these contracts included near-identical language to that in Section 4(g) of the Articles, 2-ER-312–13, and Congress found that "a significant number of existing contracts that reference LIBOR" **do not provide a "clearly defined or practicable replacement benchmark rate when LIBOR is discontinued."** 12 U.S.C. § 5801(a)(2) (emphasis added). The likelihood that the cessation of LIBOR would result in potentially catastrophic market turmoil and disruptive litigation for these contracts led Congress to pass the LIBOR Act with the explicit purpose of ensuring that floating-rate instruments tied to LIBOR have a

40

"clearly defined or practicable replacement benchmark rate." 12 U.S.C § 5801(a)(3)–(b)(1). By passing the LIBOR Act, Congress was addressing concerns with the lack of a practicable "replacement benchmark." Defendants-Appellants' reading of "benchmark replacement" is inconsistent with that.

The LIBOR Act defines "benchmark" as "***an index* of *interest rates or dividend rates*** that is used, in whole or in part, as the basis of or as a reference for calculating or determining any valuation, payment, or other measurement." 12 U.S.C. § 5802(1) (emphasis added). By its express language, the definition of "benchmark" applies to the entire chapter. *Id.* § 5802. Thus, the Court must interpret the word "benchmark" in Congress's "[f]indings and purpose" in accordance with its statutory definition. The Court can then substitute the definition in place of "benchmark" in Section 5801. Doing so results in the following: "It is the purpose of this chapter—(1) to establish a clear and uniform process, on a nationwide basis for replacing LIBOR in existing contracts the terms of which do not provide for the use of a clearly defined or practicable replacement [***index*** of interest rates or dividend rates that is used, in whole or in part, as the basis of or as reference for calculating or determining any valuation, payment or other measurement]." *Accord* § 5801(b) *with* § 5802(1). Put simply, the purpose of the LIBOR Act is to ensure that any replacement for LIBOR is an "***index*** of interest rates or dividend rates." *Id.*

41

Plaintiff-Appellee's interpretation of a "benchmark replacement" conforms with this stated purpose. The definition of a "benchmark replacement" requires that whatever replaces LIBOR must first and foremost be a benchmark. This reading represents a logical like-for-like swap by requiring that LIBOR, which is an index, be replaced by another index. Moreover, nothing in Plaintiff-Appellee's interpretation conflicts with Congress's intent to empower parties to use another "appropriate benchmark rate" (*i.e.*, a replacement rate that is "clearly defined or practicable"). *Id.* § 5801(b)(1).

Congress also stated that it intended for contracts with "practicable" replacement rates to operate according to their terms. Section 5803 provides additional context as to what makes a replacement rate practicable. As part of the LIBOR Act, Congress empowered the Board of Governors to provide tenor-spread adjustments for converting between LIBOR into SOFR. *Id.* § 5803(e).[4] The tenor-spread adjustment further demonstrates Congress's intention that the replacement benchmark have some degree of comparability. Using Series A as an example, an 8.125% fixed rate is not comparable to a floating rate as a matter of definition. Nor is it comparable to the dividend rate that would have been offered had PennyMac adopted SOFR: 11.19%.

---

[4] Currently, the tenor spread adjustment for converting SOFR to 3-month LIBOR is 0.26161%. *Id.* § 5802(20).

42

Defendants-Appellants also argue that the penultimate modifying phrase in the definition of "benchmark replacement"—"whether on a temporary, permanent, or indefinite basis"—indicates that Congress contemplated a situation in which a temporary replacement could be used permanently. D-A Br. at 36. Defendants-Appellants ignore the phrase that follows, however: "under or with respect to a LIBOR contract." Read correctly, the whole phrase speaks to ***how LIBOR is being used in the contract***, and not whether you can convert contractual use for one purpose to another (temporary to permanent). Section 4(g)'s waterfall addresses the temporary unavailability of LIBOR.[5] This is consistent with Congress's statements of purpose in Section 5801 and the overall structure of the LIBOR Act, which intend for LIBOR contracts to operate as normal with the sole exception of a one-to-one substitution of LIBOR with a replacement benchmark. But it does not, as Defendants-Appellants claim, authorize (expressly or otherwise) a contractual provision designed to address a temporary issue to amend a material term of the contract. Defendants-Appellants wish that the phrase means more than it does.

---

[5] Defendants-Appellants correctly note that the inclusion of "temporary" in this phrase was an addition by Congress from the original guidance (though the entire provision was modified; "temporary" was not just inserted), and should be treated as a "conscious decision." D-A Br. at 36 n.4. That does not, however, make Defendants' reading more plausible or Plaintiff's reading less so.

43

### 5. Congress Intended to Prevent the Conversion of Floating-Rate Instruments into Fixed-Rate Instruments

As set forth above, Plaintiff-Appellee's interpretation of the LIBOR Act and Rule is robust, well-supported, logical, and contextual. Defendants-Appellants' interpretation, pegged only to the use of two instances in which the word "or" appears, is at odds with rules of grammar, House guidance, and the statute's language, context, and purpose. Nevertheless, at best for Defendants-Appellants, these dueling interpretations of the statute lead to ambiguity. If a court has exhausted "'traditional tools of statutory construction'" and determined that a statute is ambiguous, it may turn to legislative history for guidance. *Trim v. Reward Zone USA LLC*, 76 F.4th 1157, 1163 (9th Cir. 2023) (quoting *NLRB v. United Food & Com. Workers Union, Loc. 23, AFL-CIO*, 484 U.S. 112, 123 (1987)).

Here, legislative history firmly supports Plaintiff-Appellee's interpretation. Nowhere in the hundreds of pages of legislative records does *anyone* suggest that a fixed rate qualifies as a benchmark replacement or adequate fallback provision. The legislative record demonstrates the ***opposite—stating that a goal is to prevent floating-rate instruments from unfairly converting into fixed-rate instruments***.

Congressman Brad Sherman urged Congress to pass the LIBOR Act, stating: "trillions of outstanding loans [] have adjustable interest rates… tied to… [LIBOR,] the most important interest rate in the world. We are dealing here with ***adjustable rate*** mortgages, business loans and securities, … [and] [f]or many years LIBOR was

44

the index." 2-ER-197. Mark Van Der Weide, the General Counsel of the Federal Reserve, testified to Congress that "many floating-rate notes and securitizations have problematic fallback language—generally, [with LIBOR's cessation,] these contracts convert to fixed-rate instruments at the last published value of LIBOR...." Van Der Weide further testified that "Federal legislation should be targeted narrowly to address legacy contracts that have no fallback language, that have fallback language referring to LIBOR or to a poll of banks, or that convert to fixed-rate instruments." 2-ER-107.

Defendants-Appellants suggest that Plaintiff-Appellee "cherry picked excerpts of legislative history." D-A Br. at 17. They claim that Representative Sherman's statements are unreliable because "'scattered floor statements by individual lawmakers' are 'among the least illuminating forms of legislative history.'" D-A Br. at 40 (quoting *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 481 (2017)). They also dismiss Van Der Weide's statements because it is "testimony before a subcommittee." *Id.* (quoting *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 120 (2001)). Conveniently and notably missing from Defendants-Appellants' arguments, however, is any conflicting floor statement or testimony that supports *their* interpretation. Such silence is deafening.

The Supreme Court's reluctance to use floor statements is predicated on the fact that legislative history typically includes contradictory statements from

45

opposing sides of a debate. *See NLRB v. SW General, Inc.*, 580 U.S. 288, 307 (2017) ("But Senator Byrd—the very next speaker—offered a contradictory account…. This is a good example of why floor statements by individual legislators rank among the least illuminating forms of legislative history."). Yet, there were no statements made on the House Floor that contradicted Representative Sherman's statements. In fact, the Bill passed the House by a vote of 415-9. Roll Call 407, Bill H.R. 4616 (Dec. 8, 2021).[6]

Similarly, Defendants-Appellants argue that congressional committee witness testimony is "[e]ven more 'problematic'" because it is "still more steps removed from the full Congress." D-A Br. 40 (quoting *Cir. City Stores, Inc.*, 532 U.S. at 120 and *Regan v. Wald*, 468 U.S. 222, 237 (1984)). First, Defendants-Appellants' selective truncation of quotes is misleading. In *Regan v. Wald,* the full passage reads:

> Oral testimony of witnesses and individual Congressmen, unless very precisely directed to the intended meaning of particular words in a statute, can seldom be expected to be as precise as the enacted language itself. To permit what we regard as clear statutory language to be materially altered by such colloquies, which often take place before the bill has achieved its final form, would open the door to the inadvertent, or perhaps even planned, undermining of the language actually voted on by Congress and signed into law by the President.

468 U.S. at 237. Defendants-Appellants misrepresent the meaning of this passage by claiming "[o]ral testimony of witnesses" undermines "language actually voted on

---

[6] The LIBOR ACT was never debated on the floor of the Senate. It was passed by the Senate as part of the March 15, 2022, omnibus spending bill.

by Congress." But here the cited testimony was "very precisely directed to the intended meaning of particular words in a statute" *and* Defendants-Appellants do not identify how this testimony undermines "clear statutory language." D-A Br. at 40. A court should not abandon oral testimony, as Defendants-Appellees' suggest, where the statutory language is deemed by the court to be ambiguous. Nor would Defendants-Appellees suggest such an approach if they could locate a scintilla of testimony to support their illogical statutory interpretation (because none exists).

Defendants-Appellants also ignore the context from this Court's decision in *Hertzberg* to once again suggest witness testimony is irrelevant. D-A Br. 41 ("Accordingly, even when this Court considers legislative history, it disregards 'stray comments by individuals or other materials unrelated to the statutory language or the committee reports,' such as the material cited by Plaintiff below.") (quoting *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1082 (9th Cir. 1999)). In *Hertzberg*, the Court was disregarding comments "made regarding an alternate bill which was never enacted." *Hertzberg*, 191 F.3d at 1082. Van Der Wilde's comments were not "made regarding an alternate bill," and Defendants-Appellants do not, and cannot, point to any contrary statements.

Accordingly, both the statutory text and legislative history support a finding that PennyMac's decision to convert its floating-rate notes into fixed-rate notes is precisely the outcome Congress sought to prevent by enacting the LIBOR Act, and

47

therefore constitutes unlawful conduct under the UCL. 2-ER-303–04, 316–20. The Class was, and will continue to be, denied the dividends promised and owed, unless this Action proceeds.

### C. PennyMac Engaged in Unfair Business Practices Under the UCL

Defendants-Appellants' conduct also satisfies the "unfair" prong of the UCL.

A claim for unfair conduct in violation of the UCL may be based on (1) a violation of public policy or spirit of an antitrust law, (ii) immoral, unethical, oppressive, unscrupulous, or substantially injurious conduct, or (iii) conduct for which the impact outweighs the rationales of the wrongdoer. *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214–15 (9th Cir. 2020). The Court need only find that Plaintiff-Appellee's allegations meet one of these tests to survive a motion to dismiss. *E.H. v. Meta Platforms, Inc.*, No. 23-CV-04784, 2024 WL 557728, at *6 (N.D. Cal. Feb. 12, 2024). By converting its fixed-to-floating Preferred Shares to lower-yielding fixed-rate shares, PennyMac violates all three tests.

As discussed above, Congress expressly stated—and the legislative history further supports the finding—that the purpose of the LIBOR Act was to ensure that contracts with floating rates based on LIBOR be converted to some alternative floating benchmark. *Supra* V.B.4. Thus, PennyMac's decision to convert its fixed-to-floating rate instruments to fixed-rate instruments does not comport with the public policy underpinning the LIBOR Act.

48

Even if Congress had intended to authorize the use of a fixed rate as a replacement benchmark and PennyMac's actions were found to be lawful, PennyMac's conduct would nonetheless be unfair because it was substantially injurious and not practicable, comparable, or bargained for. If PennyMac had adopted SOFR instead of a LIBOR-based fixed rate, Series A Shareholders would have received as their first dividend payment a rate of 11.19% instead of 8.125%, and Series B Shareholders would have received a rate of 11.35% instead of 8.00%. 2-ER-300–04, 308–13, and 317–19. That is a 27% drop in the expected dividend return of Series A Preferred Shares (29% for Series B). Similarly, the value of the Preferred Shares plummeted following PennyMac's announcement. 2-ER-313.

Nor can the substantial injury caused by PennyMac's decision be outweighed by any rationale from PennyMac. The majority of the financial industry adhered to regulatory guidance and adopted SOFR under the LIBOR Act. 2-ER-311. PennyMac was an outlier. 2-ER-311. Coincidentally, unlike most LIBOR contracts which are traded among institutional shareholders, PennyMac's Preferred Shares are traded among retail investors. PennyMac is alleged to have taken advantage of small, retail investors who have and will continue to lose dividend income from their retirement portfolios and otherwise. 2-ER-303. PennyMac's conduct was, as at least one market professional commented, so "particularly nasty, even exploitative, to investors" that

49

he did not think that "they would have had the sheer *chutzpah* to treat institutional investors that badly." 2-ER-303.

Moreover, PennyMac's argument that the initial rates "do not inherently favor one party over another" because the floating rates depend on SOFR, D-A Br. at 48, ignores the reality of SOFR and LIBOR. From October 31, 2022, until its cessation on June 30, 2023, the Three-Month LIBOR never fell below 3%. Given that the Preferred Shares require an additional spread over the Three-Month LIBOR of 5.831% for Series A and 5.99% for Series B, neither Series would ever have offered a dividend rate as low as 8.125% or 8.00%, respectively. In fact, on the day of its last publication, June 30, 2023, the Three-Month LIBOR was at 5.52%. Similarly, the SOFR has not fallen below 3% since October 1, 2022, and on the day of LIBOR's last publication the SOFR was at 5.05%.

The purpose of purchasing a fixed-to-floating rate instrument such as the Preferred Shares is precisely to benefit from rising interest rates. At the time of their issuance, Preferred Shareholders reasonably would have expected that the artificially deflated interest rates that resulted from the 2008 financial collapse would rebound by the time the Preferred Shares were redeemable. PennyMac sold Preferred Shares to customers based on a promise that they would be able to cash in on that expectation. While most other issuers honored their promises, PennyMac pulled the rug out from underneath retail investors.

PennyMac's conduct violated the legislative intent behind the LIBOR Act, caused substantial injury, and cannot be justified or outweighed by any business rationale. Thus, even if lawful, PennyMac's conduct was ***unfair*** under the UCL.

### D. PennyMac is Not Shielded by the UCL's Safe Harbor or Federal Preemption

Defendants-Appellants' reliance on the UCL Safe Harbor is misplaced. It is well established that a business practice which may not otherwise violate a statute may be unfair under the UCL. To qualify for protection under the UCL's safe harbor, a statute must either clearly permit the conduct or explicitly prohibit liability in an action based on the alleged conduct. *BBBB Bonding Corp. v. Caldwell*, 288 Cal.Rptr.3d 439, 461 (Cal. Ct. App. 2021) (citing *Cel-Tech*, 973 P.2d at 562). The UCL recognizes a clear distinction "'between (1) not making an activity unlawful, and (2) making that activity lawful.'" *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1001 (9th Cir. 2023) (quoting *Cel-Tech*, 973 P.2d at 563). To decide otherwise, would "collaps[e] the 'unfair' and 'unlawful' prongs into each other." *Id.* For the reasons stated, Defendants-Appellants' conduct is not expressly authorized by the Act. The Act does not expressly allow for the use of a fixed-rate as a replacement benchmark or the use of a temporary fallback provision in perpetuity. Accordingly, Defendants-Appellants' allegedly ***unfair*** conduct is not protected by the safe harbor for lawful conduct.

Federal preemption does not apply either. Contrary to Defendants-Appellants' contention, Plaintiff-Appellee is not seeking to displace the LIBOR Act's requirements for a benchmark replacement with a "provision of any State… law." D-A Br. at 46 (quoting 12 U.S.C. § 5806(1)). The UCL is silent as to benchmarks, benchmark replacements, and SOFR. Rather, the UCL is an enforcement mechanism requiring Defendants-Appellants to comply with federal law. There is no inherent conflict in utilizing the UCL for that purpose. *McKell*, 49 Cal.Rptr.3d at 252 (the UCL "only provides a means of enforcing federal requirements.").

### E.     California Law Applies to this Action

California law applies to this Action and supports the use of the UCL and its injunctive powers.

"A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits." *Atl. Marine*, 571 U.S. at 65 (2013). A state's choice-of-law rules include whether a contractual choice-of-law provision is enforceable. *See Mandviwala*, 723 Fed. Appx. at 416–17 (finding no error where court applied "California's choice-of-law provision governing enforceability of a contract").[7]

---

[7] In *Mandviwala*, the Ninth Circuit affirmed a district court's decision not to enforce a Maryland choice-of-law provision in an employment contract because doing so interfered with the plaintiff's right to bring a claim under the California Private Attorneys General Act. *Id.* at 416-17. The Private Attorneys General Act is an analog

52

Under California law, a choice-of-law provision is enforceable if either "the chosen state has a substantial relationship to the parties or transaction" or ("there is any other reasonable basis for the parties' choice of law." *Nedlloyd Lines B.V. v. Superior Ct.*, 834 P.2d 1148, 1152 (Cal. 1992). A valid choice-of-law provision "encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized." *Id.* at 1155. However, "if the chosen state's law is contrary to a fundamental policy of California," then the court must determine whether California "has a materially greater interest in the particular issue." *Id.* at 1152 (quoting Restatement (Second) of Conflict of Laws § 187).

### 1. Maryland Law is Contrary to California's Fundamental Policy Granting a Private Action for Injunctive Relief

The Declaration's choice-of-law provision identifies Maryland law as governing the relationship between the parties. Maryland has a relationship to the parties because one of two Defendants-Appellants, the Trust, is incorporated there. However, the Maryland Consumer Protection Act ("CPA") does not allow private parties to seek injunctive relief, reserving that right solely for Maryland's Attorney General. This directly conflicts with California's UCL, which grants a private party's right to a public injunction. *McGill*, 393 P.3d at 93.

---

to the UCL that grants employees the right to obtain injunctive relief from violations of employment laws.

53

As explained above, *supra* at V.A.1, this Court, California district courts, the California Supreme Court, and the California appellate courts have all routinely determined that California laws that empower citizens to act as private attorneys general and seek injunctions convey a "fundamental policy" of California. In the case of the UCL, a pre-dispute waiver of the right to equitable relief "would seriously compromise the public purposes the statutes were intended to serve." *Id*.

The District Court correctly reached the same conclusion. 1-ER-12–13 (citing *Walter*, 682 F.Supp.2d at 1042). The *Walter* court compared California's UCL to Maryland's CPA and found that enforcing a Maryland choice-of-law clause would deprive the plaintiff of the right to seek a public injunction. *Id.* at 1041–42. That conflict still exists today. Md. Code Ann., Com. Law §§ 13-406 & 13-408 (authorizing only its Attorney General to seek injunctive relief and providing consumers damages only). As in *Walter*, enforcing a Maryland choice-of-law provision here would be "contrary to a fundamental policy of California" because it will deprive Plaintiff the ability to secure a public injunction. 682 F.Supp.2d at 1041 ("Where a difference in available remedies implicates a fundamental policy set out in California law, the reviewing court must at least take pause before it allows the parties to contract around those policies by choosing to apply foreign law.").

Defendants-Appellants erroneously assert that Plaintiff-Appellee does not seek "public" injunctive relief because the relief requested would affect only class

members. D-A Br. at 57 (citing *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535 (9th Cir. 2021)). Defendants-Appellants are incorrect. First, California appellate courts have rejected *Hodges* as inconsistent with California law. *Ramsey v. Comcast Cable Commc'ns, LLC*, 317 Cal.Rptr.3d 561, 568–69, 571 (Cal. Ct. App. 2023) (declining to enforce arbitration provision as in *Hodges*, disagreeing across the board with both its holding and characterization of contrary cases), *cert. denied Comcast Commc'ns, LLC v. Ramsey*, 145 S.Ct. 1050 (2025); *Vaughn v. Tesla, Inc.*, 303 Cal.Rptr.3d 457, 475 n.16 (Cal. Ct. App. 2023). California law does not require an injunction with "universal reach." *Ramsey*, 317 Cal.Rptr.3d at 572; s*ee also Hodges*, 21 F.4th at 552 (Berzon, J., dissenting) ("The injunction sought by Hodges includes relief that is indistinguishable from the relief that we and the California Court of Appeal deemed public injunctive relief in *Blair, Mejia*, and *Maldonado*").[8] Second, the issue in *Hodges* was the collection and sale of private information, not misleading communications to potential and current consumers. *See Hodges*, 21 F.4th at 542 (distinguishing *McGill*, which featured "the paradigmatic example…, where the plaintiff sought an injunction against the use of false advertising…."). Here, the Preferred Shares are marketed, by their very name, as fixed-to-floating rate securities. The proposed injunction rectifies the misleading communication by

---

[8]*Blair v. Rent-A-Center, Inc.*, 928 F.3d 819 (9th Cir. 2019); *Mejia v. DACM Inc.*, 268 Cal.Rptr.3d 642 (Cal. Ct. App. 2020); and *Maldonado v. Fast Auto Loans, Inc.*, 275 Cal.Rptr.3d 82 (Cal. Ct. App. 2021).

requiring the adoption of SOFR as the benchmark replacement for LIBOR. Such an injunction has a near-equal impact on both current and prospective investors, the latter of which are not members of the putative class. 2-ER-313. An injunction that benefits both current and potential consumers is public relief. *Ramsey*, 317 Cal.Rptr.3d at 568–69, 573. Enjoining this illegal misconduct under the UCL sends a cautionary message to the entire financial industry.

Defendants-Appellants' assertions that "consumer protection laws are not the only—or even the most natural—way to enforce" Plaintiff-Appellee's claim is both irrelevant and inappropriate. It is well-established that the plaintiff is "the master of the complaint." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025). The plaintiff, not the defendant, gets to determine which substantive claims to bring. *Id.* Nor is it appropriate for Defendants-Appellants to alter the requested remedy to one of their choosing. D-A Br. at 55 (suggesting Plaintiff should "seek specific performance of the contract, an equitable remedy 'which is, essentially, an injunction,'") (quoting *Vasquez v. Rackauckas*, 734 F.3d 1025, 1040 (9th Cir. 2013)).[9]

---

[9] Defendants-Appellants' quotation of the Court's decision in *Vazquez* is out of context. There, the Court was faced with a jurisdictional question that turned on whether the plaintiff's claim for injunctive relief was independent of the plaintiff's claim for declaratory relief. When discussing precedent, the Court was drawing analogies, not issuing a holding. The full quote is "*Scotts*, for example, held that a claim for specific performance of a contract—which is, essentially, an injunction— was 'independent' of a claim for declaratory relief 'because it would be viable

Additionally, Defendants-Appellants misapprehend the import of *EpicentRx, Inc. v. Superior Ct.*, 572 P.3d 1 (Cal. 2025). First, *EpicentRx* concerns a forum selection provision, not a choice-of-law provision. In *EpicentRx,* the court considered whether a forum selection clause mandating that claims be brought in the Delaware Court of Chancery (which offers only bench trials) violates California's public policy favoring jury trials. Under California law, the legal standards for denying enforcement of a forum selection provision are more stringent than those for the non-enforcement of a choice-of-law provision. Although in both circumstances a court determines whether the provision conflicts with a "fundamental policy" of California, a forum selection provision is enforced absent a showing that doing so would render the litigation "unfair or unreasonable." *Id.* at 11. Conversely, a court considering whether to enforce a choice-of-law provision need only determine which state has the more substantial interest in the litigation. *Nedlloyd*, 834 P.2d at 1152.

Additionally, enforcement of the forum selection provision in *EpicentRx* did not prevent the plaintiff from pursuing its remedy, as would be the case here if Maryland law was applied. The provision merely limited where and by whom the claim would be heard (i.e., a procedural issue). *See Byrd v. Blue Ridge Rural Elec.*

---

without the declaratory claim.'" 734 F.3d 1025, 1040 (citing *Scotts Co. LLC v. Seeds, Inc.*, 688 F.3d 1154, 1158 (9th Cir. 2012)).

*Coop., Inc.*, 356 U.S. 525 (1958) (requiring questions of fact in a diversity action be assigned to the jury even if they are assigned to the judge in state court). If the provision was enforced, the plaintiff would be heard at a bench trial; if the provision was not enforced, the plaintiff would be heard at a jury trial. Either way, the plaintiff remained the master of its own complaint and asserted its intended claim.

That is simply not the issue presented here. Under Maryland law, Plaintiff-Appellee cannot seek the injunctive relief sought because that right is reserved solely for the Attorney General. Accordingly, application of Maryland law would substantially conflict with the fundamental policy of California.

### 2. California's Interests in the Litigation Trump Maryland's Interests

Finally, many factors support the finding that California has a materially greater interest than Maryland in this dispute. *Walter*, 682 F.Supp.2d at 1042. Both Defendants-Appellants maintain their headquarters in California, the officers responsible for the misconduct are located in California, the decisions related to the misconduct were made in California, and California consumers were affected. Conversely, Maryland's only connection is that one of the two Defendants-Appellants is incorporated there. Defendants have no office in Maryland nor operate there. *See Ribbens Int'l., S.A. de C.V. v. Transp. Int'l Pool, Inc.*, 47 F.Supp.2d 1117, 1121 (C.D. Cal. 1999) (finding California had a materially greater interest than Pennsylvania, where defendants were incorporated, because transactions and

58

business dealings were concentrated in California); *Jialu Wu*, 2020 WL 8461696 at *6 ("[The chosen forum's] companies need only be mindful of the fact that, when acting in California, they may be subject to the sharper teeth embodied by California's consumer protection regime") (quoting *Walter*, 682 F.Supp.2d at 1042).

Defendants-Appellants place much emphasis on *Olinick v. BMG Ent.,* 42 Cal.Rptr.3d 268 (Cal. Ct. App. 2006), for the proposition that the lack of an "anti-waiver" provision is "a factor favoring enforcement" of a "choice of law." D-A Br. 60-61. But, unlike here, the *Olinick* court explicitly acknowledged that both California's Fair Employment and Housing Act and the New York City's Human Rights Law granted the plaintiff the same cause of action and near identical remedies. *Id.* at 1303. Defendants-Appellants' other cases involving forum selection clauses are again irrelevant, because, as discussed above, forum selection clauses do not interfere with a plaintiff's substantive right to bring a claim or the relief requested; they merely dictate procedurally where the claim is heard.

Finally, Defendants-Appellants argue that Maryland's interest is dominant because it has a "well-developed statutory scheme and 'area-expert judiciary.'" D-A Br. at 65 (quoting Jason S. Oh, *et al.*, *A Theory of the REIT*, 133 Yale L.J. 755, 768 & n.64, 801 (2024)). This argument is wholly unpersuasive. The issues in this case do not concern the formation, governance, or structure of a REIT. This case primarily involves the interpretation of a federal statute, the LIBOR Act. Neither

Maryland's REIT statutory scheme nor its area-expert judiciary provides any insight into the LIBOR Act. Thus, Maryland's developed REIT law has no bearing. Even accepting that Maryland is to REITs as Delaware is to corporations, the UCL is regularly enforced against businesses doing business in California but incorporated elsewhere. *See, e.g., Briskin v. Shopify, Inc.*, 135 F.4th 739 (9th Cir. 2025) (*en banc*); *Ramsey*, 317 Cal.Rptr.3d at 573 (defendants organized under Delaware law); *Anderberg v. Hain Celestial Group, Inc.*, 652 F.Supp.3d 1232 (S.D. Cal. 2023). This is especially true where the business at issue is headquartered in and operates out of California, such as the Defendants-Appellants here. Thus, the Court should affirm the District Court's decision to apply California law.

## VII.  **CONCLUSION**

For these reasons, Plaintiff-Appellee respectfully requests that the Court find jurisdiction under Section 1292(b) is lacking or affirm the District Court's Order denying Defendants' Motions to Dismiss.

Dated: December 5, 2025                    Respectfully submitted,

**BERMAN TABACCO**

By:   */s/ Daniel E. Barenbaum*
        Daniel E. Barenbaum (SBN 209261)

Nicole Lavallee (SBN 165755)
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
nlavallee@bermantabacco.com
dbarenbaum@bermantabacco.com

60

Catherine Pratsinakis
**DILWORTH PAXSON, LLP**
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Telephone: (215) 575-7000
cpratsinakis@dilworthlaw.com

*Counsel for Plaintiff-Respondent Roberto*
*Verthelyi and the Putative Class*

61

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(f) and Circuit Rules 5-2(b) and 32-3(2), I certify under penalty of perjury that the forgoing **Plaintiff's-Respondent's Answer in Opposition to Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b)** complies with the page/word count limitation of Circuit Rules 5-2(b) and 32-3(2) because this document is proportionately spaced, has a typeface of 14 points, and contains 13,968 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

I further certify that the forgoing opposition complies with typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point size Times New Roman font.


Dated: December 5, 2025      By:      _*/s/ Daniel E. Barenbaum*_
                                         Daniel E. Barenbaum

62

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2025, I caused the foregoing **Plaintiff's-Respondent's Answer in Opposition to Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b)** to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.

Participants in the case who are registered ACMS users will be served by the appellate ACMS system.

_/s/ Daniel E. Barenbaum_
Daniel E. Barenbaum