No. 25-4458

_____

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ROBERTO VERTHELYI,
*on behalf of himself and all others similarly situated,*

*Plaintiff-Appellee,*

v.

PENNYMAC MORTGAGE INVESTMENT TRUST;
PNMAC CAPITAL MANAGEMENT, LLC,

*Defendants-Appellants.*

*Interlocutory Appeal from the United States District Court
for the Central District of California,
No. 2:24-cv-05028-MWF-JC, Hon. Michael W. Fitzgerald*

## REPLY BRIEF OF DEFENDANTS-APPELLANTS

<table>
<tr>
<td>

STEVEN M. FARINA
MELISSA B. COLLINS
WILLIAMS & CONNOLLY LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  sfarina@wc.com

</td>
<td>

MATTHEW DONALD UMHOFER
JONAS P. MANN
UMHOFER, MITCHELL & KING LLP
  767 South Alameda Street
  Suite 270
  Los Angeles, CA 90021
  (213) 394-7979
  matthew@umklaw.com

</td>
</tr>
<tr>
<td>

*Counsel for Defendant-Appellant PennyMac Mortgage Investment Trust*

</td>
<td>

*Counsel for Defendants-Appellants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC*

</td>
</tr>
</table>

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................1

ARGUMENT .......................................................................................................3

I. This Court Has Jurisdiction Under Section 1292(b). ..................................3

    A.    The LIBOR Act Issue Is Suitable for Immediate Appeal. ............3

    B.    The Choice-of-Law Issue Is Suitable for Immediate Appeal. .......5

II. Because PennyMac Complies with the LIBOR Act, Plaintiff Cannot State a Claim Under the UCL. ................................................................................8

    A.    PennyMac's Actions Comply with the LIBOR Act and Are Not "Unlawful."..................................................................................8

        1.    The Articles Contain a Clearly Defined and Practicable Fallback Provision. ...................................................................9

        2.    The Language of the Statute Does Not Reflect an Appositive. ............................................................................11

        3.    Plaintiff's Objections to Defendants' Interpretation Are Unavailing................................................................................16

        4.    The Legislative History Does Not Support Plaintiff's Interpretation................................................................................20

    B.    PennyMac's Compliance with the LIBOR Act Does Not Give Rise to an "Unfair" Claim. ...........................................................23

III. The Choice-of-Law Provision Is Enforceable, So Maryland Law Governs and Plaintiff Cannot State a Claim Under the UCL................................26

    A.    Maryland Law Does Not Contravene Fundamental California Policy. ........................................................................................26

    B.    Maryland's Interest Is Materially Greater Than California's.....32

CONCLUSION ..................................................................................................34

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Advoc. Health Care Network v. Stapleton*, 581 U.S. 468 (2017)........................11

*Bailey v. United States*, 516 U.S. 137 (1995) ...................................................13, 14

*Brown v. Gardner*, 513 U.S. 115 (1994).............................................................19

*Connell v. Lima Corp.*, 988 F.3d 1089 (9th Cir. 2021) .....................................12

*Couch v. Telescope Inc.*, 611 F.3d 629 (9th Cir. 2010) ......................................4

*Doe 1 v. Github, Inc.*, 2024 WL 4336532 (N.D. Cal. Sept. 27, 2024)...................8

*Doe v. Uber Techs., Inc.*, 90 F.4th 946 (9th Cir. 2024) .....................................30

*Duncan v. Walker*, 533 U.S. 167 (2001)............................................................12

*Dupree v. Younger*, 598 U.S. 729 (2023)...........................................................6

*Encino Motorcars, LLC v. Navarro*, 584 U.S. 79 (2018) ..................................19

*Exxon Mobil v. Allapattah Servs.*, 545 U.S. 546 (2005) ...................................22

*Fang v. CMB Exp. Infrastructure Inv. Grp. 48, LP*,
    773 F. Supp. 3d 963 (E.D. Cal. 2025) .................................................................7

*Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076 (9th Cir. 1999) ..........20, 21

*Hodges v. Comcast Cable Commc'ns, LLC*,
    21 F.4th 535 (9th Cir. 2021) .......................................................................29, 30

*In re Kelly*, 841 F.2d 908 (9th Cir. 1988)..........................................................21

*Jialu Wu v. iTalk Glob. Commc'ns, Inc.*,
    2020 WL 8461696 (C.D. Cal. Oct. 21, 2020)...................................................33

*Jogi v. Voges*, 480 F.3d 822 (7th Cir. 2007) ....................................................15

*Kim v. Cedar Realty Tr., Inc.*, 116 F.4th 252 (4th Cir. 2024) .........................28

*King v. Bumble Trading, Inc.*, 393 F. Supp. 3d 856 (N.D. Cal. 2019) ............31

*Krasner v. Cedar Realty Tr., Inc.*, 86 F.4th 522 (2d Cir. 2023).......................28

*Lawson v. FMR LLC*, 571 U.S. 429 (2014) ......................................................19

*Lockhart v. United States*, 577 U.S. 347 (2016).................................................18

iii

Page

Federal Cases—continued:

*Martinez v. Wells Fargo Home Mortg., Inc.,*
   598 F.3d 549 (9th Cir. 2010)..................................................24

*Martinez v. Refinitiv, Ltd.,* 2024 WL 5424373 (C.D. Cal. Nov. 14, 2024).......30

*Milner v. Dep't of Navy,* 562 U.S. 562 (2011) ................................20

*Montich v. Miele USA, Inc.,* 849 F. Supp. 2d 439 (D.N.J. 2012)........................6

*Pro Water Sols., Inc. v. Angie's List, Inc.,*
   2021 WL 124496 (C.D. Cal. Jan. 13, 2021) ...............................27

*Pulsifer v. United States,* 601 U.S. 124 (2024) ....................................12

*Rajaram v. Meta Platforms, Inc.,* 105 F.4th 1179 (9th Cir. 2024)...................20

*Reese v. BP Expl. (Alaska) Inc.,* 643 F.3d 681 (9th Cir. 2011).......................3, 4

*Ribbens Int'l, S.A. de C.V. v. Transp. Int'l Pool, Inc.,*
   47 F. Supp. 2d 1117 (C.D. Cal. 1999) ..................................33

*Roth v. Foris Ventures, LLC,* 86 F.4th 832 (9th Cir. 2023) ...............................3

*Ruiz v. Affinity Logistics Corp.,* 667 F.3d 1318 (9th Cir. 2012)........................7

*Shannon-Vail Five Inc. v. Bunch,* 270 F.3d 1207 (9th Cir. 2001).................6, 7

*State v. Su,* 121 F.4th 1 (9th Cir. 2024)................................................15

*Stout v. Grubhub Inc.,* 2021 WL 5758889 (N.D. Cal. Dec. 3, 2021)..................30

*Sturgeon v. Frost,* 587 U.S. 28 (2019) ...............................................14

*United States v. Woods,* 571 U.S. 31 (2013) ...........................13, 17, 19

*Vasquez v. Rackauckas,* 734 F.3d 1025 (9th Cir. 2013) ...............................27

*Walter v. Hughes Communications, Inc.,*
   682 F. Supp. 2d 1031 (N.D. Cal. 2010).....................................8, 32

*Wang Labs., Inc. v. Kagan,* 990 F.2d 1126 (9th Cir. 1993) .............................33

### STATE CASES

*EpicentRx, Inc. v. Superior Court,* 572 P.3d 1 (Cal. 2025)...............................31

*Maldonado v. Fast Auto Loans, Inc.,*
   275 Cal. Rptr. 3d 82 (Cal. Ct. App. 2021) ................................29, 30

iv

Page

State Cases—continued:

*McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017)..............................................28

*Mejia v. DACM Inc.*, 268 Cal. Rptr. 3d 642 (Cal. Ct. App. 2020) ....................29

*Nedlloyd Lines B.V. v. Superior Ct.*, 834 P.2d 1148 (Cal. 1992) ....26, 27, 28, 31

*Olinick v. BMG Ent.*, 42 Cal. Rptr. 3d 268 (Cal. Ct. App. 2006)........................32

*Ramsey v. Comcast Cable Commc'ns, LLC,*
317 Cal. Rptr. 3d 561 (Cal. Ct. App. 2023) ..............................................29, 30

## STATUTES

12 U.S.C.
§ 5801.....................................................................................................14, 15
§ 5802..................................................................................................*passim*
§ 5803.....................................................................................................15, 16
§ 5806...........................................................................................................24
28 U.S.C. § 1292 ............................................................................................3, 5

## OTHER AUTHORITIES

Fed. Rsrv. Bank of N.Y., *Secured Overnight Financing Rate Data,*
https://www.newyorkfed.org/markets/reference-rates/sofr (last
visited Jan. 26, 2026)..................................................................................25

H.R. Rep. No. 117-206 (2021) ............................................................................20

House Legislative Counsel's Manual on Drafting Style,
HLC No. 117-2, § 351 (2022).................................................................17, 18

## INTRODUCTION

Although styled as a claim under California's Unfair Competition Law, this is not a consumer protection, monopolistic behavior, or fraud case. The dispute here instead is about the meaning of a federal statute, the LIBOR Act, and how it bears on the contracts governing PennyMac's Preferred Shares. Plaintiff does not dispute that the LIBOR Act preserves contracts with fallback provisions containing a benchmark replacement not based on LIBOR. PennyMac's contracts provide such a fallback: the fixed dividend rates, which are not based on LIBOR and function in its absence.

Plaintiff seeks to override these express agreed terms, arguing that PennyMac's fallback provisions do not qualify because (he says) the statutory definition of "benchmark replacement" categorically excludes fixed rates. But the statute makes no such distinction, and Plaintiff's approach would stretch the LIBOR Act's reach to negate *any* agreement by contracting parties to fall back to a fixed rate in the absence of LIBOR. That is not the law that Congress wrote, and none of Plaintiff's strained grammatical arguments overcome the well-established statutory interpretation principles that words are generally given their ordinary meaning and that each clause is to be given effect.

1

Because PennyMac's dividend rates are qualifying "benchmark replacements," Plaintiff cannot state a claim under the UCL: complying with the LIBOR Act is neither "unlawful" nor "unfair."

Even assuming Plaintiff alleged a violation of the LIBOR Act, his UCL claim cannot proceed because Maryland law applies. Plaintiff contends that applying Maryland law would contravene "fundamental" California policy because he seeks a "public injunction" not available under Maryland law. But Plaintiff's attempt to shoehorn shareholder rights issues into a consumer-protection framework falls flat. No genuine conflict exists between Maryland and California law regarding the remedies available to Plaintiff—and even if such a conflict did exist, Plaintiff seeks a remedy that would benefit only himself and similarly situated shareholders: quintessentially "private" injunctive relief. Nor does California have a materially greater interest than Maryland in applying its law to resolve this lawsuit—which was brought by a New Jersey resident and concerns how a Maryland entity should calculate dividends pursuant to its Maryland governing documents.

This Court should reverse and remand with instructions to grant Defendants' motions to dismiss.

2

## ARGUMENT

### I.    This Court Has Jurisdiction Under Section 1292(b).

Plaintiff first seeks to relitigate the decisions of the district court and a motions panel of this Court to allow this appeal, advancing the same arguments that have twice been rejected.  But the district court properly found that the Section 1292(b) factors were satisfied, and the motions panel acted well within its discretion in accepting certification.  *See Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011) (explaining that "we defer to the ruling of the motions panel").  Since then, the parties have briefed the merits extensively, and no impediment to resolving the appeal has emerged. The Court should continue to exercise jurisdiction.[1]

### A.    The LIBOR Act Issue Is Suitable for Immediate Appeal.

Plaintiff does not dispute that the LIBOR Act issue presents a "controlling question of law," the resolution of which "may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  Plaintiff instead argues (at 24–25) that no "substantial ground" exists for a difference of opinion because, as "[t]his is the first and only litigation arising out of the

---

[1] Plaintiff agrees (at 23) that, if this Court has jurisdiction over even one question, it may address "any issue fairly included within the certified order because it is the *order* that is appealable." *Roth v. Foris Ventures, LLC*, 86 F.4th 832, 836 (9th Cir. 2023) (cleaned up).

3

LIBOR Act," no "caselaw" conflicts with the district court's construction of the Act.

This Court has already rejected that argument. Although "the mere presence of a disputed issue that is a question of first impression, *standing alone*, is insufficient to demonstrate a substantial ground for difference of opinion," *Couch v. Telescope Inc.*, 611 F.3d 629, 634 (9th Cir. 2010) (emphasis added), "when novel legal issues are presented, on which fair-minded jurists might reach contradictory conclusions, a novel issue may be certified for interlocutory appeal without first awaiting development of contradictory precedent," *Reese*, 643 F.3d at 688.

Here, the question presented is both "novel" and one "on which fair minded jurists might reach contradictory conclusions." *Id.* The district court's order on the motions to dismiss highlights the absence of any "relevant authority analyzing the construction [of the Act]," 1-ER-17, and its certification order reaffirmed the novelty of the question presented, 2-ER-43. The district court itself recognized that "reasonable jurists could disagree" with its analysis on the LIBOR Act issue in "light of the competing principles of statutory interpretation, the ambiguity of the statute, and the differing—

4

yet plausible—interpretations of the parties." 2-ER-43. This is precisely the kind of legal issue that Section 1292(b) certification exists to address.

Plaintiff's contention (at 25) that no room for disagreement exists because Defendants failed "to point to *any* legal concept, treatise, or academic article to support their interpretation" of the LIBOR Act is not a serious argument. Defendants ground their interpretation of the Act in bedrock principles of statutory interpretation, as articulated and applied by this Court and the Supreme Court. *See infra* pp. 8–23; Defendants Br. 20–47. If these basic principles do not qualify as "legal concept[s]" supporting Defendants' "interpretation" of the Act, it is hard to know what could.[2]

### B.   The Choice-of-Law Issue Is Suitable for Immediate Appeal.

As to the choice-of-law issue, Plaintiff does not dispute that the question presented is "controlling" or that an immediate appeal "may materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), because if the "Ninth Circuit determines Maryland law should apply," then

---

[2] Plaintiff suggests (at 25) that "the industry agrees" with his interpretation because "the majority of PennyMac's competitors adopted SOFR." But the only specific competitor the Complaint mentions is Bank of America, 2-ER-311, and it does not provide Bank of America's fallback language to evaluate. A conclusory allegation about a single institution's unknown "agreement" says nothing about how to interpret the statute.

"Plaintiff's only claim would be dismissed." 2-ER-39; *see* Defendants Br. 48–49.

Plaintiff instead argues (at 26) that the choice-of-law inquiry presents a "mixed question of law and fact" unsuitable for interlocutory appeal. Not so. The district court concluded that California law applies because, in its view, the application of Maryland law "conflicts with a fundamental policy of California's consumer protection laws" regarding available remedies. 1-ER-13. Determining whether such a conflict exists requires comparing the remedies available under each state's law, not sifting through evidence or weighing competing factual narratives. Thus, the inquiry here "demands a purely legal analysis and requires no factual record." *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 445 (D.N.J. 2012); *see also Dupree v. Younger*, 598 U.S. 729, 735 (2023) ("[P]urely legal issues" are those "that can be resolved without reference to any disputed facts.").[3]

Plaintiff cites *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207 (9th Cir. 2001). But even there, the Court recognized that—because the "relevant facts" were "largely undisputed"—it was "making primarily legal

---

[3] The background facts that inform the analysis are basic and undisputed: PennyMac Mortgage Investment Trust is a Maryland entity, 2-ER-305, and Plaintiff seeks an equitable remedy, 2-ER-319.

determinations." *Id.* at 1210. Other of this Court's decisions likewise recognize that the choice-of-law inquiry presents a "*question of law* subject to de novo review." *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1322 (9th Cir. 2012) (emphasis added).

Plaintiff next argues (at 27) that no substantial grounds exist for a difference of opinion. Here, too, the district court disagreed, recognizing that the choice-of-law question "presented a difficult issue that ha[s] not directly been decided by the Ninth Circuit." 2-ER-40; *see* 1-ER-12. Plaintiff nevertheless contends (at 27) that the choice-of-law question is cut and dried because some courts have held that other "private attorney general" statutes "represent *fundamental policies* that outweigh a choice-of-law clause." But those holdings say nothing about whether the UCL itself embodies a fundamental California policy. Indeed, most courts have found "that [the] UCL itself *does not* represent a fundamental policy of California," *Fang v. CMB Exp. Infrastructure Inv. Grp. 48, LP*, 773 F. Supp. 3d 963, 986 (E.D. Cal. 2025) (emphasis added) (collecting cases), and Plaintiff does not cite any cases supporting the notion that private injunctive relief under the UCL, as Plaintiff seeks (*see infra* pp. 30–32), represents such a policy.

7

Further, as the district court recognized, "other courts have disagreed with the reasoning" of the decision on which it relied, *Walter v. Hughes Communications, Inc.*, 682 F. Supp. 2d 1031 (N.D. Cal. 2010), and "found that a difference in remedies between two forums is insufficient to hold a choice-of-law provision unenforceable." 2-ER-40 (citing cases). This split among the district courts is perhaps "the best indication[] that there are substantial grounds for disagreement." *Doe 1 v. Github, Inc.*, 2024 WL 4336532, at *2 (N.D. Cal. Sept. 27, 2024).

## II. Because PennyMac Complies with the LIBOR Act, Plaintiff Cannot State a Claim Under the UCL.

### A. PennyMac's Actions Comply with the LIBOR Act and Are Not "Unlawful."

The dispute in this case is narrow. The parties agree that "benchmark replacements" not based on LIBOR or bank polling are preserved, and that contracts containing such rates need not switch to SOFR. The parties also agree that, after disregarding certain provisions as directed by the LIBOR Act, PennyMac's Articles Supplementary call for dividends to be issued at the fixed dividend rates. The question for this Court to resolve, therefore, is whether PennyMac's fixed dividend rates qualify as "benchmark replacements." The answer to that question is clear: Yes, PennyMac's initial dividend rates are "benchmark replacements." As explained in Defendants'

8

opening brief, the definition of "benchmark replacement" includes any "dividend rate" that a contract provides as a fallback for a LIBOR-based rate. And because PennyMac's rates are not based on LIBOR or polling, issuing dividends at those rates complies with the LIBOR Act. *See* Defendants Br. 21–48.

Plaintiff's attempt to get around this plain reading fails. Plaintiff argues that the dividend rates remaining in PennyMac's fallback provisions do not qualify as "benchmark replacements" because they are fixed rates. Plaintiff would therefore read PennyMac's fallbacks out entirely. But the statute does not preclude a fixed rate from constituting a "benchmark replacement," and Plaintiff's efforts to conjure such a bar run contrary to the Act's text and well-established principles of statutory interpretation. Because PennyMac complied with the LIBOR Act, Plaintiff fails to state a claim under the UCL's "unlawful" prong, and the district court's decision should be reversed.

### 1. The Articles Contain a Clearly Defined and Practicable Fallback Provision.

Plaintiff first contends (at 30) that the Articles do not provide a clearly defined, practicable fallback because they were not "drafted in contemplation of LIBOR's permanent cessation." But Congress recognized that "a number of contracts … did not contemplate the permanent cessation of LIBOR," 2-

9

ER-102, and yet did not require qualifying fallbacks to address or otherwise contemplate the permanent cessation of LIBOR. Instead, the Act expressly defines the term "benchmark replacement" as including rates "to replace … any interest rate or dividend rate based on LIBOR, whether on a *temporary*, permanent, or indefinite basis, under or with respect to a LIBOR contract." 12 U.S.C. § 5802(3) (emphasis added); *see* Defendants Br. 35–36.

Plaintiff argues (at 43) that the relevant language—"whether on a temporary, permanent, or indefinite basis, under or with respect to a LIBOR contract," 12 U.S.C. § 5802(3), "speaks to *how LIBOR is being used in the contract*, and not whether you can convert contractual use for one purpose to another (temporary to permanent)." That argument misreads the statute. The "under or with respect to" language defines *where* the replacement rate is found (under or with respect to a LIBOR contract), not *how* LIBOR is being used within that contract. And the "temporary, permanent, or indefinite" language refers to the anticipated duration of the replacement itself.

Plaintiff also argues (at 31) that fallback provisions are not "practicable" because the Articles include provisions (in Section 4(a)) describing when the rate would float. But Plaintiff's fixation on Section 4(a) ignores Section 4(g)—even though the former expressly looks to the latter to set the appropriate

10

rate. Section 4(g) provides that the dividends would be issued at a floating rate only if the "Three-Month LIBOR" definition pointed to an applicable floating rate—and in these circumstances, as Plaintiff has conceded, it does not. *See* 2-ER-219–20 ("The final clause at the end of the waterfall in Section 4(g) points to a fixed rate."); *see* Defendants Br. 36–37. Further, even if Section 4(g) contradicted Section 4(a), the specific language within Section 4(g)'s definition would override the more general language elsewhere. *See* Defendants Br. 36–37 & n.5 (collecting authorities). Plaintiff offers no argument or authority to the contrary.

### 2. The Language of the Statute Does Not Reflect an Appositive.

Plaintiff hangs his interpretation of the Act on a single textual thread. Specifically, Plaintiff argues (at 34–39) that, when the statute defines "benchmark replacement" as "a benchmark, or an interest rate or dividend rate," 12 U.S.C. § 5802(3), the clause "or an interest rate or dividend rate" is merely "an appositive phrase" that explains the statutory term "benchmark," *id.* § 5802(1). Thus, in Plaintiff's view, a "benchmark replacement" must be a "benchmark," and only a "benchmark." That interpretation is untenable.

Most conspicuously, Plaintiff "offer[s] no account of what function" the clause "would serve on [his] proposed interpretation." *Advoc. Health Care*

11

*Network v. Stapleton*, 581 U.S. 468, 477 (2017). His only assertion (at 36) is that, as an appositive, it "explain[s]/define[s]" the statutory term "benchmark"—a term that Congress already defined in Section 5802(1).[4] Plaintiff thus concedes that, on his interpretation, the clause "does no independent work." *Pulsifer v. United States*, 601 U.S. 124, 142 (2024).[5]

That kind of superfluity, in and of itself, refutes Plaintiff's reading. It is a "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." *Connell v. Lima Corp.*, 988 F.3d 1089, 1109 (9th Cir. 2021); Defendants Br. 31–32. And that "cardinal rule" applies with special force where—as here—the language at issue is "so evidently designed to serve a concrete function": expanding the potential replacement rates beyond benchmarks to other interest and dividend rates. *Pulsifer*, 601 U.S. at 143; *see Duncan v. Walker*, 533 U.S. 167, 174–75 (2001). Plaintiff's interpretation would strike two of the three options the statute authorizes—all on the dubious theory that Congress was repeating itself. Defendants'

---

[4] Elsewhere, Plaintiff suggests (at 33) that the "appositive clause" "narrows" or perhaps provides "additional context" to the definition of "benchmark." That Plaintiff cannot identify the clause's function only underscores the weakness of the argument.

[5] Plaintiff affirmatively argued as much below, assuring the district court it could simply "remov[e]" the appositive clause. *See* 2-ER-219.

12

interpretation, by contrast, "assume[s]" that "Congress used [three] terms because it intended each term to have a particular, nonsuperfluous meaning." *Bailey v. United States,* 516 U.S. 137, 146 (1995).

Plaintiff's "appositive clause" argument poses further problems. For one thing, Plaintiff offers no response to the Supreme Court in *Woods,* which recognized that an "appositive" is "a word or phrase that is *synonymous* with what precedes it." *United States v. Woods*, 571 U.S. 31, 45 (2013) (emphasis added) ("Batman or the Caped Crusader"). As Defendants explained, "an index of interest rates or dividend rates," 12 U.S.C. § 5802(1) (definition of "benchmark"), is not "synonymous" with "an interest rate or dividend rate," *id.* § 5802(3). *See* Defendants Br. 32. An "index of rates" (plural) denotes a variable rate—one that fluctuates as the underlying index moves. "An interest rate or dividend rate" (singular),[6] by contrast, may encompass either a fixed or variable rate.

For another, Plaintiff does not even attempt to explain *why* Congress would—in Plaintiff's words (at 36)—"explain/define" a statutory term that it

---

[6] In quoting the relevant clause, Plaintiff repeatedly omits the indefinite article, "an," preceding "interest rate or dividend rate." *Compare, e.g.,* Plaintiff Br. at 21, 35, 36, *with* 12 U.S.C. § 5802(3) ("or *an* interest rate or dividend rate" (emphasis added)).

*already defined in the very same section of the Act.* 12 U.S.C. § 5802(1). It strains credulity to think that, having defined the term "benchmark" with precision in Section 5802(1), Congress would then deploy an appositive phrase to redefine the term—using different words with different meanings—two doors down in Section 5802(3). *See* Defendants Br. 32–33. Plaintiff does not dispute that, if Congress wanted "benchmark replacements" to encompass only "benchmarks," there was an obvious solution: excise the second clause in Section 5802(3). Presumably, Congress did not adopt that approach because it intended for the clause to have a "meaningful role." *Bailey*, 516 U.S. at 146; *see* Defendants Br. at 31–32.

Trying another tack, Plaintiff argues (at 39–43) that the LIBOR Act's "findings and purpose" section indicates that Section 5802(3)'s second clause is an appositive. Specifically, Plaintiff contends (at 42) that, because 12 U.S.C. §§ 5801(a) and 5801(b) refer to "replacement benchmark rate[s]," rather than "benchmark replacement rates," the purpose "requires that whatever replaces LIBOR"—*i.e.*, the "benchmark replacement"—"must first and foremost be a benchmark."

Binding law is clear, however, that statutory statements of purpose "cannot override a statute's operative language." *Sturgeon v. Frost*, 587 U.S.

14

28, 57 (2019) (cleaned up); *see State v. Su*, 121 F.4th 1, 8 (9th Cir. 2024) (statement of purpose "does not limit or expand the scope of an operative clause" (cleaned up)); *Jogi v. Voges*, 480 F.3d 822, 834 (7th Cir. 2007) (collecting cases and explaining that "[i]t is a mistake to allow general language of a preamble to create an ambiguity in specific statutory … text where none exists."). And the operative language here is clear: a "benchmark replacement" is *not* limited only to a "benchmark." *See supra* pp. 8–14; Defendants Br. 29–30.

Moreover, Defendants' interpretation of the Act advances Congress's goals. In enacting the LIBOR Act, Congress sought "to allow existing contracts that reference LIBOR but provide for the use of a clearly defined and practicable replacement rate, to operate according to their terms." 12 U.S.C. § 5801(b)(3). As Defendants explained in their opening brief, the statutory definitions and operative provisions advance that purpose. *See* Defendants Br. 42–43.[7]

---

[7] Plaintiff seeks to downplay this statement of purpose by citing 12 U.S.C. § 5803(e). This provision, Plaintiff says (at 42), "demonstrates Congress's intention that the replacement benchmark have some degree of comparability." This section, however, provides that the Board will adjust *only* the "Board-selected benchmark replacement"—*i.e.*, SOFR—to "include the relevant tenor spread adjustment." *Id.* § 5803(e)(1); *see id.* § 5802(6)

Finally, the practical implications of Plaintiff's interpretation confirm its implausibility. Under Plaintiff's reading, a "benchmark replacement" could *never* be a fixed rate under any circumstance—even if the parties agreed to a contract that expressly stated, for example, that "If LIBOR is permanently unavailable for any reason, we agree that the securities will pay a dividend at a fixed rate of 10%." In Plaintiff's view, the LIBOR Act would disrupt that agreement because the fixed rate would not be a "benchmark replacement." In no world is that consistent with the operative statutory text—which does not mention fixed rates—or Congress's desire to preserve fallback rates that are "not based in any way on any LIBOR value …." 12 U.S.C. § 5803(f)(2); Defendants Br. 6–7.

### 3. Plaintiff's Objections to Defendants' Interpretation Are Unavailing.

Finding little support for his "appositive clause" theory, Plaintiff devotes the bulk of his efforts to nitpicking Defendants' interpretation. Specifically, Plaintiff contends (at 34–36) the definition of "benchmark replacement" cannot introduce a "series of three distinct elements" because

---

(defining "Board-selected benchmark replacement"). It says nothing about benchmark replacements *other than* SOFR.

16

"rules of grammar" and the House Legislative Counsel's Manual on Drafting say so. His arguments do not withstand scrutiny.

Plaintiff first argues (at 34–35) that the absence of a serial comma means the definition does not convey "a series of elements." The lack of such a comma, however, "cannot bear that much weight, given the compelling textual evidence to the contrary." *Woods*, 571 U.S. at 45. Crucially, the absence of a comma has its own function. As written, the parenthetical at the end of the clause—"or an interest rate or dividend rate (which may or may not be based in whole or in part on a prior setting of LIBOR)"—applies to both an interest rate and a dividend rate. Inserting a comma prior to "or dividend rate," as Plaintiff insists is necessary to indicate a series, would materially alter the clause, leaving the parenthetical to modify only the last item in the series ("dividend rate") rather than both items ("interest rate or dividend rate"). 12 U.S.C. § 5802(3).

It makes sense, then, that those two alternatives are grouped together within a single clause. Indeed, the legislative drafting manual on which Plaintiff relies contemplates that the form in which a series is listed may be affected by how modifiers apply within that series. *See* House Legislative Counsel's Manual on Drafting Style, HLC No. 117-2, § 351, p. 45 (2022). The

17

manual likewise admonishes drafters to "[k]now when to deviate"—an acknowledgment that drafting conventions are guidelines, not straitjackets, and may be set aside when clarity demands. *See id.* at 49.

Plaintiff seeks to sidestep this issue by suggesting (at 35) that, had Congress intended to create a list, it also would have excised the comma at the end of the parenthetical. But in that scenario, it would be unclear how the limiting parenthetical would apply: it could modify only the immediately proceeding noun, "dividend rate," (under the "rule of the last antecedent," *Lockhart v. United States*, 577 U.S. 347, 351 (2016)), or all three of "benchmark," "interest rate" and "dividend rate," (under the "series-qualifier principle," *id.* at 365 (Kagan, J., dissenting)). In either case, Plaintiff's hypothetical alternative would alter the meaning of the clause.

Plaintiff also (at 35) cites the drafting manual to argue that when Congress creates a list, it includes the conjunction "or" at "the end of the next to-last item only." The cited rule, however, applies only "[i]f the list is preceded by a dash"—which is not the case here. House Legislative Counsel's Manual on Drafting Style, HLC No. 117-2, § 351, p. 44 (2022).

The same logic disposes of Plaintiff's argument that context supports an atypical reading of the word "or." In Plaintiff's view (at 37), "[r]eading the

18

first 'or' in the definition of 'benchmark replacement' as disjunctive is contrary to both accepted rules of grammar and the House Legislative Counsel's Manual on Drafting." As just explained, though, Plaintiff's arguments about serial commas and the drafting manual miss the mark. *See supra* pp. 16–18. None of Plaintiff's arguments can therefore overcome the presumption that "or" is "almost always disjunctive." *Woods*, 571 U.S. at 45–46.

Plaintiff also disputes (at 38) Defendants' reliance on the presumption of consistent usage, contending that *Brown v. Gardner*, 513 U.S. 115, 118 (1994) is inapposite because the Court was not considering a word as "ubiquitous and variable as 'or.'" But "or" is exactly the word the Court applied the presumption to in *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88 (2018) (citing *Brown*, 513 U.S. at 118). *See* Defendants Br. 33–34.

Finally, Plaintiff argues (at 21) in passing that the Act's "title" cuts against reading the definition of "benchmark replacement" to include "fixed value[s]." But a title is a tenuous basis for interpreting the "detailed provisions" of the operative text and cannot override that text's plain meaning. *Lawson v. FMR LLC*, 571 U.S. 429, 446 (2014). The statute means what it says—a benchmark replacement may be a "benchmark," "interest rate," or "dividend rate"—and binding precedent requires that it be applied as written.

19

### 4. The Legislative History Does Not Support Plaintiff's Interpretation.

Plaintiff (at 44) relies on statements from the legislative history to argue that Congress intended to prevent the "conversion of floating rate instruments into fixed-rate instruments." But legislative history has no role to play here because the statutory text and context provide a clear answer. *See Rajaram v. Meta Platforms, Inc.*, 105 F.4th 1179, 1185 (9th Cir. 2024). So even if Plaintiff's "scant" snippets gave contrary signals (they do not), this Court should reject Plaintiff's attempt to use "ambiguous legislative history to muddy clear statutory language." *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011).

In any event, the legislative history does not support Plaintiff's position that a benchmark replacement can never be a fixed rate. As an initial matter, Plaintiff offers not a word about the House Committee Report—which in the genus of legislative history is the highest form of life. *See Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1082 (9th Cir. 1999). That omission is both telling and unsurprising, as the Report makes clear that Congress sought to preserve the non-LIBOR, non-polling provisions of contracts with workable replacements (like PennyMac's). *See, e.g.*, H.R. Rep. No. 117-206, at 8 (2021) ("This bill is designed to affect only those instruments, which according to

20

their terms, would require a calculation based on LIBOR after it is no longer published."); *see* Defendants Br. 42.[8]

Plaintiff instead relies (at 44–45) on two stray remarks from the legislative record—precisely the sort of legislative history that this Court has long cautioned against relying on. *See* Defendants Br. 40–41 (collecting authorities). The first is from Rep. Brad Sherman, who said that Congress was "dealing … with adjustable rate mortgages, business loans and securities." 2-ER-197. But no one disputes the thrust of Rep. Sherman's statement—that LIBOR was the benchmark for many "adjustable rate" contracts, and that Congress sought to repair those contracts if they would no longer function after LIBOR's cessation. *See* Defendants Br. 6. Rep. Sherman's statement does nothing to support Plaintiff's theory that the LIBOR Act overrides *any* agreement by contracting parties to fall back to a fixed rate.

---

[8] Plaintiff says (at 47) that Defendants "ignore the context" from *Hertzberg*, 191 F.3d at 1082. When considering legislative history this Court has long considered committee reports, not "[s]tray comments by individual legislators" or congressional witnesses. *In re Kelly*, 841 F.2d 908, 912 n.3 (9th Cir. 1988).

The second is from Mark Van Der Weide, a congressional witness who testified before a House Subcommittee in April 2021—nearly one year before the LIBOR Act became law—in which he voiced aspirations for what the statute "should" do. 2-ER-107. But statements from non-members of Congress shed no light on what *Congress* actually intended or enacted. *See* Defendants Br. 40–42 (collecting cases). Plumbing the depths of witness statements when the members are silent is truly "an exercise in looking over a crowd and picking out your friends." *Exxon Mobil v. Allapattah Servs.*, 545 U.S. 546, 568 (2005) (cleaned up).

Plaintiff inveighs (at 47) that Defendants cannot "locate a scintilla of testimony" to support their interpretation. But if the Court were to consider individual comments or testimony, numerous representatives and congressional witnesses made clear that Congress sought to repair only contracts that could not "continue to function" and were not "feasible" to amend, not to preclude parties from applying fallbacks to fixed rates. *See, e.g.,* Statement of Rep. Sherman, 2-ER-109 (draft bill "involve[s] inserting government only where the parties did not make an agreement that can be carried out"); Statement of Rep. Huizenga, 2-ER-99–100 ("One of the biggest challenges … is the thousands of existing legacy contracts that … do not

22

contain contractual, 'fallback language,' that allows for the contract to be amended, and continue to function should LIBOR be discontinued."); Testimony of Brian Smith, Deputy Assistant Secretary for Federal Finance, U.S. Department of the Treasury, 2-ER-105 (legislation necessary for "contracts that do not specify a workable fallback rate and are not feasible for private-sector actors to modify on their own"); Testimony of Kevin Walsh, Deputy Comptroller for Market Risk Policy, Office of the Comptroller of the Currency, 2-ER-109 (concern about litigation over "contracts that do not have fallback language").

\* \* \*

Plaintiff's interpretation of the Act defies the plain language of the statute and is inconsistent with Congress's intent—stated within the statute itself—to allow contracts with non-LIBOR fallbacks to operate according to their terms. This Court should reject that proposed interpretation, and instead honor the Act's statutory language and the terms the parties themselves agreed to in the Preferred Shares' governing documents.

**B.    PennyMac's Compliance with the LIBOR Act Does Not Give Rise to an "Unfair" Claim.**

Plaintiff argues (at 49) that, even if "PennyMac's actions were found to be lawful," he still can state a UCL claim under the "unfairness" prong. That

23

is wrong. As the district court recognized, Plaintiff's "unfair" theory is "premised on Defendants' purported violation of the LIBOR Act," 2-ER-43, so the two theories fall together. *See* Defendants Br. 45–46.

First, Plaintiff does not dispute that the LIBOR Act preempts any state law that would impose a different benchmark replacement rate than the Act. *See* 12 U.S.C. § 5806(1). Plaintiff instead contends (at 52) that federal preemption "does not apply" because the "UCL is silent as to benchmarks, benchmark replacements, and SOFR." That argument misses the point. What is preempted is Plaintiff's claim that—even if PennyMac's current rate is set in accordance with the LIBOR Act (which it is)—the UCL nonetheless can require a different rate. *See Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 556 (9th Cir. 2010). On that, Plaintiff offers no response.

Second, Plaintiff barely engages with the UCL's safe harbor for government-permitted conduct, which independently protects Defendants from liability. Plaintiff's sole argument (at 51) is that safe harbor does not apply because Defendants' "conduct is not expressly authorized by the Act." But that argument fails for the reasons described above and in Defendants' opening brief: the LIBOR Act directs that contractual fallbacks that do not rely on polling or LIBOR are to be given effect. This is not a situation where

24

the Act is silent on the pertinent issue; instead, the Act provides direction for all contracting parties to follow when evaluating fallback provisions, and Defendants followed that direction to the letter. *See* Defendants Br. 46–47.

Finally, Plaintiff devotes several pages (at 48–51) to discussing the UCL's various "unfairness" tests. That unfairness analysis matters only if Plaintiff's claim survives federal preemption and the UCL's safe harbor, which it does not. In any event, there is nothing "unfair" about issuing dividends at a rate that complies with the governing contracts and federal law. Relying on facts outside the record—and without any citation—Plaintiff suggests (at 50) that a SOFR-based rate is invariably higher than PennyMac's initial rates. But interest rates fluctuate over time and are currently declining. *See* Fed. Rsrv. Bank of N.Y., *Secured Overnight Financing Rate Data*, https://www.newyorkfed.org/markets/reference-rates/sofr (last visited Jan. 26, 2026). Defendants' basic point stands: PennyMac's initial rates do not inherently favor one party over another, and it would *not* be fair to deviate from the plain terms of the Articles to benefit one class of shareholders (the Preferred Shareholders) over another (the common shareholders). *See* Defendants Br. 48.

III. **The Choice-of-Law Provision Is Enforceable, So Maryland Law Governs and Plaintiff Cannot State a Claim Under the UCL.**

Plaintiff does not dispute that his claim falls within the scope of PennyMac's choice-of-law provision or that Maryland has a substantial relationship with the parties and their transaction. *See* Defendants Br. at 50–52. Nor does Plaintiff dispute that, if the choice-of-law provision is "enforceable," Plaintiff's "only claim would be dismissed." 2-ER-39. Plaintiff instead contends (at 53, 58) that the choice-of-law provision is unenforceable because "Maryland law is contrary to California's fundamental policy" regarding "public injunctions," and "California's interests in the litigation trump Maryland's interests." Each argument misses the mark.

## A. Maryland Law Does Not Contravene Fundamental California Policy.

To establish that the "chosen law" is "contrary to a fundamental policy of California," the choice-of-law clause's opponent must first establish that the laws of the two jurisdictions actually "conflict." *Nedlloyd Lines B.V. v. Superior Ct.*, 834 P.2d 1148, 1152 (Cal. 1992). "If there is no such conflict, the court shall enforce the parties' choice of law." *Id.*

Here, as Defendants have explained, Maryland and California do not conflict regarding the remedies available to Plaintiff. *See* Defendants Br. 53–

26

55. In response, Plaintiff does not meaningfully dispute that an order compelling specific performance of a contract "is, essentially, an injunction." *Vasquez v. Rackauckas*, 734 F.3d 1025, 1040 (9th Cir. 2013).[9] Instead, Plaintiff seeks to avoid the issue by asserting (at 56) that, as the "master of the complaint," he "gets to determine which substantive claims to bring."

That is beside the point. The choice-of-law inquiry demands examining each state's law and asking whether they conflict; if they do not, the choice-of-law provision is enforceable, regardless of what "substantive claim" the plaintiff invokes in the complaint. *See Nedlloyd*, 834 P.2d at 1152. Indeed, whenever a court enforces a choice-of-law provision, it necessarily disrupts the specific claim the plaintiff sought to pursue. *See e.g.*, *Pro Water Sols., Inc. v. Angie's List, Inc.*, 2021 WL 124496, at *6 (C.D. Cal. Jan. 13, 2021).

Nor is it "inappropriate" in this case to look beyond consumer protection laws when considering the remedies available under Maryland law to determine if the states' laws conflict. *Contra* Plaintiff Br. at 56. The Articles Supplementary are "a contract between [a Maryland legal entity] and its

---

[9] Plaintiff says (at 56 n.9) that *Vazquez* is irrelevant because the Court was "not issuing a holding." But there the Court was simply restating the settled (and unremarkable) principle that an order compelling specific performance affords essentially the same relief as an injunction to perform the contract. 734 F.3d at 1040 & n.13 (collecting authorities).

27

preferred stockholders under Maryland law that defines the rights of these stockholders in connection with their securities." *Krasner v. Cedar Realty Tr., Inc.*, 86 F.4th 522, 525 (2d Cir. 2023). Accordingly, "[c]laims that arise from the duties listed in the Articles are … treated as breach-of-contract claims." *Kim v. Cedar Realty Tr., Inc.*, 116 F.4th 252, 260 (4th Cir. 2024) (applying Maryland law).

Here, because Plaintiff's claim "arise[s] from" PennyMac's Articles Supplementary, it is most naturally treated as breach of contract claim, not a consumer-protection claim. It thus makes sense to account for the relief available under Maryland corporate and contractual law when asking whether the remedies are inferior to those available under California law. *See* Defendants Br. 53–54. Examining those remedies here makes clear that Plaintiff could seek substantially the same relief in Maryland—thus rendering illusory any putative "conflict." That alone is reason to enforce the choice-of-law provision. *See Nedlloyd*, 834 P.2d at 1152.

Further, even if California and Maryland law did conflict, proceeding under Maryland law here would not contravene a "fundamental California policy." *See* Defendants Br. 56–63. Plaintiff is not seeking "*public* injunctive relief under the UCL." *McGill v. Citibank, N.A.*, 393 P.3d 85, 94 (Cal. 2017)

28

(emphasis added). As Defendants' opening brief explains, Plaintiff seeks an injunction to resolve a dispute between PennyMac and a putative class of shareholders over the meaning of the Articles Supplementary. *See* Defendants Br. 57–58. And that sort of "injunctive relief"—which is "aimed at regulating the substantive terms of contractual arrangements"—is "private injunctive relief that primarily benefits those who enter into such contracts." *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 546 (9th Cir. 2021).

Plaintiff's primary response (at 55) is that a California Court of Appeals has "rejected *Hodges* as inconsistent with California law." *See Ramsey v. Comcast Cable Commc'ns, LLC*, 317 Cal. Rptr. 3d 561 (Cal. Ct. App. 2023). In *Ramsey*, the court adopted the reasoning of two earlier court of appeals decisions. *See id.* at 568 ("follow[ing]" the reasoning of *Mejia v. DACM Inc.*, 268 Cal. Rptr. 3d 642 (Cal. Ct. App. 2020) and *Maldonado v. Fast Auto Loans, Inc.*, 275 Cal. Rptr. 3d 82 (Cal. Ct. App. 2021)).

In *Hodges*, however, this Court expressly rejected *Mejia* and *Maldonado*—the cases relied on by *Ramsey*—because they "rest[ed] on such a patent misreading of California law" that this Court did not think they "would be followed by the California Supreme Court." *Hodges*, 21 F.4th at 544. The California Supreme Court has not adopted the *Mejia* and

29

*Maldonado* approach, and *Hodges* remains good law in this Circuit. *See, e.g.*, *Martinez v. Refinitiv, Ltd.*, 2024 WL 5424373, at \*5 (C.D. Cal. Nov. 14, 2024) (refusing to "disregard the Ninth Circuit's conception of public injunctive relief in *Hodges*"); *Stout v. Grubhub Inc.*, 2021 WL 5758889, at \*7 n.4 (N.D. Cal. Dec. 3, 2021) (same).[10]

Plaintiff's backup argument is that his proposed injunction is "public" under *Hodges*. Specifically, Plaintiff contends (at 55–56) that his suit is really about the false advertising of shares labeled "floating," when they should be called "fixed." This argument borders on frivolous. Plaintiff is not seeking an injunction to change the names of PennyMac's shares. He is seeking an injunction forcing Defendants to implement a SOFR-based dividend—which would translate directly to the payment of money to a discrete class of PennyMac preferred shareholders. 2-ER-319. Under *Hodges*, Plaintiff is not seeking a "public injunction."[11]

---

[10] "[D]ecisions of the California Courts of Appeal … do not bind" this Court. *Doe v. Uber Techs., Inc.*, 90 F.4th 946, 949 (9th Cir. 2024).

[11] Even under *Ramsey*, the relief Plaintiff seeks is not a "public injunction" because here, unlike there, "the relief" Plaintiff seeks *will* "compensate him for the ascertainable loss of money" he alleges in this lawsuit. 317 Cal. Rptr. 3d at 570 (internal quotation marks omitted).

30

Plaintiff's request for purely *private* injunctive relief does not implicate any fundamental California policy. *See* Defendants Br. 58–63. Plaintiff does not argue otherwise, repeatedly characterizing his requested injunction as "public," Plaintiff Br. 23, 27, 53–56, and that should be the end of the matter.

None of Plaintiff's additional arguments move the needle. First, Plaintiff disputes (at 57–58) Defendants' reliance on *EpicentRx, Inc. v. Superior Court*, 572 P.3d 1 (Cal. 2025). Plaintiff contends (at 57) that *EpicentRx* is inapposite because it involves a forum selection clause, not a choice-of-law provision. In *EpicentRx*, however, the Court expressly noted that the "fundamental policy" inquiry was "analogous" to the same inquiry for "choice-of-law provisions." 572 P.3d at 11 (citing *Nedlloyd*, 834 P.2d at 1148); *see King v. Bumble Trading, Inc.*, 393 F. Supp. 3d 856, 866 n.1 (N.D. Cal. 2019).

Plaintiff also contends (at 57–58) that *EpicentRx* is distinguishable because the plaintiff was deprived of a procedural right, rather than a substantive one. Although the Court did note that the jury-trial right was procedural, it separately emphasized that the relevant constitutional provision (unlike other statutes deemed fundamental) lacked provisions that "explicitly or implicitly void[ed] a private agreement." *Id.* at 17. *EpicentRx* thus confirms that the absence of an anti-waiver provision is powerful evidence that

a statute's underlying policy cannot override contractual terms—a principle that applies with equal force to choice-of-law provisions. *See Olinick v. BMG Ent.*, 42 Cal. Rptr. 3d 268, 282 (Cal. Ct. App. 2006); *see also* Defendants Br. 60–61.[12]

Finally, Plaintiff (at 54) offers virtually no defense of the decision in *Walter*, 682 F. Supp. 2d at 1042, instead merely restating the court's reasoning without explanation. He does not acknowledge that the court's opinion was primarily devoted to explaining why the CLRA—not the UCL—embodies a "fundamental" California policy. *See* Defendants Br. 62. Nor does he acknowledge that, because of the CLRA's anti-waiver provision, the court flipped the usual burden of proof. *See id.* 62 & n.12. And crucially, he recognizes *Walter* did not consider a request for a private injunction, as Plaintiff requests here.

### B. Maryland's Interest Is Materially Greater Than California's.

Finally, the choice-of-law provision is enforceable for the independent reason that Maryland has a materially greater interest than California in

---

[12] Plaintiff responds (at 59) that *Olinick* is distinguishable because California and New York law granted the plaintiff a similar "cause of action and near identical remedies." But the court there also emphasized that the absence of an anti-waiver provision was a *separate* "factor favoring enforcement" of the choice-of-law provision. *Olinick*, 42 Cal. Rptr. 3d at 282.

applying its law. *See* Defendants Br. 63–67. In arguing the contrary, Plaintiff focuses (at 58–59) almost on entirely on PennyMac's California location. As Defendants have explained, PennyMac's location alone is insufficient to outweigh Plaintiff's lack of connection to California and PennyMac's status as a Maryland legal entity. *See* Defendants Br. at 66–67. Indeed, Maryland's interest here is particularly strong given that PennyMac is a Maryland REIT with shareholders across the country. *See Wang Labs., Inc. v. Kagan*, 990 F.2d 1126, 1129 (9th Cir. 1993).

Plaintiff principally relies on two district court cases (at 58–59), but in each one California had a significantly greater interest than Plaintiff does. *See Jialu Wu v. iTalk Glob. Commc'ns, Inc.*, 2020 WL 8461696, at \*2 n.1 & \*6 (C.D. Cal. Oct. 21, 2020) (plaintiff was California citizen seeking to represent class of California consumers); *Ribbens Int'l, S.A. de C.V. v. Transp. Int'l Pool, Inc.*, 47 F. Supp. 2d 1117, 1122 (C.D. Cal. 1999) (case involving "a California contract concerning California merchandise sold by a company doing substantial business in California from a California facility and to be received by the buyer in California").[13] Here, Plaintiff is a New Jersey shareholder

---

[13] None of Plaintiff's three other cited cases (at 60) involved whether to enforce a choice-of-law provision.

seeking to represent a nationwide class, 2-ER-305, and he does not allege that he purchased shares or was harmed in California.

## CONCLUSION

This Court should reverse and remand with instructions to grant Defendants' motions to dismiss.

Respectfully submitted,

*/s/ Matthew Donald Umhofer*
MATTHEW DONALD UMHOFER
JONAS P. MANN
UMHOFER, MITCHELL & KING
LLP

STEVEN M. FARINA
MELISSA B. COLLINS
WILLIAMS & CONNOLLY LLP
*680 Maine Avenue, S.W.*
*Washington, DC 20024*
*(202) 434-5000*
*sfarina@wc.com*

*767 South Alameda Street*
*Suite 270*
*Los Angeles, CA 90021*
*(213) 394-7979*
*matthew@umklaw.com*

*Counsel for Defendant-Appellant PennyMac Mortgage Investment Trust*

*Counsel for Defendants-Appellants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC*

JANUARY 26, 2026

34

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32, I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Cir. R. 32-1(b) because this brief contains 6,991 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word and Century Expanded 14-point font.

/s/ *Matthew Donald Umhofer*
MATTHEW DONALD UMHOFER

*Counsel for Defendants-Appellants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC*

DATED: JANUARY 26, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Matthew Donald Umhofer*
MATTHEW DONALD UMHOFER

*Counsel for Defendants-Appellants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC*

DATED: JANUARY 26, 2026